Jonah J. Horwitz, Idaho Bar No. 10494
Christopher M. Sanchez, New York Bar No. 5414099
Assistant Federal Defenders
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, Idaho 83702
Telephone: (208) 331-5530
Facsimile:  (208) 331-5559
ECF:  Jonah_Horwitz@fd.org
        Christopher_M_Sanchez@fd.org

Attorneys for Petitioner

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ERICK VIRGIL HALL,<br><br>       Petitioner,<br><br>v.<br><br>TYRELL DAVIS, Warden, Idaho Maximum Security Institution, Department of Correction, State of Idaho,<br><br>       Respondent. | CASE NO. 1:18-cv-218-DCN<br><br>**CAPITAL CASE**<br><br>MEMORANDUM IN SUPPORT OF FIRST MOTION FOR DISCOVERY (DNA) |

For the reasons that follow, Petitioner Erick Virgil Hall respectfully moves the Court to order discovery regarding DNA materials.

## I.    Introduction

Erick Hall stands to be executed for murder in a case where the prosecution's strongest evidence against him proved, at most, that he had sexual intercourse with the victim. However, even this evidence suggested that there was another possible perpetrator. Forensic testing and analysis could conclusively establish that there was another perpetrator, showing that critical physical evidence, including the victim's vaginal samples, contained genetic material from another man. The instant motion seeks discovery for the express purpose of pursuing this forensic testing and analysis, and proving that there was another perpetrator.

This is the first motion for discovery in the instant habeas action. Mr. Hall anticipates moving for additional discovery in the future, but believes that commencing discovery at this stage in the proceeding is essential to developing his habeas claims, and would materially advance the speedy resolution of his petition.

## II.    Facts and Procedural History

In this memorandum, Mr. Hall presents only the background that is relevant to his discovery motion.

Lynn Henneman, a New York-based flight attendant with United Airlines, disappeared during an overnight layover in Boise, Idaho, on September 24, 2000. A-11 at 3411.[1] Two weeks later, investigators recovered her body, which had been found floating in the Boise River. *Id*. at 3412. A forensic pathologist from the coroner's office concluded that she had been strangled to death with a sweater that had been found tied in a single overhand knot around her neck, and the pathologist collected a series of biological samples for additional investigation. *See id*. These samples included multiple vaginal swabs and smears (the "vaginal samples"). *See id*. at 3958.

---

[1] Citations beginning with "A," "B," C," and "D" are to the current state-court lodgings. *See* Dkt. 34 (Notice of Lodging State Court Records).

Additional investigation showed that the vaginal samples contained sperm. A-11 at 4300. Investigators sent those samples to a private laboratory, Cellmark Diagnostics, with instructions that it test the samples and generate genetic profiles that might be used to find the perpetrator. *Id*. at 4303. Testing showed that the sperm fraction contained genetic material from more than one person, but generated a single profile from the strongest material identified (the "primary sperm fraction"). A-12 at 4452, 4461. Investigators compared the primary sperm fraction with genetic profiles generated from biological reference samples obtained from various persons of interest, including Christian Johnson, whom a witness identified as having approached the victim in the final hours of her life at the last place that she had been seen alive (i.e., the Boise Greenbelt). A-11 at 3575–79, 4149–50; A-12 at 4453.

Mr. Johnson was a suspect. *See* A-11 at 4145. Miriam Colon, the witness that identified him, had contacted police. A-11 at 3573. Ms. Colon explained that Mr. Johnson had approached her on the Greenbelt, asked her a series of inappropriate questions that had frightened her, and then approached and spoke with Ms. Henneman. *Id*. at 3575–79. Police contacted Mr. Johnson in the days following Ms. Henneman's disappearance, and he later provided investigators with a written statement claiming that he had overheard a man, 6-feet-8 inches tall, with a stutter, dressed in black, telling someone on a payphone something that sounded like a "disguised confession" about "somebody dying." *Id.* at 3801–06.

Patrick Hoffert, another man that witnesses had seen with Ms. Henneman in the final hours of her life, allegedly admitted to an acquaintance that he had made sure that Ms. Henneman returned to her hotel on the evening that she disappeared, and that he had raped someone. B-13 at 188. Mr. Hoffert committed suicide the day after Ms. Henneman's disappearance. *Id.* Investigators never collected reference samples from Mr. Hoffert, but

concluded that the primary sperm fraction did not match Mr. Johnson or any other person of interest. *See* D-24 at 156; A-11 at 4150. Law enforcement database searches provided no matches, and the case largely went cold. A-11 at 4400.

Two years later, Mr. Hall provided investigators with a reference sample in another investigation. *See* A-11 at 3431. The same laboratory that had generated the primary sperm fraction generated his genetic profile, which matched, and he was charged with murder, rape, and kidnapping. *See id.* at 3431–32. Prior to trial, defense counsel received from the prosecution in discovery a compact disc containing the raw data generated by Cellmark when it conducted its testing. *See* B-27 at 4942.

At trial, the prosecution's case centered on the primary sperm fraction match. *See, e.g.*, A-11 at 3412–13; 3426–28; 3431–32; 3435; A-12 at 5462. Investigators had collected other critical physical evidence, including the sweater that the prosecution alleged that the killer had handled, but never established any direct connection between this evidence and Mr. Hall. B-27 at 4922–23. Investigators even lifted fingerprints from the victim's wallet contents, which had been found set on fire in a field miles from her body, but none matched Mr. Hall. A-11 at 3424. With no other forensic evidence to rely on, the prosecution alleged that the primary sperm fraction itself had provided investigators with the "profile of the killer." *Id.* at 3427.

Kathryn Colombo, the Cellmark employee who had tested the vaginal samples and generated the primary sperm fraction, testified. A-12 at 4429–4534. She explained that Mr. Hall matched the primary sperm fraction. *Id.* at 4464. However, she admitted that her testing had shown that the sperm fraction contained genetic material from more than one person, and further admitted that some of that genetic material had not matched Mr. Hall. *Id.* at 4452, 4465–66.

**Combined vaginal swabs and slide (sperm fraction):**

The data indicate that DNA from more than one individual was obtained from the sperm fraction of the combined vaginal swabs and slide. The DNA obtained from this

B-4 at 746 (alterations added).

As Ms. Colombo explained, the forensic testing that she performed on the victim's vaginal samples ("13-STR testing") amplifies genetic material ("alleles") at thirteen different genetic regions ("loci"). A-12 at 4457–58. Biological samples from one donor generally will contain no more than two alleles at a given genetic region, whereas biological samples from more than one donor (a "mixture") generally will contain more than two alleles at a given genetic region. *See* A-12 at 4487. Ms. Colombo's testing showed that the sperm fraction contained more than two alleles at multiple genetic regions, including an allele ("13") at a genetic region ("D5S818") that did not match Mr. Hall:

| Sample | D3S1358 | vWA | FGA | AMEL | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S20 |
|---|---|---|---|---|---|---|---|---|---|---|
| combined vaginal swabs and slide (NSF) | 16,17 | 14,16 | 21,26 | X | 12,14 | 29,30 | 15,17 | 11 | 11,12 | 9,11 |
| combined vaginal swabs and slide (SF) | 16,17,18 | 15,16,18 | 21,23 | X,Y+ | 12,13,14 | 30 (29) | 10,15 | 11,12,13,14 | 11,12,13 | 8,9.1 |

A-135 (alterations added); *see also* A-12 at 4452, 4465–66.

Ms. Colombo dismissed as a possible explanation that there could have been genetic material from Mr. Johnson, even though she admitted that her testing had shown that he had genetic material that could have matched (i.e., he has an allele 13 at D5S818), and offered various explanations that did not involve genetic material from more than one man. *See* A-12 at 4521, 4529, 4453, 4465–67, 4505. These explanations included that the sperm fraction contained some genetic material from the non-sperm fraction ("carry-over"), and that allele 13

could have resulted from "stutter," "contamination," or "sex with another person two weeks prior to the attack." *Id.* at 4465–67, 4505.

The prosecution framed the primary sperm fraction match as dispositive of guilt on all charges, not just rape. *See* A-11 at 3435 (asking jurors to "find proof beyond reasonable doubt that the only man on the planet whose DNA matches the DNA in Lynn Henneman's vaginal vault is that man there" and "return a guilty verdict against him for murder, for rape and for kidnapping"). It asserted that the match was "more powerful," "more compelling," and "more reliable" than an eyewitness, and that jurors could find guilt beyond reasonable doubt on all charges, including murder, because he "left his genetic code inside her." *Id.* at 3412.

Mr. Hall was found guilty and sentenced to death. A-12 at 4670–71, 5522–25. In initial post-conviction proceedings before the state district court, Mr. Hall's attorneys argued that trial counsel had rendered ineffective assistance in failing to present expert testimony that could have challenged Ms. Colombo's testimony regarding the sperm fraction and her various explanations for the presence of genetic material that had not matched Mr. Hall. B-7 at 1343–46. Dr. Greg Hampikian, an expert retained by Mr. Hall for the post-conviction proceedings, swore in an affidavit that Ms. Colombo's testing had resulted in evidence (i.e., allele 13 at D5S818) that the victim's vaginal samples contained "DNA from more than one male," but that this evidence was "downplayed." B-13 at 175.

Mr. Hall's post-conviction attorneys further argued that his trial counsel had rendered ineffective assistance in failing to fully investigate and present evidence that Mr. Hoffert, the man that had been seen with the victim and allegedly admitted that he had raped someone, could have been connected with the crime. B-6 at 1089. His post-conviction attorneys explained that evidence that identified someone else as an alternate or additional perpetrator could have raised

doubt that would have been mitigating during the penalty phase and could have lessened Mr. Hall's "moral culpability." *Id*. at 1095–96.

Finally, Mr. Hall's post-conviction attorneys argued that the prosecution had committed misconduct in misrepresenting the conclusions that could be drawn from Ms. Colombo's testing results. B-7 at 1267. The prosecution stated to the jury that the testing had excluded Mr. Johnson as the killer, but Mr. Johnson still could have been the killer. *Id.* At most, his post-conviction attorneys elaborated, the testing established that Mr. Johnson "did not leave any semen." *Id.*

The trial court summarily dismissed the petition for post-conviction relief. B-11 at 2417. The Idaho Supreme Court affirmed in a consolidated appeal. D-27 at 108. Mr. Hall then initiated the instant proceeding for a writ of habeas corpus. Even though both parties requested one, *see* Dkts. 14, 15, this Court declined to stay the habeas action pending completion of a second state post-conviction petition, *see* Dkt. 22, making it especially appropriate for the case to move forward into discovery litigation now.

## III.    Legal Standard for Discovery

Discovery in a federal habeas proceeding is permitted under Rule 6(a) of the Rules Governing § 2254 Cases. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).[2] Rule 6(a) provides that a petitioner is entitled to discovery under the Federal Rules of Civil Procedure "for good cause shown." *Id.* Good cause is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are more fully developed, be able to demonstrate that he is entitled to relief." *Id.* at 908–09.

---

[2] Unless otherwise noted, in this memorandum, all internal quotation marks, ellipses and citations are omitted, and all emphasis is added.

The good cause standard for discovery is not demanding. *See id.* at 909. Indeed, the petitioner "need not show that the discovery would definitely lead to relief." *Payne v. Bell*, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000); *accord Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005). All that the petitioner need show is that the proposed discovery "might provide support for a claim," *High v. Nevens*, No. 2:11-cv-891, 2013 WL 1292694, at *1 (D. Nev. Mar. 29, 2013), or that the proposed discovery "would lead to relevant evidence regarding his petition," *Riofta v. Pacholke*, No. 3:07-cv-5489, 2010 WL 4622550, at *3 (W.D. Wash. Nov. 3, 2010).

In the Ninth Circuit, the district court can find that the petitioner has shown good cause and order discovery prior to determining that he is entitled to an evidentiary hearing. *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997). The district court can further find that the petitioner has shown good cause and order discovery prior to determining whether he has exhausted or procedurally defaulted his claims; in fact, the district court can order discovery on the grounds that it would aid the court's determinations regarding *whether* a claim is procedurally defaulted. *See High*, 2013 WL 1292694, at *6; *McGiboney v. Yordy*, No. 1:16-cv-150, 2017 WL 4159361, at *10 (D. Idaho Sept. 19, 2017). In short, the district court need not "decide every potential procedural and merits issue in the case before it permits discovery of facts that may more fully inform its consideration of at least some of those issues later in the case." *High*, 2013 WL 1292694, at *6.

Where good cause has been shown, the scope and extent of discovery is left to the discretion of the district court. *Bracy*, 520 U.S. at 909. However, the district court abuses its discretion if it denies discovery that is "indispensable to a fair, rounded, development of the material facts." *Toney v. Gammon*, 79 F.3d 693, 700 (8th Cir. 1996); *accord Pham*, 400 F.3d at 743. Moreover, courts have acknowledged that "more liberal discovery is appropriate in capital

cases where the stakes for petitioner are so high." *Payne*, 89 F. Supp. 2d at 971; *see also Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality op.) (explaining that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed").

## IV. Discussion

Under these lenient standards, good cause exists for discovery here. For the reasons discussed below, Mr. Hall's discovery (A) supports multiple habeas claims, (B) supports multiple procedural default exceptions, and (C) "is indispensable to the fair and rounded development of material facts." *See Pham*, 400 F.3d at 743; *McGiboney*, 2017 WL 4159361, at *10; *Toney*, 79 F.3d at 700. Because of the interrelated nature of the arguments that follow, every section of this memorandum is incorporated into every other section.

### A. Mr. Hall's Discovery Supports Multiple Habeas Claims

Mr. Hall's discovery would allow his expert to pursue forensic testing and analysis of critical physical evidence that was collected during the investigation, including the victim's vaginal samples. This testing and analysis could support multiple claims raised in his habeas petition. In particular, it could support his claims that (1) he is actually innocent, and (2) his trial attorneys rendered ineffective assistance.

#### 1. Mr. Hall's Discovery Supports His Claim That He is Actually Innocent

Mr. Hall claims that he is actually innocent. Dkt. 39 at ¶¶592–93. He expressly avers that another man was the killer, and that there is evidence that supports this account. *Id.* Most importantly, the victim's vaginal samples, the sole physical evidence that led investigators to believe that he had been responsible for the victim's death, contained genetic material that indicated that there was another perpetrator. *Id.* Additionally, there were two highly suspicious

individuals who seemed, for different but equally compelling reasons, to share at least some culpability for the crime: Messrs. Johnson and Hoffert. *See supra* at 3–4.

To ultimately prevail, a petitioner with a freestanding actual innocence claim has to make a "truly persuasive demonstration," *Herrera v. Collins*, 506 U.S. 390, 427 (1993), and "affirmatively prove that he is probably innocent," *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc). In other words, the petitioner must establish that "he did not in fact do the act of which he was convicted." *Caro v. Calderon*, 162 F.3d 1167, 1998 WL 751085, at *3 (9th Cir. 1998).

Mr. Hall's discovery has the potential to prove that he is innocent, as it could result in reliable physical evidence that establishes that he was not responsible for the victim's death. *See Carriger*, 132 F.3d at 477. Specifically, forensic testing and analysis could (i) establish that critical physical evidence, including the victim's vaginal samples, contained genetic material from another man, and (ii) establish that this other man was the killer. *See Myers v. Bagley*, No. 3:04-cv-174, 2020 WL 633317, at *6 (S.D. Ohio Feb. 11, 2020) (granting habeas discovery on actual innocence claim where forensic testing could establish that critical physical evidence contained genetic material from someone other than petitioner); *Cherrix v. Braxton*, 131 F. Supp. 2d 756, 765–67 (E.D. Va. 2001) (noting that, where petitioner alleged that forensic testing could establish actual innocence, "the DNA evidence must first be brought before the Court in discovery prior to consideration of the habeas corpus petition on the merits").[3]

---

[3] In *Myers*, the petitioner moved for discovery to show that he was actually innocent for the purposes of establishing that he was entitled to an exception to procedural default. *Myers*, 2020 WL 633317, at *1. In *Cherrix*, the petitioner moved for discovery to establish that he was actually innocent and that "the execution of a person actually innocent of the crime of which he was convicted would be in violation of his Eighth Amendment right against cruel and unusual punishment." *Cherrix*, 131 F. Supp. 2d at 765. As in *Cherrix*, Mr. Hall claims that he is actually innocent and that his execution would violate the Eighth Amendment. Dkt. 39 at ¶¶592–93. In

### i. Forensic Testing and Analysis Could Establish That Critical Physical Evidence, Including the Victim's Vaginal Samples, Contained Genetic Material from Another Man

The victim's vaginal samples were the single most important evidentiary items that law enforcement officials collected during the investigation. Indeed, there was no other physical evidence that led investigators to believe that Mr. Hall was responsible for the victim's death, and the prosecution alleged at trial that the vaginal samples had provided investigators with the "profile of the killer." A-11 at 3427.

But the vaginal samples were not that simple. Testing had shown that the sperm fraction contained genetic material from more than one person, including genetic material that did not match Mr. Hall. A-12 at 4452, 4465–66. At trial, Ms. Colombo effectively downplayed these results, telling jurors in language cloaked with seeming scientific certainty that there were various reasonable explanations that did not involve genetic material from another man, and repeatedly asserting that there was no way for her to determine where the foreign genetic material had originated. *See id.* at 4466 ("[T]here's not a lot I can say about the result."); *id.* at 4467 ("I cannot make any conclusions about that."); *id.* at 4521 ("I don't know where it came from."); *id.* at 4526 ("I don't know where it came from."); *id.* at 4531 ("There's no way for me to know that.").

Contrary to Ms. Colombo's attempts at explanation, Mr. Hall's discovery could conclusively establish that the vaginal samples contained genetic material from another man. Discovery could further establish that other critical physical evidence, including instruments that the killer himself allegedly handled, contained genetic material from another man. As detailed in

the event that Mr. Hall has procedurally defaulted on any of his claims, he also intends to claim that he is actually innocent for the purposes of establishing that he is entitled to an exception to procedural default and discovery is warranted on that basis as well. *See infra* at 29–30; *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

an attached declaration from Alan Keel, an expert with decades of experience in law enforcement, this could be achieved in the following ways. Ex. A at ¶¶30–41, ¶¶42–50; *see Osborne v. Dist. Att'y Off. for Third Jud. Dist.*, 521 F.3d 1118, 1132 (9th Cir. 2008) (explaining that a petitioner seeking post-conviction access to evidence for DNA testing need not "demonstrate that he would be entitled to habeas relief if the test results are favorable in order even to conduct such testing"), *rev'd on other grounds*, 557 U.S. 52, (2009).

*The victim's vaginal samples:* There are two methods that could be used to investigate the victim's vaginal samples in discovery now: Y-STR testing on the biological material itself and re-analysis of the raw data generated by Cellmark, which is in digital form on discs. Mr. Hall takes each in turn.

To begin, Y-STR testing, an advanced forensic technique that has never been performed in this case, could conclusively establish that the vaginal samples contained genetic material from another man. Ex. A at ¶¶30, 33. Y-STR testing differs from other testing, including the 13-STR testing performed at the time of trial, in that it targets genetic material that is exclusive to males. *Id.* at ¶31. Y-STR testing has proven particularly useful for testing biological samples that contain a mixture of female and male genetic material, including vaginal samples that contain sperm, and often allows investigators to determine if there is genetic material from more than one male. *Id.* at ¶¶31, 36. Mr. Keel has reviewed materials from the investigation and believes that the vaginal samples contain sufficient amounts of biological material for Y-STR testing and possibly other future testing. *Id.* at ¶35.

In addition to the Y-STR testing, Mr. Keel further attests that computer analysis of raw data that resulted from the 13-STR testing performed on the vaginal samples during the investigation could also conclusively establish that the vaginal samples contained genetic

material from another man. *Id.* at ¶37. The raw data that results from 13-STR testing requires interpretation on the part of analysts, who must "determine which results are actual genetic material (i.e., alleles) and which results are artifacts (e.g., stutter)." *Id.* at ¶38. That determination is made using an "analytical threshold value." *Id.* Mr. Keel opines that analysis of the raw data, including the analytical threshold value, "could reveal actual alleles" that "were ignored as artifacts." *Id.* at ¶39. Mr. Keel believes that the raw data that resulted from testing was preserved on the Cellmark network, as well as Jaz disks, and explains that it is "usual and customary, if not universal policy, for raw DNA test data to be preserved indefinitely." *Id.* at ¶41.

*The victim's fingernail clippings:* The victim's fingernail clippings were collected at the same time that the vaginal samples were collected, but the fingernail clippings were never tested in the same manner, even though the fingernail clippings could contain genetic material from the perpetrator. A-11 at 3962, 4305. In fact, fingernail clippings have often been found to contain genetic material from perpetrators of violent crimes. *See, e.g.*, *Cotton v. State*, 144 So. 3d 162, 163 (Miss. Ct. App. 2013); *see also* Ex. A at ¶45.

Here, there is good reason to think that the fingernail clippings could contain genetic material from Ms. Henneman's killer. The prosecution alleged that the victim had been "flailing" as the perpetrator strangled her to death. A-12 at 5505–06. As such, it is possible, if not highly likely, that the victim's fingernails captured some of the perpetrator's genetic material. As with the vaginal samples, Y-STR testing could conclusively establish that the fingernail clippings contained genetic material from a male. Ex. A at ¶44. 13-STR testing, in turn, could conclusively establish that the fingernail clippings contained genetic material from someone other than Mr. Hall. *See id.* at ¶43. That is, Mr. Hall's 13-STR DNA profile from the

investigation could be compared with the 13-STR DNA profile that results from 13-STR testing the fingernail clippings, and he could be excluded as the source of the genetic material. *See id.*

**The victim's shorts, sweater, and t-shirt, and the knife found at the scene:** The prosecution alleged that the killer had torn the victim's shorts off her body, that he strangled her using a sweater found tied in a single overhand knot around her neck, and that he then "hog-tied" her using a t-shirt found tied in a double overhand knot around her left wrist. *See* A-11 at 3411–12. Testimony about this evidence proved critical. *See* A-11 at 3992–4001, 4115. It provided foundation for the prosecution's most inflammatory evidence, a series of staged photographs that showed the victim nude and hogtied, and for the prosecution's closing argument that Mr. Hall should be executed.[4] *See id.*; *see also* A-12 at 5450 ("You know about the violence of this attack. You heard it in the guilt phase. You know that her shorts were cut off of her, ripped off of her."). The killer, the prosecution alleged, would have had to strangle the victim for up to five minutes, slowly starving her brain of exhaustion, before finally killing her. A-12 at 4656. Yet, investigators never connected this evidence with Mr. Hall. B-27 at 4922–23. As with the victim's fingernail clippings, the shorts, sweater, and t-shirt could be Y-STR and 13-STR tested, and that could conclusively establish that there is genetic material from someone other than Mr. Hall on crucial pieces of evidence. *See* Ex. A at ¶44. Similarly, the prosecution told the jury that the perpetrator "cut" the shorts off the victim's body using a knife that was found by the river. A-12 at 5507–08. The knife should therefore be tested for DNA as well.

---

[4] Mr. Hall claims that the prosecution committed misconduct when it improperly introduced these photographs. *See* Dkt. 39 at ¶183. Mr. Hall's discovery, which could establish that another man had handled the sweater and t-shirt that formed the basis for the photographs, directly supports this prosecutorial misconduct claim. *See id.* This too provides good cause for discovery. *See Pham*, 400 F.3d at 743.

***The victim's wallet:*** Investigators found the victim's wallet and its contents (e.g., her driver's license, employee identification card, personal photographs, etc.) behind East Junior High School, several miles from the victim's body. A-11 at 3715–16. The wallet and its contents had been set on fire using cologne from a bottle recovered at the scene, and were partially burned. *Id.* at 3726–28. All of the circumstances of the case suggested that the perpetrator, evidently in an attempt to destroy evidence that could have identified him or his victim, had handled the wallet and set it on fire. For example, it was never suggested that the credit cards had been used after the victim disappeared, and it was never suggested that any of the wallet's other contents were missing. *See id.* Investigators, in turn, examined the wallet and its contents for fingerprints, and lifted multiple latent prints for comparison and identification. A-11 at 4256–57. However, none of these fingerprints matched Mr. Hall. *Id.* at 4261–62. As with the victim's fingernail clippings, sweater, and t-shirt, the victim's wallet and its contents could be Y-STR and 13-STR tested, which could conclusively establish that there is genetic material present from someone other than Mr. Hall. Ex. A at ¶44.

### ii. Forensic Testing and Analysis Could Establish That Another Man was the Killer

As set forth above, Mr. Hall's discovery could conclusively establish that the victim's vaginal samples contained genetic material from another man, and could further establish that other critical physical evidence contained genetic material from another man. If the victim's vaginal samples contained genetic material from another man, or if other critical physical evidence contained genetic material from another man, additional investigation could affirmatively prove that this other man had been the killer. In other words, Mr. Hall's discovery could show that he "may, if the facts are more fully developed, be able to demonstrate that he is entitled to relief." *Bracy*, 520 U.S. at 908–09.

To elaborate, if the victim's vaginal samples contained genetic material from another man, or if other critical physical evidence contained genetic material from another man, this man could be identified and located. Then, he could be investigated through other traditional means, like interviews of him and those around him at the time of the murder who might have insight into his culpability. *See, e.g.*, *Warney v. State*, 947 N.E.2d 639, 642 (N.Y. 2011); *Myers*, 2020 WL 633317, at *6 (granting habeas discovery where petitioner alleged that forensic testing could result in identification of the actual killer and then the actual killer's confession); *see also Carriger*, 132 F.3d at 477 (suggesting that a petitioner could make a showing of actual innocence with "new and reliable physical evidence, such as DNA, that would preclude any possibility of [petitioner's] guilt").[5]

Identification of this man could be achieved in multiple different ways. Y-STR and 13-STR DNA profiles generated from the vaginal samples or other critical physical evidence could be uploaded into "CODIS," the Federal Bureau of Investigation's genetic database, which contains more than 14 million profiles. Ex. A at ¶43. CODIS has regularly been described by courts as a valuable resource in violent crime investigations, and has even been recognized as a valuable resource for habeas petitioners on discovery. *See Maryland v. King*, 569 U.S. 435, 444–45 (2013); *Riofta*, 2010 WL 4622550, at *2 (granting habeas discovery where petitioner alleged that an "STR DNA profile" obtained from hairs found at the crime scene "can be uploaded into CODIS to help establish the identity of the actual perpetrator").

---

[5] In *Warney*, the court described how the inmate's second-degree murder conviction was vacated after post-conviction testing showed that crime-scene evidence contained genetic material from another man, whom investigators then identified and located. *Warney*, 947 N.E.2d at 642. That man provided investigators with a full confession, and subsequently pled guilty to second-degree murder. *Id.*

Y-STR and 13-STR DNA profiles generated from the vaginal samples or other critical physical evidence, alternatively, could be directly compared against profiles generated from reference samples obtained from known male subjects.  Ex. A at ¶49.  Reference samples, including from deceased persons, can be obtained from a person's body (e.g., blood, hair, saliva), from personal items (e.g., toothbrushes, hairbrushes, combs), or from family members.  *Id.* at ¶50.  This includes, specifically, Mr. Hoffert, whose Y-STR and 13-STR DNA profiles could be generated from reference samples and then compared against the Y-STR and 13-STR DNA profiles generated from the vaginal samples or other critical physical evidence.[6]  *See id.* at ¶48.

Several 13-STR DNA profiles already exist from individuals sampled during the investigation, and could be used for direct comparison with the results generated from the vaginal samples or other critical physical evidence.  A-11 at 4149–50.  This includes Mr. Johnson, the man that a witness identified as having approached the victim in the final hours of her life after harassing another woman in the same area.  A-12 at 4453.  Ms. Colombo generated Mr. Johnson's 13-STR DNA profile, and she testified that she had excluded him as the primary sperm fraction donor, and further testified that she had excluded him as the donor of the genetic material that did not match Mr. Hall (i.e., allele 13 at D5S818), on the grounds that he had not matched the remaining sperm fraction profile.  *Id.* at 4519–21.  But her testimony on the latter

---

[6] In the event that the instant discovery motion is granted, and forensic testing or analysis reveals that evidence contains genetic material from another man, Mr. Hall intends to move for discovery for the purpose of generating Mr. Hoffert's Y-STR and 13-STR DNA profiles for comparison.  For that reason, among others, Mr. Hall reserves the right to move for additional discovery after the instant motion is granted and the resulting testing and analysis is performed.

point was erroneous, as Mr. Johnson could have donated this genetic material whether or not he matched the remaining sperm fraction profile.[7]  Ex. A at ¶28.

In the event that identification is not achieved, Mr. Hall's discovery could still show that another man was the killer.  The vaginal samples were the sole physical items that led investigators to believe that Mr. Hall was responsible for the victim's death.  Critically, no other physical evidence directly connected him with the crime, including the victim's shorts, sweater, and t-shirt, which the killer himself had allegedly handled.  If the vaginal samples, sweater, t-shirt, or other evidence contained genetic material from another man, Mr. Hall could credibly allege that this other man had been the killer, and therefore that he is actually innocent.  *See Myers*, 2020 WL 633317, at *6.

### 2. Mr. Hall's Discovery Supports His Claim That His Trial Attorneys Rendered Ineffective Assistance

Mr. Hall claims that his trial attorneys rendered ineffective assistance in failing to use an expert to challenge Ms. Colombo's testimony regarding the probability that the victim's vaginal samples contained genetic material from another man.  Dkt. 39 at ¶¶39–41.  Mr. Hall further claims that his trial attorneys rendered ineffective assistance in failing to pursue forensic testing that could have established that Mr. Hoffert, a man that had been seen with the victim on the evening that she disappeared and allegedly admitted that he had raped someone, had been involved with the crime.  *Id.* at ¶¶67–78.

---

[7] Mr. Hall claims that the prosecution committed misconduct in wrongly excluding Mr. Johnson as the source of this genetic material.  *See* Dkt. 39 at ¶¶184–86.  Mr. Hall's discovery, which could establish that Mr. Johnson had in fact donated this genetic material, directly supports this prosecutorial misconduct claim.  *See id.*  This too provides good cause for discovery.  *See Pham*, 400 F.3d at 743.

A petitioner that claims his trial attorneys rendered ineffective assistance has to show that his trial attorneys' performance was deficient, and that his trial attorneys' performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This requires evidence that the trial attorneys' performance "fell below an objective standard of reasonableness," and that the trial attorneys' performance "actually had an adverse effect on the defense." *Id.* at 687–88, 693.

Mr. Hall's discovery could result in evidence that satisfies the test, showing that he "may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy*, 520 U.S. at 908–09. Forensic testing and analysis would allow Mr. Hall to show that his trial attorneys (i) could have established that the victim's vaginal samples and other critical physical evidence contained genetic material from another man, such as Mr. Hoffert, and (ii) could have raised reasonable doubt about his guilt. *See Jones*, 114 F.3d at 1009–10 (granting habeas discovery on ineffective assistance claim where forensic testing was capable of showing whether petitioner's trial attorneys could have established that his clothing had not been covered in victim's blood); *see also Riofta*, 2010 WL 4622550, at *3.

> **i.** **Forensic Testing and Analysis Could Show That Trial Counsel Were Ineffective for Not Establishing That the Victim's Vaginal Samples and Other Critical Physical Evidence Contained Genetic Material From Another Man**

Mr. Hall's discovery could conclusively establish that the victim's vaginal samples contained genetic material from another man, and that other critical physical evidence contained genetic material from another man. *See supra* at 11–15 (discussing how forensic testing and analysis could conclusively establish that the victim's vaginal samples and other critical physical evidence contained genetic material from another man). Mr. Hall's discovery could further establish that this other man was Mr. Hoffert or Mr. Johnson. *See supra* at 17 (discussing how

Mr. Hoffert's Y-STR and 13-STR DNA profiles could be generated and then compared against Y-STR and 13-STR DNA profiles generated from the vaginal samples or other critical physical evidence), *id.* (discussing how Mr. Johnson's 13-STR DNA profile was generated during the investigation and could be directly compared against the results generated from the vaginal samples or other evidence). For the reasons discussed below, this is evidence that Mr. Hall's trial attorneys could have developed during their representation, and it is therefore necessary to develop his ineffectiveness claims. *See Jones*, 114 F.3d at 1009–10 (explaining that discovery was "essential" to petitioner's ineffective assistance claim because it "may establish the prejudice required to make out such a claim"); *accord Riofta*, 2010 WL 4622550, at *3.

*The victim's vaginal samples:* The victim's vaginal samples were the single most important evidentiary items that law enforcement officials collected during the investigation, for the simple reason that the vaginal samples were the sole items that officials collected, tested, and concluded contained genetic material that had come from the perpetrator. But even this evidence suffered from a singular weakness, one that Mr. Hall's trial attorneys could have developed in his defense. Testing had shown that the sperm fraction contained genetic material from more than one person, including genetic material that did not match Mr. Hall. A-12 at 4452, 4465–66.

The fact that the sperm fraction contained genetic material that did not match Mr. Hall suggested that more than one man might have raped the victim, and further suggested that there could have been an alternative or additional killer, as the prosecution itself alleged that the vaginal samples contained genetic material that identified the person that had been responsible for the victim's death. *See* A-11 at 3427 ("Kathryn Colombo will tell you that she was able to make a profile of the killer.").

However, Mr. Hall's trial attorneys never pursued forensic testing or computer re-analysis of the raw data that could have conclusively established that the vaginal samples contained genetic material from another man. Y-STR testing, which could conclusively establish that the vaginal samples contained genetic material from another man, was available at the time that investigators collected reference samples from Mr. Hall, and Cellmark advertised that fact on the evidence submission forms that Idaho State Police officials filled out to request that it test Mr. Hall's reference samples. Ex. A at ¶¶30, 32; Ex. B, Att. 1, at 3. Y-STR testing is even known to be particularly valuable in cases, like this one, that involve biological samples containing a mixture of female and male genetic material (e.g., vaginal samples from a rape victim). Ex. A at ¶31. Indeed, Mr. Keel clarifies that the vaginal samples would have been "obvious candidates for Y-STR testing." *Id.* at ¶34.

Alternatively, analysis of the raw data that resulted from Ms. Colombo's 13-STR testing could have conclusively established that the vaginal samples contained genetic material from another man. Ex. A at ¶37. Mr. Keel comments that this analysis, like Y-STR testing, could have been conducted at the time of trial, and that it would have been "warranted," given that the testing had shown that the vaginal samples contained genetic material (i.e., allele 13 at D5S818) that "did not come from Mr. Hall." *Id.* at ¶40.

***Other critical physical evidence:*** Other critical physical evidence that law enforcement officials collected during the investigation included biological samples from the victim's body that could have contained genetic material from the killer (i.e., the victim's fingernail clippings), as well as items that the killer allegedly handled or could have handled (i.e., the victim's shorts, sweater, t-shirt, wallet, and knife).

Mr. Hall's trial attorneys could have developed this evidence, and could have pursued testing that showed that this evidence contained genetic material from another man. As discussed above, the sole physical evidence that connected Mr. Hall with the crime at all (i.e., the vaginal samples) had suggested that more than one man might have had sexual intercourse with the victim, and even suggested that there could have been another killer. Testing this other evidence and showing that it contained genetic material from another man could have established that this other man had been the killer. *See supra* at 11–15 (discussing how forensic testing and analysis could establish that another man had been the killer).

Testing the sweater and t-shirt, in particular, would have been particularly obvious. The prosecution's forensic pathologist believed that the sweater had been used to strangle the victim to death, and that the t-shirt had then been used to hogtie the victim. *See* A-11 at 3992–4001. This led the forensic pathologist himself to hogtie, and then photograph, the victim's nude and hogtied body, for the purpose of presenting these photographs at trial. *See id.* Mr. Hall's trial attorneys objected to presenting these photographs at trial, but did not pursue testing that could have shown that Mr. Hall had never even touched the sweater or t-shirt.[8]

As with the vaginal samples, Y-STR and 13-STR testing this other critical physical evidence could have been pursued before trial, and could have conclusively established that it contained genetic material from another man. *See* Ex. A at ¶¶32, 44–48.

---

[8] Mr. Hall further claims that his trial attorneys rendered ineffective assistance in failing to retain an expert that could have challenged the forensic pathologist's testimony on these points. *See* Dkt. 39 at ¶¶61–66. Mr. Hall's discovery, which would allow him to show that his trial attorneys could have established that Mr. Hall had never touched the sweater or t-shirt, directly supports this ineffective assistance claim too, *see id.*, providing additional good cause for discovery, *see Pham*, 400 F.3d at 743.

***Mr. Hoffert:*** Mr. Hall's trial attorneys had multiple reasons for developing evidence that could have identified other potential perpetrators. Most significantly, Mr. Hall's trial attorneys knew that Mr. Hoffert had been seen with the victim on the evening that she disappeared, and that he allegedly admitted to having raped someone before committing suicide. Dkt. 39 at ¶¶67–69. More than that, Mr. Hall's trial attorneys knew that there was evidence that the killer had likely handled, which had not been connected to Mr. Hall, and that could have been tested. Testing this evidence could have conclusively established that it contained genetic material from another man, and additional testing and investigation could have established that this genetic material matched Mr. Hoffert. *See* Ex. A at ¶¶44–48.

### ii. Forensic Testing and Analysis Would Allow Mr. Hall to Show that His Trial Attorneys Could Have Raised Reasonable Doubt

Had Mr. Hall's trial attorneys conclusively established that the victim's vaginal samples contained genetic material from another man, or that other critical physical evidence contained genetic material from another man, his trial attorneys could have raised reasonable doubt during the guilt and penalty phases. *See Detrich v. Ryan*, 740 F.3d 1237, 1257–58 (9th Cir. 2013) (plurality op.) (explaining the impact that trial attorneys' forensic testing showing that another individual had been involved with the crime could have had).

***Reasonable doubt during the guilt phase:*** First, if Mr. Hall's trial attorneys had conclusively established that the victim's vaginal samples contained genetic material from another man, they could have effectively discredited the prosecution's murder case, which rested on the assumption that the victim's vaginal samples contained genetic material that identified her killer. *See* A-11 at 3435. If the vaginal samples contained genetic material from another man, the prosecution would have been left with nothing to prove that Mr. Hall, rather than the other man, had been the killer, as there were no witnesses or other evidence that directly identified Mr.

Hall as the killer.  *See Jones*, 114 F.3d at 1011 (explaining that "raising the specter" that another individual had been the killer "could raise a reasonable doubt" where doing so "attacks the heart of the prosecution's case").

Had Mr. Hall's trial attorneys conclusively established that other critical physical evidence contained genetic material from another man, his trial attorneys could have further discredited the prosecution's assumption that the victim's vaginal samples contained genetic material that identified her killer.  If other critical physical evidence, including instruments that the killer likely handled, contained genetic material from another man, the prosecution could not have been able to plausibly contend that the vaginal samples alone identified Mr. Hall as the killer.  The vaginal samples, without more, could perhaps have established that Mr. Hall had sexual intercourse with the victim, but could not establish that he killed her.

At minimum, if the victim's vaginal samples contained genetic material from another man, Mr. Hall's trial attorneys could have effectively discredited the prosecution's most important guilt-phase witness.  Ms. Colombo admitted that the sperm fraction contained genetic material from more than one person, including genetic material that did not match Mr. Hall, but effectively downplayed these results, telling jurors that there were various reasonable explanations that did not involve genetic material from another man.  *See* A-12 at 4452, 4465–66, 4505.  This propped up the prosecution's assumption that the victim's vaginal samples contained genetic material that identified Mr. Hall as her lone killer.  *See* A-11 at 3435.  Had Mr. Hall's trial attorneys presented expert testimony and evidence that conclusively established that the vaginal samples had contained genetic material from another man, Ms. Colombo's testimony on this critical point would have been directly rebutted, and her credibility would have been

damaged. Discovery must take place so that this serious ineffectiveness claim can be fully and adequately litigated. *See Jones*, 114 F.3d at 1009–10; *Riofta*, 2010 WL 4622550, at *3.

     ***Reasonable doubt during the penalty phase:*** Even if the discovery standards are not met with respect to this material in terms of guilt-phase ineffectiveness, it is certainly satisfied with respect to penalty-phase ineffectiveness. The prosecution's penalty-phase case rested on the assumption that this was the "right case" to "impose the death penalty," because there was "overwhelming proof." A-12 at 5445. And in the prosecution's final plea for death, it made clear for jurors what it believed that overwhelming proof was: "those strands of DNA that gave you the insurance you need." *Id.* at 5462. But for the reasons discussed above, if the vaginal samples contained genetic material from another man, or if other critical physical evidence contained genetic material from another man, the prosecution's murder case and its most important witness would have been effectively discredited; in other words, the prosecution would have been deprived of its "overwhelming proof." *Id.*

     More than that, Mr. Hall's trial attorneys could have directly rebutted three of the State's four aggravators, namely, that the killer had exhibited "exceptional depravity," "[u]tter disregard for human life," and "propensity to commit murder." A-12 at 5449, 5452, 5454. The prosecution's arguments on these points had been grounded in the manner that the killer had allegedly taken the victim's life. *See id.* at 5505 ("Lynn was tied up."); *id.* at 5505–06 ("I'm not even going to ask you to imagine what it would take to kill a screaming, flailing woman by choking her to death."); *id.* at 5508 ("He kills her because he wants to, because he's sadistic and brutal.").

     But if critical physical evidence, particularly the instruments that the killer had allegedly used in taking the victim's life, contained genetic material from another man, the prosecution

would have been left with nothing that could have proven that Mr. Hall, rather than the other man, had been responsible for the way that the killer had taken the victim's life. Put differently, if the instruments that the killer had allegedly used in taking the victim's life contained genetic material from another man, Mr. Hall's trial attorneys could have credibly alleged that this other man, if anyone, had been the one that exhibited exceptional depravity, utter disregard for human life, and propensity to commit murder. The jury would then have had far less reason to impose a death sentence.

At the very least, if the victim's vaginal samples contained genetic material from another man, or if other critical physical evidence contained genetic material from another man, Mr. Hall's trial attorneys could have raised "residual doubt," or used the fact that another man had been involved in the crime to mitigate Mr. Hall's personal culpability. During the penalty phase of a capital trial, "residual" or "lingering" doubt about a defendant's guilt "is the most powerful mitigating fact." *Williams v. Woodford*, 384 F.3d 567, 624 (9th Cir. 2004). In recognition of that fact, courts have observed that the best thing that a defendant can do to save himself from a death sentence is "to raise doubt about his guilt." *Cox v. Ayers*, 613 F.3d 883, 898 (9th Cir. 2010); *see also Lockhart v. McCree*, 476 U.S. 162, 181 (1986) (remarking that "residual doubt has been recognized as an extremely effective argument for defendants in capital cases"). Even if the Court concludes that the evidence is not capable of showing ineffectiveness at the guilt phase, it is surely capable of demonstrating that counsel could have sowed enough doubt at sentencing to convince one juror that Mr. Hall was an inappropriate target for the harshest penalty there is, which is all that is necessary for such a claim to succeed. *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (granting habeas relief on a sentencing ineffectiveness claim because

of "a reasonable probability that at least one juror would have struck a different balance").

Discovery is accordingly necessary.

### B. Mr. Hall's Discovery Supports Multiple Procedural Default Exceptions

A petitioner procedurally defaults on a claim, barring the district court from granting relief, if he has not exhausted his remedies in state court, and if state procedural rules would prevent him from returning to state court and doing so. *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996). However, the district court can excuse a procedural default if the petitioner satisfies one of two exceptions: (1) "cause and prejudice," *Murray v. Carrier*, 477 U.S. 478, 487 (1986), or (2) "actual innocence," *Schlup*, 513 U.S. at 329 (1995); *see also Dickens v. Ryan,* 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc) (explaining that if a petitioner "can show cause and prejudice to excuse a procedural default, AEDPA no longer applies and a federal court may hear this new claim de novo").

The "cause and prejudice" exception excuses procedurally defaulted Sixth Amendment claims if the petitioner can show that his post-conviction attorneys rendered ineffective assistance in presenting those claims. *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). A post-conviction attorney renders ineffective assistance if his performance is deficient, and if his performance prejudices the post-conviction proceedings. *Kayer v. Ryan*, 923 F.3d 692, 725 (9th Cir. 2019), *cert. pet. filed* (09-99027) (May 13, 2020). Alternatively, the "actual innocence" exception excuses procedurally defaulted claims where there is new evidence that makes it "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327.

Here, no determinations have been made regarding exhaustion or procedural default. However, a district court can proceed to grant discovery on the grounds that discovery could aid

determinations regarding these issues, including potential procedural default exceptions. *See High*, 2013 WL 1292694, at *6; *McGiboney*, 2017 WL 4159361, at *10. For the reasons discussed below, Mr. Hall's discovery could aid eventual determinations regarding potential procedural default exceptions. To wit, Mr. Hall's discovery could result in evidence showing that (i) his post-conviction attorneys rendered ineffective assistance in presenting his trial ineffective assistance claim regarding the failure to challenge Ms. Colombo's testimony, and (ii) he is actually innocent.

### 1. Mr. Hall's Discovery Could Result in Evidence Showing That His Post-Conviction Attorneys Rendered Ineffective Assistance

Mr. Hall's post-conviction attorneys claimed that his trial counsel rendered ineffective assistance in failing to present expert testimony that could have challenged Ms. Colombo's testimony regarding the sperm fraction and her various explanations for the presence of genetic material that did not match Mr. Hall. B-6 at 1343–46. To support that claim, Mr. Hall's post-conviction attorneys presented an expert declaration maintaining that Ms. Colombo's testing had resulted in evidence (i.e., allele 13 at D5S818) that the victim's vaginal samples contained "DNA from more than one male." B-13 at 175.

However, so far as undersigned counsel can ascertain, Mr. Hall's post-conviction attorneys never pursued forensic testing (e.g., Y-STR testing) or computer re-analysis of the raw data from Ms. Colombo's testing to show that his trial counsel could have conclusively established that the vaginal samples contained genetic material from another man. Mr. Hall's post-conviction attorneys should have pursued this testing and analysis for the same reasons that his trial counsel should have pursued this testing and analysis. As it happens, his post-conviction attorneys had even more cause to do so, for they had the benefit of an expert's opinion that the vaginal samples indeed contained evidence that there was genetic material from more than one

man. *See id.* Such testing and analysis had the capacity to reveal powerful new evidence in support of Mr. Hall, as he detailed earlier. It follows that the evidence would "fundamentally alter" the ineffectiveness claims that were advanced in state court, thereby bringing them within *Martinez*'s ambit, *see Dickens*, 740 F.3d at 1319 (discussing the fundamentally altered rule), and making them fit for discovery in this case, *see Jones v. Shinn*, 943 F.3d 1211, 1221–22 (9th Cir. 2019) (explaining that evidentiary development is allowed in federal court under *Martinez*).

Mr. Hall's discovery supports his claim that his post-conviction attorneys rendered ineffective assistance in presenting this trial ineffectiveness claim, for the same reasons that it supports his claim that his trial attorneys rendered ineffective assistance. *See supra* at 19–23 (explaining how forensic testing and analysis would allow Mr. Hall to show that his trial attorneys could have established that the victim's vaginal samples and other critical physical evidence contained genetic material from another man). Discovery has the capacity to show that his post-conviction attorneys could have conclusively established that the victim's vaginal samples and other critical physical evidence contained genetic material from another man, which would help establish both that his post-conviction attorneys' performance was deficient, and that it was prejudicial. *See Kayer*, 923 F.3d at 725.

### 2. Mr. Hall's Discovery Could Result in Evidence Showing That He is Actually Innocent

As set forth above, Mr. Hall's discovery could establish that the victim's vaginal samples and other critical physical evidence contained genetic material from another man, and that this other man was the killer. *See supra* at 11–15. If the victim's vaginal samples contained genetic material from another man, or if other critical physical evidence contained genetic material from another man, this man could be identified, located, and tied to the crime through other investigative means. *See supra* at 16. Mr. Hall's discovery could thereby establish that no

reasonable juror would have found him guilty beyond a reasonable doubt. *See Myers*, 2020 WL 633317, at *6 (granting habeas discovery on actual innocence claim where forensic testing could establish that critical physical evidence contained genetic material from someone other than petitioner); *Schlup*, 513 U.S. at 327.

Granting Mr. Hall's discovery to develop this actual innocence exception could further advance the speedy resolution of his petition. As a review of the habeas petition will show, Mr. Hall intends to pursue several substantial habeas claims that he believes might be unexhausted, and that would therefore be procedurally defaulted. *See generally* Dkt. 39. Allowing Mr. Hall to develop the facts necessary to excusing procedural default of these claims now, rather than later, will prevent piecemeal litigation of these complex issues in the future, reducing unnecessary delay and expenditure of judicial resources in the resolution of his petition.

### C. Mr. Hall's Discovery is Indispensable to the Fair and Rounded Development of Material Facts

Where good cause has been shown, as Mr. Hall just did, a district court abuses its discretion if it denies discovery that is "indispensable to a fair, rounded, development of the material facts." *Toney*, 79 F.3d at 700; *accord Jones*, 114 F.3d at 1009–10. For the reasons discussed below, Mr. Hall's discovery is indispensable to the fair and rounded development of the material facts. *Toney*, 79 F.3d at 700.

First, Mr. Hall's discovery is no broader than necessary to begin developing the habeas claims discussed above, seeking no more evidence than necessary to help establish that he would be entitled to relief on these claims. That is to say, Mr. Hall's discovery request is no "fishing expedition," based on "ambiguous allegations" with the purpose of investigating "mere speculation" or "claims for which there is no factual basis." *Calderon v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 98 F.3d 1102, 1106 (9th Cir. 1996); *Payne*, 89 F. Supp. 2d at 970. His petition sets

forth specific claims, backed with detailed factual allegations, and he now seeks evidence that would allow him to conclusively establish those factual allegations. *See* Dkt. 39 at ¶¶592–93, ¶¶39–41, ¶¶67–78.

Second, Mr. Hall's discovery seeks, in part, evidence that was in the possession of his trial attorneys. *See* B-27 at 4942 (showing that Mr. Hall's trial attorneys received a compact disc containing the raw data that resulted from testing during the investigation). Mr. Hall's undersigned counsel should have received, and thus should still be in possession of, this evidence. *See High*, 2013 WL 1292694, at *7 (granting habeas discovery and noting that "petitioner is seeking discovery of material—material that would have been in the criminal discovery file—that is fundamental to any investigation of a federal habeas case . . . and which otherwise would be in the files available to federal habeas counsel but for the loss of the records by prior counsel"). The fact that the disc is no longer in prior counsel's file is mere happenstance, and it should not prevent the undersigned from accessing material that would ordinarily have already been in their possession.

Finally, Mr. Hall moves for discovery at this stage because his undersigned counsel, despite diligent informal efforts, have been prevented from obtaining the evidence in question. Undersigned counsel have requested, but not received, the raw data from the 13-STR testing performed on the victim's vaginal samples at the time of trial from anyone who might have it, including: (1) the Ada County Public Defender, which represented Mr. Hall at trial; (2) the State Appellate Public Defender ("SAPD"), which represented Mr. Hall on direct appeal and post-conviction review, and Dr. Greg Hampikian, retained by the SAPD as a DNA expert; (3) the Ada County Prosecutor and the Idaho Attorney General, which prosecuted Mr. Hall and defended his conviction and death sentence, respectively; (4) the Idaho State Police, which facilitated the

testing that resulted in the raw data, and the Boise Police Department and Garden City Police Department, which were primarily responsible for the investigation in this case; (5) Bode Technology, which acquired Cellmark, the private laboratory that performed the testing and generated the raw data; and (6) Forensic Analytics, the private laboratory that the Ada County Public Defender retained to review the testing results before trial. *See* Ex. B at ¶¶9–16. Having exhausted these informal requests, and in the interest of diligently developing the claims in this habeas proceeding, discovery is the only remaining method for Mr. Hall to obtain the evidence he needs in order to pursue his claims, and the Court's intervention is therefore called for.

## V. Conclusion

For the reasons set forth above, Mr. Hall respectfully asks that the Court grant his motion for discovery and enter an order compelling any State agents with access to the materials listed below, including, but not limited to, the Idaho State Police, the Boise Police Department, the Garden City Police Department, the Office of the Ada County Prosecuting Attorney, and the Office of the Attorney General of the State of Idaho, to produce these materials to Mr. Hall's expert, Alan Keel, for forensic testing and analysis:

1. Lynn Henneman's vaginal swabs and smears;

2. Lynn Henneman's fingernail clippings;

3. Lynn Henneman's shorts;

4. all articles of clothing found attached to Lynn Henneman's body;

5. the knife found at the Boise River;

6. all items found at East Junior High School, including Lynn Henneman's wallet, its contents, and a bottle of cologne;

7.     all raw data resulting from testing that Cellmark Diagnostics performed on Lynn Henneman's vaginal swabs and smears;

8.     any other physical items that might contain biological material from the perpetrator or perpetrators of Lynn Henneman's murder, rape, or kidnapping; and

9.     an opportunity to amend the habeas petition in light of any discovery that is obtained and investigated.

DATED this 23rd day of October 2020.

/s/ Jonah J. Horwitz
Jonah J. Horwitz
Christopher M. Sanchez

Attorneys for Petitioner

### CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of October 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

L. LaMont Anderson
lamont.anderson@ag.idaho.gov

/s/ Julie Hill
Julie Hill