# Exhibit 1

**(*Fields v. Blades*, D. Idaho, No. 1:95-cv-422, Dkt. 88, Lodging A-42)**

1    And we feel that the Court owes a duty to that sub set

2    of our society, those people incarcerated in the State

3    penal system to protect them from this individual as

4    well.  It's not a recommendation that the State makes

5    lightly, Your Honor.  But because the statutory

6    aggravating circumstances exist in this case and

7    because they're not outweighed by the -- any mitigating

8    circumstances, it's the State's view it's the duty of

9    the Court under the capital sentencing scheme that we

10    have to order a sentence of death in this case.  Thank

11    you, Judge.

12              THE COURT:  Did you wish to respond?

13              MR. HACKNEY:  Yes, Your Honor.  Your

14    Honor, first of all I'd like to point out what I'm sure

15    the Court is aware of, that the State I believe has the

16    burden of proof to show beyond a reasonable doubt that

17    each of the aggravating circumstances outweighs

18    whatever mitigation the Court finds beyond a reasonable

19    doubt.  Initially I'd like to state that Mr. Fields has

20    consistently maintained his innocence throughout this

21    process.  I say that because of our decision where we

22    elected that he not testify.  We felt that his demeanor

23    may negatively impact the jury and he certainly may

24    have a better -- we felt he had a better chance relying

25    upon reasonable doubt at the time the choice was made,

1923

especially where a case such as this relied heavily on inmate informant testimony. I feel that there's quite a bit of mitigation -- mitigating circumstances which are contained and inherent in the facts of this case itself, Your Honor.

First of all, even though this jury has spoken, I believe clearly there is some question about the actual perpetrator given the trial testimony. I'm referring specifically to the two women who were in the store just prior to the murder. Both of these people described an individual who, except by extreme leap of faith, an individual who does not match Mr. Fields' description. What basically convicted Mr. Fields was the inmate informant testimony which we believe is inherently problematic. There's something very disconcerting, very disquieting if a Court imposes a death penalty based -- where a conviction is based, substantially as it was in this case, relied heavily upon inmate informant testimony. Also there's no physical evidence that tied Mr. Fields to the murder.

There was no effort on the part of the perpetrator to prevent the victim from summoning help. By that I mean, the telephone was not torn from the wall or the victim was not bound, in some way prevented from summoning help. It occurred very quickly, as the

Colloquy

1     Court is aware.  The timing of the incident was very

2     quick, within a couple of minutes.  We believe this

3     shows that there was no intentional torture or the

4     cruel infliction of pain.  Finally, there was no

5     molestation of the victim as we've seen in, for

6     instance, the Sivak case, which I believe is a -- is an

7     interesting case because it did start out similar to

8     this factually as a robbery or a theft of a small

9     store.  However, the facts in Sivak, as I'm sure this

10    Court is aware having reviewed that case, goes far

11    beyond what we have in this case, including not only

12    the stabbing multiple times, which I understand there

13    was somewhere around 30 times, I may be incorrect on

14    that, but that was my recollection, as well as shooting

15    of the victim and then the victim in the Sivak case was

16    sexually molested.

17        Your Honor, the -- I assume also from the

18    evidence of this case that -- I don't know if anybody

19    would disagree with me, that the primary motivation for

20    the crime was to steal or take money from the cash

21    drawer of the store.  Also there was no history of any

22    animosity between the perpetrator, Mr. Fields and the

23    victim in this case.  Finally, Mr. Fields has been --

24    as pointed out by counsel for the State that Mr. Fields

25    has been a good inmate and he's behaved himself while

Colloquy

1    in prison, not finding himself in any trouble,
2    especially any violent trouble where he posed a danger
3    to other inmates.
4         Your Honor, in short, we assert the facts of
5    this case does not reflect the conscienceless or
6    pitiless crime that is separate or is somehow different
7    from the norm of first degree murders which is
8    unnecessarily torturous to the victim, the first factor
9    that is relied upon, the heinous, atrocious or cruel --
10   first of all, I would like to point out contrary to
11   counsel's statement is the Osborn definition of this
12   does not focus -- I couldn't see any language that
13   indicated it focused on the -- the effect that the
14   killing blows or the effect that the crime had on the
15   victim is such.  It basically focuses on the acts of
16   the defendant and the circumstances surrounding the
17   killing.
18        The first thing the Court has to determine, and
19   which I know we've struggled with, is to determine,
20   first of all, what is the norm of the first degree
21   murder.  And then the Court would have to determine
22   what additional acts set this particular case apart.
23   Facts we have in this case are we have a robbery or a
24   theft of a small business.  It appeared that the victim
25   responds in some manner and the situation deteriorates,

30 5744

Colloquy

1    the perpetrator then responds with violence and the
2    death occurs.  Although tragic, Your Honor, this is a
3    scenario I would hesitate to say occurs daily in this
4    country.  This is not a torture case, this is not a
5    Sivak case where the victim was sexually molested.  I
6    believe in that case it was even after she died.
7    Exactly also how this particular killing occurred
8    really is a matter of shear speculation since nobody
9    saw it occur.

10           The State engages in some speculation and some
11   guesswork in attempting to establish the (g)(5), as
12   well the (g)(6) factor, but especially in the (g)(5)
13   factor.  I would indicate that the State's theory that
14   the victim was held -- grabbed and held by the
15   perpetrator and deliberately stabbed a number of times
16   is no more reasonable than the theory that the victim
17   in this case attempted to either prevent the
18   perpetrator from taking the money or somehow appeared
19   to be preventing his escape and was stabbed in that
20   particular process.  Since nobody actually saw the
21   actual killing, Your Honor, we would be engaging in
22   speculation in determining exactly how this occurred.
23   And, again, we have to be sure beyond a reasonable
24   doubt.  All the wounds, the way I understand the
25   testimony, all the wounds except for the neck wound

1927

1   were not the deep life threatening types of wounds that
2   I've indicated in my memorandum, did not appear the
3   perpetrator was pushing the knife to the hilt in an
4   attempt to kill on each and every wound.  Although the
5   neck wound itself was ultimately fatal, even though it
6   was not the extreme type of wound, we feel shows or
7   evidences an intent to kill.

8        Also the prosecutor is engaging in guesswork on
9   this (g)(5) area, Your Honor, with advancing the theory
10  that the perpetrator deliberately inflicted a wound
11  that was fatal, but one of which the victim would live
12  for some period of time and suffer and linger.  Again,
13  Your Honor, this is nothing but shear speculation.
14  It's inconsistent with their -- the testimony from the
15  inmates that they presented and it's inconsistent with
16  logic, as well as being inconsistent with other
17  positions that they've taken that the purpose of the
18  killing was to eliminate a witness to a robbery or a
19  theft.  In short, Your Honor, I would assert that this
20  is not the extremely wicked, vile, shockingly evil
21  crime that Osborn requires in order for the (g)(5)
22  factor to apply and I would argue that this does not
23  apply and it has not been shown beyond a reasonable
24  doubt.

25       The (g)(6) factor, the utter disregard for

Colloquy

1  human life as counsel has in their memorandum, I

2  believe has correctly pointed out that you can't rely

3  on the same facts if you want to rely upon the (g)(6)

4  factors you have in relying upon in attempting to show

5  the (g)(5) factors.  They have to show some additional

6  facts separate from those mentioned to show again

7  beyond a reasonable doubt the highest and the utmost

8  disregard for human life, the cold blooded, pitiless

9  slayer.

10          As I pointed out in my memorandum, in reviewing

11  the cases I was confused as to -- and somewhat unclear

12  as to whether we focus on the acts of the perpetrator

13  or the perpetrator's state of mind.  It appears after

14  the Paz case we're back again to focusing on the acts

15  and the surrounding circumstances.  However, when you

16  reflect on this you certainly -- you come to the

17  conclusion that even a state of -- the state of mind in

18  arriving at some conclusions about the state of mind,

19  that the perpetrator you have to look at what he does

20  since you can't look inside his head, obviously.  But

21  the prosecutor in this case relies upon first of all

22  the statements of the inmates who did not testify which

23  we have objected to and the Court is certainly aware

24  that we've objected to this.  And the reason we've

25  objected to this we can't cross-examine Mr. Troutner,

1929

Mr. Johnson or Mr. Steiger as we were able to
cross-examine Mr. Bianchi and the other inmate
witnesses. And we object to its use. For instance,
Mr. Johnson. I spoke to Mr. Johnson personally, he's
also spoken to our investigator and he had indicated
that the initial statements he made were false and were
simply made for benefit, some benefit he felt would be
forthcoming. He also indicated that for a certain
amount of money he would say just about anything. It
would be inappropriate, Your Honor, to apply the (g)(6)
aggravating circumstance simply because the perpetrator
concealed or destroyed item of evidence. There's
nothing in either the statutory language of (g)(6) or
in the Osborn case that would indicate that merely
because the perpetrator destroyed evidence and got rid
of evidence that this would justify the use of the
utter disregard for human life. In fact, I would
assert that destroying of evidence or making some
attempt to conceal your steps or conceal your crime
would be something that you would find in any first
degree murder and certainly would be considered the
norm of first degree murders.

The (g)(7), felony murder. We again would ask
the Court to take a look at the facts that we've stated
in terms of mitigation in this case. They again --

Colloquy

1    there must be a separate finding beyond a reasonable
2    doubt of a specific intent to kill. That itself by
3    itself outweighs all mitigation evidence. That's under
4    the Charboneau decision. There is no allegation of
5    intent or that the defendant acted intentionally or
6    intentionally committed in the Information. The
7    conviction was based on felony murder. We would argue,
8    Your Honor, that there -- the facts of this case show
9    that there was not a specific intent to kill. It
10   occurred quickly, there was no torture, intentional
11   cruelty. The wounds in and of themselves I believe do
12   not arrive at the conclusion beyond a reasonable doubt
13   or require the conclusion of beyond a reasonable doubt
14   of intent to kill. Again, the other factors I've
15   mentioned, including there's no attempt to prevent the
16   victim from obtaining help.
17       Your Honor, this is a tragic event. It was
18   something that obviously began as a theft of some kind,
19   escalated into a level of violence that was not
20   contemplated by or initially intended by the
21   perpetrator. We do not feel the (g)(7), felony murder
22   aggravating circumstance has been shown beyond a
23   reasonable doubt.
24       The (g)(8), propensity to commit murder.
25   Certainly Mr. Fields, Your Honor, has been on the wrong

30 5749

Colloquy

1 side of the law most of his life. His background,
2 however, is essentially one of thefts, burglaries,
3 controlled substances. The aggravated assault
4 conviction, most recent one, itself grew out of a
5 shoplifting. Also the facts of that case are a
6 two-edge sword in analyzing his propensity to commit
7 murder. If Mr. Fields had the propensity to commit
8 murder, to kill, we should have had dead or injured --
9 a dead or injured Shopko employee when the Shopko
10 employee confronted Mr. Fields in the act of stealing,
11 in the act of shoplifting. Instead Mr. Fields, as I
12 understand it, after the employee was frightened off
13 disposed of the weapon that he used. That he was
14 convicted of the ag assault for -- in the act of
15 frightening the -- the Shopko employee.
16      In conclusion, Your Honor, Mr. Fields does not
17 have a history, although he has a criminal history, a
18 history which requires the conclusion beyond a
19 reasonable doubt of the propensity. In conclusion,
20 Your Honor, this Court does not justify the imposition
21 of the death penalty. We would ask the Court to impose
22 a life sentence.
23      THE COURT: Did Mr. Fields wish to speak
24 on his own behalf at this time?
25      MR. HACKNEY: I don't believe so, Your

30 5750

Colloquy

1    Honor.

2              MR. FIELDS:  Yes, I would.

3              MR. HACKNEY:  I guess he does, Your Honor.

4              THE COURT:  Did you wish to consult with

5    him before he does that?

6              MR. HACKNEY:  Could I have just a moment?

7              THE COURT:  We could take a short recess

8    or take whatever recess is necessary if you wish to.

9    We'll be in recess.

10             (A recess was then taken.)

11             THE COURT:  Have you had a sufficient

12   opportunity to consult with Mr. Fields?

13             MR. HACKNEY:  Yes, I have, Your Honor.

14             THE COURT:  And is it his desire to make a

15   statement at this time?

16             MR. HACKNEY:  It is.  He'd like to make a

17   short statement, Your Honor.

18             THE COURT:  Go ahead.

19             MR. FIELDS:  My statement to the Court is

20   this; is that -- that is a tragic event that Mrs.

21   Vanderford was murdered.  That it's right it shouldn't

22   go unpunished.  What I'm trying to say is I didn't kill

23   her and I would like to appeal both the sentence and

24   the conviction on the matter.  Thank you very much.

25             THE COURT:  State wish to respond?

30  5751

Colloquy

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | MR. HORTON:  Just briefly, Your Honor.                               |
| 2  | Judge, with respect to the (g)(5), heinous                          |
| 3  | circumstance.  What I was attempting to articulate is               |
| 4  | that it's the State's position that the defendant                   |
| 5  | knowingly leaving Mrs. Vanderford alive in that                     |
| 6  | condition, grievously wounded with fatal wounds is                  |
| 7  | exactly the sort of statute -- or circumstances which               |
| 8  | fall within the scope.  With respect to counsel                     |
| 9  | attempting to characterize this as a brief struggle                 |
| 10 | where she interfered with the robbery, this isn't the               |
| 11 | sort of case where the perpetrator simply used the                  |
| 12 | amount of force necessary to extract himself from the               |
| 13 | situation.  Instead he repeatedly stabbed.  And while               |
| 14 | counsel may be correct that we couldn't conclusively                |
| 15 | establish that these were wounds plunged to the hilt,               |
| 16 | the fact is that he used sufficient violence in the                 |
| 17 | administration of these stab wounds to puncture the                 |
| 18 | back and punctured lungs with each of the stab wounds               |
| 19 | to the back, as well as to inflict the fatal wound.                 |
| 20 | With respect to the (g)(6) circumstance,                            |
| 21 | counsel suggests that this Court should disregard the               |
| 22 | reliability of the statements that Mr. Johnson made in              |
| 23 | those handwritten notes.  I would submit to the Court               |
| 24 | that the reliability of those statements is -- comes                |
| 25 | from the fact that he knew something that only the                  |

1934

1   killer would know.  That is, that the killer had
2   inflicted some wound in the forehead of Mrs. Vanderford
3   and I think when the Court, if it would examine State's
4   Exhibit 12 see exactly that sort of physical
5   corroboration of the statements that Mr. Johnson made.
6   And basically it's the State's position that this sort
7   of minimal provocation resulting in this sort of
8   offense is a (g)(6) statutory aggravating circumstance.
9            With respect to the (g)(7) circumstance, the
10   felony murder circumstance, it's absolutely true that
11   in the preparation of the Information and the charging
12   language the State didn't make any specific allegation
13   that there was a specific intent to cause the death of
14   Kay Vanderford.  The reality is, though, as the Court
15   recalls when it instructed the jury, it instructed the
16   jury on the meaning of the word murder which was
17   incorporated in the State's Information.  And the Court
18   told the jury that they had to find that specific
19   intent to cause her death.  Counsel's statements as to
20   cruelty and torture are simply in opposite in the
21   context of the deliberate taking of a human life which
22   is the gist of a (g)(7) felony murder statutory
23   aggravating circumstance.
24            Finally with respect to factor (g)(8), defense
25   counsel points to the Shopko incident as some sort of

30 5753

Colloquy

1  evidence that the defendant isn't predisposed to commit
2  murder.  And all I would suggest to the Court that the
3  Shopko incident reveals that if the defendant is
4  surrounded by a crowd of people, then perhaps then he
5  won't commit murder.  But in the circumstances where
6  there was one prospective victim, as was the case
7  inside the Wishing Well, that there's every evidence
8  that the defendant will kill.  Indeed, the defense has
9  conceded that the defendant is a sociopath.  Thank you,
10  Judge.
11            THE COURT:  Did you wish to respond
12  further?
13            MR. HACKNEY:  No, thank you, Your Honor.
14            THE COURT:  In this case it is necessary
15  for me to review the record in light of the arguments
16  that have been made and to enter findings and a
17  conclusion as to the sentence.  I will incorporate
18  rulings upon the objections to the portions of the
19  presentence report and within that memorandum.  I will
20  after I've completed that, give notice and have this
21  case brought back to Court for further proceedings.
22  Thank you.
23            MR. HACKNEY:  Thank you, Your Honor.
24            (These proceedings were then concluded.)
25

Colloquy

THE COURT:  Take up at this time the case of the State of Idaho versus Zane Jack Fields.

Counsel will you each identify yourselves for the recored.

MR. HORTON:  Joel Horton and Roger Bourne, Ada County Prosecutor's office appearing on behalf of the Plaintiff, State of Idaho.

MR. HACKNEY:  Gar Hackney, John Lynn on behalf of Mr. Fields, Your Honor.

THE COURT:  This is the time set for pronouncement of sentence in this case.  Is there any legal cause why sentence should not be pronounced at this time?

MR. HACKNEY:  No, there is not, Your Honor.

MR. HORTON:  No, Your Honor.

THE COURT:  I will advise those present that under Idaho law when the death penalty is implicated, is a possibility, that it is necessary for the Court, in whatever decision it reaches, to set forth findings concerning a number of items required by Idaho Statute and by the Idaho Supreme Court Rule.  This is a lengthy process and I will, at this time, read into the record the findings that I have made in regard to this case.

Those findings will be filed subsequent to

1 pronouncement in open court.

2           In the District Court of the Fourth Judicial

3 District of the State of Idaho in and for the County of Ada.

4 State of Idaho Plaintiff versus Zane Jack Fields Defendant.

5 Findings Of The Court In Considering Death Penalty Under

6 Section 19-2515 Idaho Code.

7           The above named defendant having been found

8 guilty by a jury of the criminal offense of Murder in the

9 First Degree which under the law authorizes imposition of

10 the death penalty; and the Court having ordered a

11 presentence investigation of the Defendant and thereafter

12 held a sentencing hearing for the purpose hearing all

13 relevant evidence and argument of counsel in aggravation and

14 mitigation of the offense.

15           NOW THEREFORE the Court makes the following

16 findings:

17           1. Conviction. The Defendant while represented

18 by counsel was found guilty of the offense of Murder in the

19 First Degree by jury verdict.

20           2. Presentence Report. A Presentence Report was

21 prepared by order of the Court and a copy delivered to the

22 Defendant or his counsel at least seven days prior to the

23 sentencing hearing pursuant to section 19-2515, Idaho Code,

24 and the Idaho Criminal Rules. The Defendant objected to

25 portions of the Presentence Report and the Court has ruled

30  5756

on those objections in a separate memorandum. The Court has excised those portions of the report to which an objection was sustained.

3. Sentencing Hearing. A sentencing hearing was held on January 14, 1991, pursuant to notice to counsel for the Defendant and at that hearing, in the presence of the Defendant, the Court heard the argument of counsel. Evidence was not submitted by either the Prosecutor or the Defendant, but each had previously submitted sentencing memoranda.

4. Facts Found in Mitigation. The mitigating factors that appear to the Court are as follows:

The Defendant was abandoned by his father when he was two years old.

Apparently he was oppressed by a dominant female figure early in life which has contributed to the aggressive attitude he has displayed toward women.

There is some indication that he suffered childhood convulsions and that he reacted poorly under stress.

The Defendant has relatively low intelligence. As a teenager he was evaluated in the area of borderline retardation. However, he has completed a GED program.

The Defendant has been a drug and alcohol abuser for many years, commencing at an early age. As a teenager

1     he indicated that he used "all kinds of alcohol" and "as

2     much as possible." The use of alcohol and drugs has

3     impaired his ability to conform his conduct to legal and

4     social standards.

5         As an inmate in the penal system he has been able

6     the conform his conduct to institutional standards for

7     substantial periods of time. A Department of Corrections

8     report dated June 6, 1981, indicates that he volunteered to

9     help and seemed willing to work. A progress report dated

10    September 1, 1981, indicates that he was quotes "manageable

11    within the protective custody unit at the ISMF, having

12    received no disciplinary reports and generally received

13    above average on his work evaluations." Close quote. A

14    report November 11, 1984, indicates that he completed a high

15    school course in the penitentiary. On January 20, 1986, he

16    was evaluated as a good worker and on August 6th, 1986, he

17    was noted to be polite to staff, friendly with other inmates

18    and generally to follow rules.

19         5. Statutory Aggravating Circumstances

20    Considered But Not Found Beyond A Reasonable Doubt. Idaho

21    Code Section 19-2515 (g)(5). The State seeks a

22    determination that the aggravating circumstance set forth in

23    Idaho Code Section 19-2515 (g)(5) exists, asserting that

24    "The murder was an especially heinous, atrocious or cruel

25    manifesting exceptional depravity." In ordinary language it

1 might appear that this killing falls within those words.

2 The victim was a 69-year-old woman who was stabbed numerous

3 times and left to die by a large young man. However, to

4 find this aggravating circumstance the Court must find that

5 the killing was accompanied by additional acts which set the

6 crime apart from the norm of capital felonies -- "the

7 conscienceless or pitiless crime which is unnecessarily

8 tortuous to the victim." Clearly this crime was

9 conscienceless and pitiless to the victim. However, the

10 Court cannot find beyond a reasonable doubt that it was more

11 tortuous than other killings. The killing was not

12 accomplished with surgical precision. It was cruel, as

13 virtually all murders are, but the victim was not tortured

14 or put to pain beyond the infliction of the wounds, one

15 which was fatal.

16           6.  Statutory Aggravating Circumstances Found

17 Beyond A Reasonable Doubt.

18 (a) Idaho Code Section 19-2515 (g)(6).  The State seeks a

19 determination that the aggravating circumstance set forth in

20 Idaho Code Section 19-2515 (g)(6) exists in that, "By the

21 murder, or circumstances surrounding its commission, the

22 Defendant exhibited utter disregard for human life."  This

23 element requires a showing of acts or circumstances "which

24 exhibit the highest, the utmost, callous disregard for human

25 life, that is, the cold-blooded, pitiless slayer."  This

| | |
|---|---|
| 1 | aggravating circumstance has been proved beyond a reasonable |
| 2 | doubt.  The Defendant stabbed the 69-year-old woman multiple |
| 3 | times.  She posed no physical threat to him.  He left her to |
| 4 | die.  He stabbed her to complete a small value property |
| 5 | crime or to avoid detection for that crime.  In any use of |
| 6 | the language, he displayed utter disregard for human life |
| 7 | which was callous, cold-blooded, pitiless. |
| 8 | (b) Idaho Code Section 19-2515 (g)(7).  The State seeks a |
| 9 | determination that the aggravating circumstances set forth |
| 10 | in Idaho Code Section 19-2515 (g)(7) has been proved beyond |
| 11 | a reasonable doubt in that the murder was committed in the |
| 12 | perpetration of a robbery and/or burglary and was |
| 13 | accompanied by an intent to cause death.  The Jury found the |
| 14 | Defendant guilty of felony murder, that is, murder committed |
| 15 | in the perpetration of a robbery and/or burglary.  In this |
| 16 | case the Court gave a more restrictive instruction on the |
| 17 | element of intent than may be necessary for felony murder |
| 18 | instructing the Jury on the elements of malice |
| 19 | aforethought.  Express malice involves an intention to |
| 20 | kill.  Implied malice involves conduct with a wanton |
| 21 | disregard for human life.  To be a statutory aggravating |
| 22 | circumstance under Idaho Code Section 19-2515 (g)(7), the |
| 23 | Court must find beyond a reasonable doubt that the killing |
| 24 | was with a specific intent to cause death, not the wanton |
| 25 | disregard for human life of implied malice.  The element of |

1    a killing with a specific intent to cause death has been

2    established beyond a reasonable doubt.

3          The State relies upon the number and savagery of

4    the wounds as evidence of an intention to kill.  It is

5    powerful evidence of that intention, but by itself is also

6    consistent with wanton disregard for human life.  However,

7    additional facts support the finding that the wounds were

8    inflicted with an intention to kill.  If the Defendant had

9    merely sought escape when confronted by Mrs. Vanderford, he

10   could have overpowered her easily without the infliction of

11   a lethal wound.  The only reason to use a knife was to

12   silence her forever.  As Scott Bianchi testified, echoing

13   the Defendant's words, he, the Defendant needed "to finish

14   the job."  The fact that she was still alive when he left

15   does not weigh significantly against the finding that he

16   intended the kill her.  The number and extent of the wounds

17   would have left no reasonable doubt as to the outcome.  He

18   intended to "finish the job," to kill her, and he did.

19   (c) Idaho Code Section 19-2515 (g)(8).  The State seeks a

20   determination that the aggravating circumstance set forth in

21   Idaho Code Section 19-2515 (g)(8) exists in that "The

22   Defendant, by prior conduct or conduct in the commission of

23   a murder at hand, has exhibited a propensity to commit

24   murder which will constitute a continuing threat to

25   society."

1         A 1974 report by Ira Nadler a psychiatrist at

2    State Hospital South has a chilling forecast of this case,

3    noting of Zane Fields that, "He also denies any actual rape

4    of people and denies ever having used a knife in order to

5    commit an assault on a lady."  The report continues to state

6    the following:  "He does not show any appropriate concern

7    about the facts -- about the acts he has committed and does

8    not look at all upset about the accusation of having raped a

9    three-year-old."  Dr. Nadler diagnosed him as antisocial

10   personality, borderline mental retardation.

11        The clinical records from State Hospital South in

12   1975 notes another instance of inappropriate sexual behavior

13   that required his removal from the facility for the safety

14   of other patients.

15        The Presentence Report dated December 12, 1976

16   for his first adult felony notes the following:

17        "The subject's commitment to the Youth Training

18   Center in St. Anthony, Idaho, began in 1972.  This

19   commitment occurred when the subject violated curfew and

20   made threatening gestures with a knife toward a girl.

21   During that same year, the subject was granted an extended

22   leave to Idaho Falls.  June 14, 1973, Zane was returned to

23   the Youth Training Center after being charged with

24   assaulting a woman in an Idaho Falls laundromat.  According

25   to YTC records, this charge was subsequently dropped.

1       In June of 1974, another incident involving

2   attempted rape reportedly occurred in a park in the area."

3   Leaving the quotation.

4       The Presentence Investigator noted in the 1976

5   report that, "The subject's behavioral problems were not

6   altered significantly by either hospitalization or

7   commitment to the Youth Training Center.  Zane's performance

8   under probation as a juvenile was poor."

9       Clinical records from State Hospital South in

10  Blackfoot from January 1975, reveal the following comments

11  from Richard Grow, doctor of education, Psychologist 3:

12  Quote "Zane has not internalized the values and norms of our

13  society.  He is impulsive and has a low frustration

14  tolerance.  He is prone to be suspicious of others and tends

15  to blame others for his mistakes.  He seems unable to learn

16  from experience, and thus modify his behavior.  Finally, I

17  deeply fear that Zane is incapable of significant loyalty

18  and tends to perceive people as objects.  His views of

19  sexuality are distorted, and he has felt downtrodden by some

20  important female sexual figure in the past.

21      "While he is not actively psychotic, there are

22  hints of a thought disorder which will increase in

23  proportions in time.

24      "In a psychiatric sense, there is nothing about

25  Zane that should excuse him from criminal responsibility for

1     his behavior.  In my judgment this is not the last that the

2     criminal justice system will hear from this individual and

3     he will be a habitual offender of a progressive nature."

4            In 1978 Fred Kirn, a psychologist at the Idaho

5     Security Medical Facility, reported as follows:   "In summary

6     unless Mr. Fields changes his present thought patterns and

7     decreases his alcoholic consumption there is a strong

8     likelihood that he will continue to act out criminally,

9     violently and sexually."

10           As an adult Mr. Fields failed on probation,

11     committing forgery while on bond for delivery of marijuana.

12     By August, 1982, Mr. Fields developed a plan to become a

13     private detective, but according to the progress report of

14     August 5, 1982, had made little progress towards

15     rehabilitation.

16           The 120-day jurisdiction evaluation dated

17     September 21, 1983, noted that Mr. Fields was free of

18     disciplinary violations, but the social workers rated him as

19     a poor candidate for successful completion of probation.

20     The concerns were accurate.  On April 10, 1984, he was

21     declared a probation violator.

22           In general the Defendant has not been a

23     discipline problem in the penitentiary, but he has

24     consistently violated laws when released.  The following is

25     a summary of the Defendant's criminal record:  1, a 1976

1  conviction for grand larceny, resulting in a five-year

2  commitment with a 120-day retained jurisdiction; 2, a 1977

3  conviction from Bonneville County for unlawful possession of

4  controlled substance resulting in a suspended sentence and

5  probation; 3, a 1977 probation violation in Bonneville

6  County resulting in revocation of probation and commitment

7  to the Idaho State Correctional Institution for the

8  indeterminate three-year period that was previously

9  suspended; 4, a 1980 misdemeanor conviction Bonneville

10 County for petit theft resulting in a $60.00 fine, plus a

11 jail sentence; 5, two felony convictions in Bonneville

12 County in 1980 for forgery and delivery of a controlled

13 substance resulting in indeterminate five year sentences to

14 the Idaho State Correctional Institution.  Additionally, at

15 that time there was a probation violation; 6, a 1984 felony

16 conviction for Second Degree Burglary accompanied by a

17 probation violation for the burglary resulting in concurrent

18 sentences to the Idaho State Correctional Institution for

19 terms not to exceed five years; 7, a 1986 felony conviction

20 in Bannock County for Grand Larceny resulting in a jail

21 sentence; 8, a 1987 conviction in Ada County, Boise for

22 pedestrian under the influence, resulting in a fine and

23 costs; 9, a 1988 felony conviction in Ada County for

24 Aggravated Assault, resulting in a sentence of five years to

25 the Idaho State Correctional Institution and at that same

time a misdemeanor conviction for petit theft, resulting in a 127 day jail sentence. The aggravated assault and the petit theft occurred subsequent to the murder in this case.

In addition to the adult criminal record, the Defendant's juvenile record began in 1968 with a finding under the Youth Rehabilitation Act that he committed burglary. In 1969 he was found to have committed shoplifting, "car prowl," and auto theft. In 1972 he committed assault. In 1973 he was charged with assault with intent to commit rape. In 1974 another incident involving assault with intent to commit rape occurred. As a juvenile he was placed on probation was ordered to undergo phychological counselling, was committed to the Youth Training Center, to a Harbor House and to the Idaho Youth Ranch. He also was in State Hospital South in Blackfoot on two occasions.

Sworn testimony from pre-trial proceedings in this case indicate that he is volatile and threatening.

The dichotomy exists in this case. The record establishes beyond a reasonable doubt that in free society the Defendant has exhibited a propensity to commit crimes which will constitute a continuing threat to society. He views people as objects, he is fascinated with weapons, particularly knives. In commission of the murder at hand he killed when his property crime was detected. In free

society he would constitute a continuing threat to kill when others interfere with his desires, as occurred in this case.

On the other hand, much of the Defendant's institutional record is discipline free. An argument can be made that institutionalization would take away the continuing threat. Obviously, if one is isolated from the opportunity to commit harmful acts he will not commit harmful acts. However, the Court is convinced beyond a reasonable doubt that if frustration or aggravation confronted the Defendant in confinement he would kill if the opportunity arose. The fact that, hypothetically the Defendant can be prevented from committing acts by isolation does not mean he does not constitute a continuing threat to society to commit murder if the occasion arises.

The aggravating factor of a propensity to commit murder which will be a continuing threat to society has been proved beyond a reasonable doubt.

7. Additional Fact in Aggravation. Eleven days after murdering Mrs. Vanderford the Defendant committed a petit theft at Shopko in Boise, Idaho. When an attempt to apprehend him occurred, he drew a handgun on store personnel, resulting in a conviction following jury trial for aggravated assault and petit theft. The murder and the aggravated assault occurred within approximately two months

of his release from the penitentiary. The fact that he had murdered a woman eleven days earlier did not deter him from committing another theft, carrying a weapon and threatening use of the weapon. The number of witnesses present eliminated the practicality of killing to avoid detection.

This is a factor that would logically seem to fall within the consideration of Idaho Code Section 19-2515 (g)(8) as an aggravating circumstance, but reference to "prior conduct" precludes its consideration under that statutory provision, since it occurred subsequent to the murder. Therefore, the Court sets it forth separately as a factor considered in understanding the Defendant. Imposition of the death penalty upon this circumstance would not be proper.

8. Weighing the Aggravating and Mitigating Circumstances in Determining the Penalty. The Court is required to weigh all mitigating factors against each aggravating circumstance.

The aggravating circumstance in Idaho Code 2515 (g)(6) that, "By the murder, or circumstances surrounding its commission, the Defendant exhibited utter disregard for human life" outweighs all mitigating circumstances. One may have sympathy for the circumstances of the Defendant's life, but the cumulative effect of all mitigating factors pales in the face of the aggravating circumstance of utter disregard

for Mrs. Vanderford's life. The mitigating factors do not outweigh the aggravating circumstance and do not make imposition of death unjust.

Similarly the mitigating factors do not outweigh or balance the aggravating circumstance in Idaho Code Section 19-2515 (g)(7) that in the commission of felony murder the Defendant had a specific intent to kill. The cumulative mitigating circumstances are insubstantial in comparison to the magnitude of the act of intending to kill in the commission of a felony. Again, the mitigating factors do not outweigh the aggravating circumstance and do not make imposition of death unjust.

The cumulative effect of the mitigating circumstances does not outweigh the propensity to commit murder as a continuing threat to society so as to make imposition of death unjust. There have been some sad events in the Defendant's life and a limited number of positive factors. The limited positive trates shown by the Defendant are insubstantial in comparison to the danger he poses to others. The mitigating factors do not outweigh the aggravating circumstance and do not make imposition of death unjust.

9. The Factor of Guilt. A jury has found the Defendant guilty beyond a reasonable doubt. That finding was based in significant part on inmate testimony

1    implicating the Defendant. Before considering imposition of

2    the death penalty the Court feels a legal and moral

3    obligation to test whether there is sufficient certainty in

4    the evidence to dictate that a person die when inmate

5    testimony constitutes a substantial port of the evidence

6    leading to the conviction. If the Court harbors doubts

7    about imposing a death penalty based on inmate testimony,

8    apart from any other weighing process, individual conscience

9    would dictate against the imposition of death. The only

10   barrier that might stand between the Defendant and the

11   ultimate criminal penalty is if the quality of evidence were

12   such that the death penalty would be too final in light of

13   that evidence. There is no such barrier. No doubts of

14   conscience shield the Defendant. It is the Court's

15   conclusion that the appropriate penalty is death.

16          The Court will enter a judgment to that effect.

17   Court is in recess.

18          (Matter concluded.)

19

20

21

22

23

24

25