Nicole Owens
Executive Director
Jonah J. Horwitz, Idaho Bar No. 10494
Christopher M. Sanchez, Idaho Bar No. 12070
Assistant Federal Defenders
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, Idaho 83702
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
ECF:   Jonah_Horwitz@fd.org
         Christopher_M_Sanchez@fd.org

Attorneys for Petitioner

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| ERICK VIRGIL HALL, | ) | CASE NO. 1:18-CV-218-DCN |
| | ) | |
| Petitioner, | ) | |
| | ) | **CAPITAL CASE** |
| v. | ) | |
| | ) | |
| TIM RICHARDSON,[1] Warden, Idaho | ) | PETITIONER'S OPENING BRIEF |
| Maximum Security Institution, | ) | ON THE MERITS OF CLAIMS 2, |
| Department of Correction, State of | ) | 3, 14, 20, 37, 38, 39, AND 40 |
| Idaho, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| | ) | |
| | ) | |

---

[1] Tim Richardson should be substituted in as the respondent. *See* Dkt. 62 at 1 n.1.

# TABLE OF CONTENTS

I.    Standard of Review ................................................................................. 1

II.   Argument ................................................................................................ 11

      A.    Claim 2: Mr. Hall was improperly shackled at trial. ............................ 11

            1.    Section 2254(d)(1) is satisfied by the shackling claim. ............. 12

            2.    Section 2254(d)(2) is satisfied by the shackling claim. ............. 15

            3.    De novo review of the shackling claim leads to relief. .............. 18

            4.    Mr. Hall is entitled to at least an evidentiary hearing. ............. 20

      B.    Claim 3: DNA testimony violated the Confrontation Clause. ............... 22

      C.    Claim 14: The trial court violated Mr. Hall's due-process rights
            by denying him a complete appellate record. ........................................ 30

            1.    The Idaho Supreme Court's determination about the
                  completeness of Mr. Hall's record is an unreasonable
                  application of federal law and an unreasonable
                  determination of facts under § 2254(d)....................................... 32

            2.    The Idaho Supreme Court's determination that Mr. Hall
                  must show prejudice is based on an unreasonable
                  application of clearly established federal law under
                  § 2254(d)(1). .............................................................................. 40

            3.    The Idaho Supreme Court's finding that there were adequate
                  substitutions for the missing records is an unreasonable
                  determination of facts under § 2254(d)(2). ............................... 42

            4.    Mr. Hall is entitled to relief or at least a hearing under a
                  de novo standard......................................................................... 44

      E.    Claim 20: Unanimity was improperly required on mitigation and
            weighing. .............................................................................................. 46

      F.    Claim 37: The HAC aggravator is unconstitutionally vague................. 49

      G.    Claim 38: The utter disregard aggravator is unconstitutionally vague 55

      H.    Claim 39: The propensity aggravator is unconstitutional. .................... 68

      I.    Claim 40: The felony-murder aggravator fails to serve the
            constitutionally required narrowing function where the murder
            conviction is also premised upon felony-murder. ................................. 76

      J.    Cumulative prejudice warrants relief or at least a hearing ................. 86

III.  If relief is denied a Certificate of Appealability is appropriate...................... 92

IV.   Conclusion ................................................................................................ 93

Pursuant to the Court's order, *see* Dkt. 70, Petitioner Erick Virgil Hall submits this opening brief on the merits of eight fully exhausted claims.[2]

## I.   Standard of Review

"The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action," and it must "be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris v. Nelson,* 394 U.S. 286, 290–91 (1969).[3]

Because of its filing date, Mr. Hall's petition is ostensibly governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA").  However, Mr. Hall asserts that AEDPA is unconstitutional.  Congress cannot define prisoners' habeas rights so narrowly as to suspend the writ.  *See* U.S. Const. art. I, § 9, cl. 2.  AEDPA renders federal courts powerless, in many circumstances, to grant relief when it is undisputed that the conviction or sentence was unconstitutional.  Even in strong cases with clear state-court error, a federal court under AEDPA will deny relief if

---

[2] In addition to the issues addressed in the instant brief, the parties stipulated that Claim 12 would be included in the current merits litigation.  *See* Dkt. 63 at 2. Claim 12 alleges that the evidence was insufficient with respect to Mr. Hall's conviction for forcible rape.  *See* Dkt. 39 at 41–42.  Mr. Hall has elected not to brief Claim 12 at this time.  He does not thereby concede the validity of the forcible-rape conviction, which he may challenge later depending on the fruits of counsel's ongoing investigation and the course of the legal proceedings.

[3] In this brief, unless otherwise noted, all internal quotation marks, citations, and alterations are omitted, and all emphasis is added.

the state-court's erroneous decision falls short of unreasonableness.  As such,

AEDPA suspends the writ, is unlawful, and cannot be utilized here.

Furthermore, the writ "is designed to restrain" Congress and is "an

indispensable mechanism for monitoring the separation of powers." *Boumediene v.*

*Bush*, 553 U.S. 723, 765–66 (2008).  By requiring courts to ignore unlawful

detentions, AEDPA runs afoul of the separation of powers and cannot be applied for

that reason as well.

In light of AEDPA's unconstitutionality, this petition should be analyzed

under pre-AEDPA law.  That law compels relief "when a state prisoner carries his

burden of proving that his detention violates the fundamental liberties of the

person, safeguarded against state action by the Federal Constitution." *Doe v. Ayers*,

782 F.3d 425, 428–29 (9th Cir. 2015).  De novo review is used to consider the state

courts' "determinations of pure questions of law and mixed questions of law and

fact." *Burton v. Davis*, 816 F.3d 1132, 1140 (9th Cir. 2016).

Mr. Hall acknowledges that the courts have upheld AEDPA's

constitutionality.  *See, e.g., Felker v. Turpin*, 518 U.S. 651 (1996).  However, the

precedent was established before judicial interpretations had elevated AEDPA's bar

so high.  Indeed, one important decision that significantly weighs against AEDPA's

constitutionality was handed down earlier this year: *Shinn v. Ramirez*, 142 S. Ct.

1718 (2022).  *Ramirez* held that under 28 U.S.C. § 2254(e)(2) petitioners may not

develop the record in federal court on a claim that was defaulted in state court

through the ineffectiveness of post-conviction counsel barring extremely rare

exceptions. 142 S. Ct. at 1734. However, *Ramirez* did not purport to overrule *Martinez v. Ryan*, 566 U.S. 1, 9 (2012), which ruled that a federal habeas petitioner is entitled to use ineffective assistance of post-conviction counsel as a means to pursue a challenge to his trial lawyer's performance on a theory that has been procedurally defaulted in state court. In fact, the majority in *Ramirez* described its side as being truer to *Martinez*'s holding than the dissent. *See Ramirez*, 142 S. Ct. at 1737 ("*Martinez* itself cuts against respondents' proposed result."). Thus, in the power-*Ramirez* world, it is still true as an equitable matter that petitioners should not be locked out of court simply because the state gave them two sets of incompetent lawyers, and yet such petitioners can apparently do nothing to prove the claims once in court. In that way, *Ramirez*'s interpretation of § 2254(e)(2) has made habeas relief illusory for a class of claims that the Supreme Court itself continues to describe as calling for federal habeas review. Changing circumstances have thus rendered AEDPA unconstitutional under the suspension clause. Mr. Hall will apply AEDPA here on the assumption that the Court rejects the foregoing argument, which he raises primarily to preserve for appeal.

AEDPA places limitations on a federal court's power to grant a state prisoner's federal habeas petition. *Cullen v. Pinholster,* 563 U.S. 170, 181 (2011). When a state court has adjudicated a claim on the merits, relief may be granted only if the adjudication of that claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). If a claim has been adjudicated on the merits by the state court, the federal court's analysis under § 2254(d) is limited to the record that was before the state court. *Pinholster,* 563 U.S. at 181.

However, when a state court has not adjudicated a federal claim on the merits, but instead relies on a procedural bar, review of the claim is de novo. *Cone v. Bell,* 556 U.S. 449, 472 (2009); *Pirtle v. Morgan,* 313 F.3d 1160, 1167 (9th Cir. 2002). The Court ordered the parties here to address the merits of the claims in their briefs. *See* Dkt. 70. If the State raises any argument outside the merits in its responsive brief, such as exhaustion or procedural default, Mr. Hall will address it in his reply.

De novo review also applies when the state court failed to reach any element of the claim prescribed by federal law, and § 2254(d) is inapplicable to the federal court's analysis of the un-adjudicated portion of the claim. *See Wiggins v. Smith,* 539 U.S. 510, 534 (2003) ("[O]ur review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis."); *Rompilla v. Beard,* 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim de novo").

Under § 2254(d), "clearly established Federal law" refers to the holdings of the Supreme Court at the time the state court adjudicated the claim on the merits. *Williams v. Taylor*, 529 U.S. 362, 412 (2000) ("*Terry Williams*") (O'Connor, J., for the Court as to part II of her opinion).  While Supreme Court precedent is the only controlling authority under AEDPA, cases from lower courts can illuminate the contours of the Supreme Court's holdings and provide persuasive authority to aid in determining whether a particular state court opinion is an unreasonable application of the Court's holdings.  *Robinson v. Ignacio*, 360 F.3d 1044, 1057 (9th Cir. 2004); *Luna v. Cambra*, 306 F.3d 954, 960 (9th Cir.), *amended on other grounds by* 311 F.3d 928 (9th Cir. 2002); *Padilla v. Blades*, No. 1:17-cv-527-BLW, 2019 WL 1063625, at *5 (D. Idaho Mar. 6, 2019).

An unreasonable application of federal law results where the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Terry Williams*, 529 U.S. at 407–08.  An unreasonable application of clearly established federal law also results "when a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  In those circumstances, when the limitations of § 2254(d) are satisfied, the only obstacle to a grant of the writ is the need for a showing that the petitioner is in custody in violation of the Constitution or laws or treaties of the United States. *Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc) (citing § 2254(a)).  The "more general-but still limited-provision" of 2254(a) "alone governs, where the other limitations set out in § 2254(d) . . . are no obstacle

to the grant of habeas relief," and § 2254(a) "contains no requirement of deference to state court adjudications." *Id*. Thus, when the limitations of § 2254(d) do not apply, federal courts "necessarily decide the issues before them de novo, as was done before AEDPA's addition of § 2254(d) in 1996." *Id*. In this case, whenever Mr. Hall argues that § 2254(d) does not bar habeas relief, he is arguing at the same time—and for the same reasons—that § 2254(a) requires the Court to grant the writ. *See id.* ("[A] holding on habeas review that a state court error meets the § 2254(d) standard will often simultaneously constitute a holding that the § 2254(a) . . . requirement is satisfied as well.").

AEDPA does not require habeas courts to await "some nearly identical factual pattern" before applying a clearly established rule, nor does it prohibit "finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). AEDPA's statutory language "recognizes … that even a general standard may be applied in an unreasonable manner." *Id*.

When a state court's adjudication of the merits of a claim "is dependent on an antecedent unreasonable application of [a] federal law, the requirement set forth in § 2254(d)(1) is satisfied." *Id*. A federal court may resolve such claims "without the deference AEDPA otherwise requires." *Id*. An unreasonable application of law under § 2254(d)(1) is one that is "objectively unreasonable." *Terry Williams*, 529 U.S. at 409. Transforming the test into a subjective one, because "one of the Nation's jurists has applied the relevant federal law in the same manner the state

court did," is inappropriate, and an individual jurist's similar application of the relevant law does not make the state court's application of law objectively reasonable. *Id*. at 409–10.

When the state court decision gives an explanation in a reasoned decision, those reasons control the analysis, and when the "reasoning contradict[s] clearly established federal law as determined by the Supreme Court, § 2254(d) is not a barrier to relief." *Avila v. Richardson*, 751 F.3d 534, 537 (7th Cir. 2014). *Johnson v. Williams* only "instructs us to give state courts the benefit of the doubt when the basis for their holdings is unclear.  It does not require us to ignore a state court's explicit explanation of its own decision." *James v. Ryan*, 733 F.3d 911, 916 (9th Cir. 2013).

Importantly, it is only the actual contents of the state court's decision, and not any *post hoc* reasoning that a respondent may offer as an alternative means for justifying the outcome of the state court proceeding, that is relevant to the § 2254(d) analysis. *See Wiggins*, 539 U.S. at 529–30 (justifications for state court's denial of relief offered by respondent in federal habeas proceedings but not relied upon in actual state court decision have "no bearing" on federal court's analysis under § 2254(d)).

As for § 2254(d)(2), an unreasonable determination of the facts by the state courts is a separate and independent path to de novo review in federal habeas proceedings.  *See Rodriguez v. McDonald*, 872 F.3d 908, 920 (9th Cir. 2017).

This Court must deem § 2254(d)(2) satisfied if it cannot "reasonably conclude that the finding" at issue "is supported by the record before the state court." *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014). "When a state court rejects a federal claim without expressly addressing that claim," there is a rebuttable presumption "that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 301 (2013).

A faithful application of § 2254(d)(2) cannot be accomplished without looking beneath a state court's factual "findings" in order to assess the reasonableness of the conclusions reached by the state court in light of the evidence that was before that court. *Miller-El v. Dretke*, 545 U.S 231, 240–41 (2005); *Wiggins*, 539 U.S. at 528. While the state court's decision is entitled to "substantial deference" under § 2254(d)(2), "deference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). "Under § 2254(d)(2), a state court decision is based on an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Pruitt v. Neal*, 788 F.3d 248, 263 (7th Cir. 2015).

In *Doody v. Ryan*, 649 F.3d 986, 1002–07 (9th Cir. 2011), the en banc Ninth Circuit found § 2254(d)(2) satisfied even though the record was somewhat ambiguous and a dissent disagreed with the majority's reading of the facts. *Cf. id*. at 1029–50 (dissenting opinion of three judges). Section 2254(d)(2) clearly does not require every reasonable jurist to disagree with the state court for the state court's

findings or procedures to be unreasonable.

Once a petitioner has satisfied § 2254(d), he is no longer limited to the state

court record in proving his claim. *See Pinholster*, 563 U.S. at 180 (indicating that

its holding concerned only "the scope of the record *for a § 2254(d)(1) inquiry*").

Thus, once an inmate has shown either that the state court's adjudication was an

unreasonable application of clearly established federal law or that it unreasonably

determined the facts, the inmate is entitled to request an evidentiary hearing. *See*

*Cruz v. Ryan*, No. CV-13-389-TUC-JGZ, 2018 WL 1524026, at *21–30 (D. Ariz. Mar.

28, 2018) (granting an evidentiary hearing on an exhausted claim because the

prisoner met the terms of § 2254(d)).  A hearing is appropriate when it "could enable

an applicant to prove the petition's factual allegations, which, if true, would entitle

the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465 at 474.

Section 2254(e)(2) conditions the allowance of an evidentiary hearing, barring

exceptions not relevant here, on whether the petitioner "develop[ed] the factual

basis of a claim in State court proceedings."  "A petitioner who has previously

sought and been denied an evidentiary hearing has not failed to develop the factual

basis of his claim and therefore satisfies § 2254(e)(2)." *Stanley v. Schriro*, 598 F.3d

612, 624 (9th Cir. 2010).  In his initial state post-conviction action, Mr. Hall

repeatedly and consistently requested an evidentiary hearing from the trial court.[4]

---

[4] Mr. Hall moved for partial summary disposition in his favor with respect to
several claims.  However, he did not do so in connection with any of the claims
asserted here, and the motion is accordingly irrelevant to the argument above. *See*
B-10 at 1830–48.

Petitioner's Opening Brief on the Merits – 9

*See* B-1 at 32; B-2 at 361; B-7 at 1348; B-10 at 2006.[5]  The trial court nevertheless summarily dismissed the petition without holding an evidentiary hearing on a single one of Mr. Hall's thirty-eight claims in this complex capital case, *see* B-11 at 2417, despite the fact that evidentiary hearings have been granted in a substantial majority of initial capital post-conviction cases in Idaho over at least the last twenty-five years, *see* Dkt. 68 at 114.  Mr. Hall continued to pursue an evidentiary hearing on appeal, *see* D-24 at 241–44, and the request was denied there as well, *see State v. Hall*, 419 P.3d 1042, 1132–33 (Idaho 2018).  Because Mr. Hall diligently and fruitlessly sought an evidentiary hearing in state court, § 2254(e)(2) is no bar to factual development in federal habeas.

In the present case, if the Court concludes that it is unable to grant relief on the basis of the state court record on any claim outlined in this brief, Mr. Hall respectfully requests an evidentiary hearing on that claim or, in the alternative, access to more modest tools of factual development such as depositions.  *See Blackledge v. Allison*, 431 U.S. 63, 81 (1977) (clarifying that habeas courts "may employ a variety of measures in an effort to avoid the need for an evidentiary hearing," including through the use of discovery mechanisms).

Mr. Hall acknowledges that the local rules indicate that a litigant in a capital habeas matter seeking "an evidentiary hearing related to the merits of any claim . . . must file a motion to that effect within 90 days after the answer is filed."  Dist. Idaho Loc. Civ. R. 9.2(e)(6).  However, the Court has already departed from the case

---

[5] Citations in the format above are to the current lodgings.  *See* Dkt. 34.

Petitioner's Opening Brief on the Merits – 10

progression contemplated by the local rule by beginning the case with this merits

briefing.  *See* Dist. Idaho Loc. Civ. R. 9.2(d).  In the interest of efficiency, Mr. Hall

includes in this brief arguments as to why his merits claims are suited to

evidentiary hearings.  The Court may prefer instead to first determine which claims

survive § 2254(d) and then, at a later date, solicit briefs regarding a potential

evidentiary hearing.  Mr. Hall would have no objection to such an approach, which

would have the benefit of allowing the parties to brief the propriety and scope of an

evidentiary hearing in light of the Court's § 2254(d) analysis.[6]

## II.   Argument

Mr. Hall now addresses each of the merits claims.  He incorporates every

section of his brief into every other section.  With respect to any argument for guilt-

phase relief, Mr. Hall asks in the alternative that the writ issue as to his death

sentence.

### A. Claim 2: Mr. Hall was improperly shackled at trial.

Mr. Hall is entitled to relief or at least an evidentiary hearing on his

shackling claim because the trial court required him to wear noticeable restraints

without any adequate justification in violation of his constitutional rights.  Here,

Mr. Hall will first explain how the Idaho Supreme Court's resolution of the claim

satisfies 28 U.S.C. § 2254(d); then, he will show why he is entitled to habeas relief

---

[6] If the Court denies relief on any of the following claims on the basis of this merits
briefing, and if Mr. Hall later discovers facts supporting the claim, he reserves the
right to argue that the claim should be reopened, and the new facts taken into
consideration.

as a result; and finally, he will demonstrate why, if relief is not granted, an evidentiary hearing should be held.

### 1. Section 2254(d)(1) is satisfied by the shackling claim.

Mr. Hall is entitled to de novo review under § 2254(d)(1) because the state supreme court's opinion was an unreasonable application of clearly established federal law.

"Section 2254(d)(1) permits a federal habeas court to grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case." *Wiggins*, 539 U.S. 510 at 520. The clearly established federal law on this question comes from *Deck v. Missouri*, 544 U.S. 622, 629 (2005), which held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." Audible restraints, like visual restraints, fall within *Deck*'s ambit. *See Weaver v. Carlin*, No. 3:10-cv-295, 2013 WL 1797444, at *12 (D. Idaho Apr. 29, 2013) (interpreting *Deck* to "require[ ] that the jury know about the restraint—either by seeing *or hearing it*"). The rule applies at both the guilt and sentencing phases of a capital trial. *See Wiggins*, 539 U.S. at 632. *Deck* does not permit the post-hoc justification of restraints, but rather demands they be explained at the time the device is utilized at trial. *See Larson v. Palmateer*, 515 F.3d 1057, 1063 (9th Cir. 2008) ("Although any of these reasons may have provided an adequate basis for

imposing security restraints, the Supreme Court in *Deck* specifically rejected such post-hoc rationales.").

In the case at bar, the Idaho Supreme Court recognized that the claim was governed by *Deck* and its ruling that the use of shackles at trial must be supported "by a state interest specific to a particular trial." *Hall*, 419 P.3d at 1119. Nevertheless, the state court unreasonably applied this federal law by using post-hoc justifications for Mr. Hall's shackling. The Idaho Supreme Court on appeal excused the restraints with reference to two factors: 1) the nature of the charges in both the Lynn Henneman case (the underlying proceeding here) and the Cheryl Hanlon case (a separate rape-murder proceeding charged simultaneously but tried later); and 2) Mr. Hall's prior conviction for felony escape. *See id.* However, neither of these reasons were cited by the trial judge below when he authorized restraints. As a consequence, the Idaho Supreme Court's analysis represents a classic post-hoc approach, and it is foreclosed by *Deck* as recognized by binding Ninth Circuit precedent in *Larson*. It follows that § 2254(d)(1) is satisfied because the Idaho Supreme Court "identifie[d] the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] that principle to the facts of petitioner's case." *Wiggins*, 539 U.S. at 520.

The only justifications offered by the district court for the restraints were articulated not, as required by *Deck* and *Larson*, at the time they were ordered, but rather in post-conviction proceedings. At that time, Judge Neville claimed to have made findings about the need for restraints at trial and to have used "the least

intrusive means to accomplish the desired result." B-11 at 2317. He also asserted that he "made the determination that restraining the Petitioner by some method was a necessary precaution to protect the courtroom and its occupants." *Id.* As an initial matter, Judge Neville's comments in post-conviction were not invoked by the Idaho Supreme Court, so they by definition fall outside of the § 2254(d)(1) analysis here. *See Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When applying [§ 2254(d)(1)'s] heightened deferential standard, we review the last reasoned decision by the state court addressing the petitioner's claim.").

The other problem with these avowals by Judge Neville is that there is no indication that any such findings were made *at trial*. Neither the transcript nor the clerk's record reflect determinations along these lines being made during the relevant time-period. Moreover, Ninth Circuit law prevents federal habeas courts from relying on the self-serving recollections of state judges, untested by cross-examination, when they are attempting to insulate their rulings in post-conviction proceedings from constitutional attack. *See Hurles*, 752 F.3d at 790–91.

Mr. Hall acknowledges that Judge Neville did on one occasion comment at the beginning of jury selection that Mr. Hall was "in custody although it's not apparent." A-10 at 2067. This offhand remark does not defeat the shackling claim for several reasons. First, it is not at all clear what "in custody" means in the context of this sentence. Restraints are not naturally described as a type of "custody." Second, the statement sheds no light on whether the restraints were observable throughout the rest of the lengthy trial, as opposed to on that single

occasion.  That is an especially important point because Mr. Hall has sworn in an affidavit that the restraints would have been noticeable to the jury when he pushed a lever to unlock the brace, which he had to do every time he sat down.  *See* B-7 at 1377.  In a situation like the one Mr. Hall described in his affidavit, the restraints would presumably not have been apparent to the jury at the moment Judge Neville made his statement, because Mr. Hall would not have been in the process of sitting down at that moment.  Still, that would not change the fact that the restraints would be apparent to the jury at other times during trial, when Mr. Hall was sitting down.  And third, the word "apparent" seems to refer to visible restraints and does not speak to the main issue raised here, which is that the shackles were *audible* to the jury.

### 2.  Section 2254(d)(2) is satisfied by the shackling claim.

In the event the Court rejects the foregoing argument respecting § 2254(d)(1), Mr. Hall can secure de novo review through § 2254(d)(2) instead.

When the state courts "overlook[] and ignore[ ]" key evidence, their fact-finding becomes unreasonable within the meaning of § 2254(d)(2).  *Kipp v. Davis*, 971 F.3d 939, 953–54 (9th Cir. 2020).  In Mr. Hall's case, the Idaho Supreme Court rejected the shackling claim in part with reference to the assertion that "the leg brace he was required to wear was not visible to the jury and the court took care to seat [Mr.] Hall at the defense table when the jury entered the room each time and to keep his movement out of the view of the jury."  *Hall*, 419 P.3d at 1119–20.  But the Idaho Supreme Court overlooked and ignored the critical factual question of

whether the jury was alerted to Mr. Hall's shackles by the *sound* they made. Mr. Hall submitted a sworn affidavit in his state post-conviction proceedings to establish that the leg device that he wore for all court appearances made clicking noises that the jurors would have been able to hear every time he stood up. *See* B-7 at 1377. In his opening brief in the consolidated appeal, Mr. Hall's claim likewise focused on the audible sound from the leg restraint. *See* D-24 at 165. Yet nowhere in the Idaho Supreme Court's opinion did it acknowledge the affidavit, which was admissible evidence as a matter of state law. *See* Idaho Code § 19-4907(a) (providing that a post-conviction court "may receive proof by affidavits"). Furthermore, the affidavit is "highly probative and central to petitioner's claim," *Kipp*, 971 F.3d at 954, because it speaks directly to the critical issue of whether the jury was conscious of Mr. Hall's restraints. Because the Idaho Supreme Court "overlooked and ignored" the evidence, *id.*, § 2254(d)(2) is no obstacle to relief or a hearing.

To be sure, Mr. Hall's second-chair counsel at trial, D.C. Carr, testified after trial that he could not hear Mr. Hall's restraints. *See* B-22 at 3272. Importantly, though, the Idaho Supreme Court itself did not rely on that account, *see Hall*, 419 P.3d at 1119–20, making it irrelevant for § 2254(d)(2) purposes, *see Pizzuto v. Yordy*, 947 F.3d 510, 523 (9th Cir. 2019) ("We apply our review under § 2254(d)(2) to the last reasoned state court decision."). Furthermore, under well-settled Idaho law, it is only permissible to summarily dismiss a post-conviction petition without a hearing if "the applicant's evidence has raised no genuine issue of material fact

that, if resolved in the applicant's favor, would entitle the applicant to the relief requested." *State v. Payne*, 199 P.3d 123, 136 (Idaho 2008).  It, therefore, cannot be the case that the Idaho Supreme Court silently relied upon Mr. Carr's account when there was competent evidence contradicting it in the form of Mr. Hall's affidavit.

Finally, the state post-conviction court's reliance on Mr. Carr's statement, if it is considered, does not defeat the claim.  The post-conviction court stated that "the undisputed evidence in this case is that *trial counsel* did not see or hear the device at trial."  B-11 at 2318.  But trial counsel's perceptions are immaterial.  The question is whether the restraints were apparent "*to the jury*."  *Deck*, 544 U.S. at 629.  When Mr. Carr was asked whether the restraints made noise, his response was: "Not around me it didn't.  It may have been.  But I have high frequency loss, so."  B-22 at 307.  In other words, Mr. Carr personally could not hear the restraints, but suffered from a hearing impairment that might have prevented him from being aware of the noise.  The fact that a hearing-impaired attorney was not cognizant of the noise from the restraints falls far short of showing that the jury was oblivious as well.

Lastly, § 2254(d)(2) is no bar to relief because the state courts unreasonably deprived Mr. Hall of the ability to develop the facts in support of the claim by blocking juror interviews, as described below, *see infra* at Part II.A.4, making the post-conviction fact-finding procedures "seriously inadequate for the ascertainment of the truth."  *Panetti*, 551 U.S. at 954.

### 3. De novo review of the shackling claim leads to relief.

With § 2254(d) satisfied, the question is whether Mr. Hall is entitled to relief. Mr. Hall has already explained how the requisite findings were not made at trial, which demonstrates that his constitutional rights were violated. The remaining inquiry is into prejudice. Prejudice turns on whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Larson*, 515 F.3d at 1064 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

Mr. Hall submits that he is entitled to guilt-phase relief on his shackling claim, at least with respect to the murder charges. Guilt-phase relief on a shackling claim becomes more appropriate when a defendant is charged with a violent crime, for "the shackl[ing] essentially brand[s] [him] as having a violent nature." *Rhoden v. Rowland (Rhoden II)*, 172 F.3d 633, 637 (9th Cir. 1998). Mr. Hall was charged with a rape-murder, which is plainly a violent crime.

It is also relevant, in considering prejudice at the guilt phase, whether "the evidence was disputed." *Id.* Here, it was. The only evidence directly linking Mr. Hall to the crime was DNA testing. However, while that evidence arguably could have been viewed by the jury as establishing Mr. Hall's involvement in the rape, it did not connect him to the murder. There was no physical evidence to suggest that Mr. Hall was guilty of that more severe offense. The gap is especially noteworthy because evidence was presented to the jury of another highly suspicious individual who could well have been involved in the crime. That individual was Christian Johnson, who accosted another woman on the Greenbelt in a frightening manner

and was then seen following and harassing Ms. Henneman shortly before her death. *See generally* A-11 at 3564–602.  Mr. Johnson was a drug user with a criminal record who bizarrely called the police after the murder—and before any arrests—to report that he had overheard a 6'8" man dressed in all black with a stutter talking on a pay phone in a way that suggested he might have been responsible for Ms. Henneman's death.  *See generally id.* at 3760–811.  In other words, Mr. Johnson was a dubious character observed badgering the victim right before her death and who then sua sponte tried to deflect blame to an apparently fictitious person. Patrick Hoffert was another prime candidate for alternative perpetrator.  There were reports that Mr. Hoffert was seen with Ms. Henneman and then confessed to an acquaintance that he had raped a woman before committing suicide the day after the murder.  *See* B-22 at 3380–86.  Consequently, the evidence of Mr. Hall's guilt for the murder "was disputed," *Rhoden II*, 172 F.3d at 637, and this factor also cuts in favor of guilt-phase relief.

Alternatively, sentencing relief should be awarded.  Restraints at a capital sentencing are constitutionally problematic because they suggest to the jury "that court authorities consider the offender a danger to the community—often a statutory aggravator and nearly always a relevant factor in jury decisionmaking." *Deck*, 544 U.S. at 633.  In the case at bar, the risk for prejudice at sentencing was especially high.  The State pursued four aggravating circumstances in Mr. Hall's case, one of which was that he "exhibited a propensity to commit murder which will probably constitute a continuing threat to society."  A-1 at 33–34.  At sentencing,

Petitioner's Opening Brief on the Merits – 19

the State presented additional evidence exclusively on the propensity aggravator. *See* A-12 at 4733. In addition, empirical research demonstrates that future dangerousness "is on the minds of most capital jurors, and is thus at issue in virtually all capital trials." John H. Blume et al., *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L. Rev. 397, 398 (2001). Because restraints imply dangerousness, and because dangerousness is at the heart of a capital sentencing, prejudice is manifest.

Finally, the questions about the strength of the State's guilt-phase evidence surveyed earlier cement sentencing prejudice on this claim. That is, the prospect that a different individual was the murderer would create residual doubt in the jury about Mr. Hall's guilt sentencing, and—in the absence of the shackles—a single juror would likely have rejected the ultimate punishment of death. *See State v. Hartman*, 42 S.W.3d 44, 59 (Tenn. 2001) (vacating a death sentence because evidence of residual doubt was excluded from the jury's consideration and observing that "recent studies have shown that in general residual doubt is one of the most compelling mitigating circumstances a capital defendant can establish to improve his chances of receiving a life sentence"). In short, the restraints placed a "thumb [on] death's side of the scale." *Deck*, 544 U.S. at 633, and sentencing relief at a minimum is proper.

### 4. Mr. Hall is entitled to at least an evidentiary hearing.

In the event the Court denies habeas relief on the instant claim, an evidentiary hearing should at least be afforded. "In deciding whether to grant an

evidentiary hearing, a federal court must consider whether the hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro*, 550 U.S. 465. To the extent the Court believes that Mr. Carr's post-trial testimony about the restraints is an impediment to relief on the papers, there is a classic dispute of fact. As mentioned, Mr. Hall himself has sworn in an affidavit that his restraints "would have been noticeable to the jury" and that the jury "would have been able to hear" them. B-7 at 1377. Evidentiary hearings are required in federal habeas proceedings when such factual issues cannot be resolved on the record alone. *See Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005).

One significant benefit to an evidentiary hearing on this issue would be the opportunity to learn from the jurors themselves what they were or were not aware of at trial. *See Rhoden v. Rowland (Rhoden I)*, 10 F.3d 1457, 1459–60 (9th Cir. 1993) (remanding a federal habeas case to the district court for an evidentiary hearing so that the petitioner could develop the record on whether the jury saw his shackles). It is appropriate to allow an evidentiary hearing in federal court on the question of the jurors' knowledge because such an inquiry was foreclosed by the state judiciary. Mr. Hall sought to interview jurors to develop his post-conviction claims, which included the shackling issue, but the state district judge refused, and the Idaho Supreme Court affirmed. *See Hall v. State*, 253 P.3d 716, 719–26 (Idaho 2011). Mr. Hall was diligent under § 2254(e)(2) because he "made a reasonable attempt, in light of the information available at the time, to investigate and pursue"

Petitioner's Opening Brief on the Merits – 21

the shackling issue.  *West v. Ryan*, 608 F.3d 477, 484 (9th Cir. 2010).  Thus, AEDPA

does not bar an evidentiary hearing, and one should be held.  *See Ogletree v. State*,

No. A-9638, 2010 WL 4260624, at *2 (Alaska Ct. App. Oct. 27, 2010) (reflecting

what evidentiary proceedings are necessary to fully and fairly resolve shackling

claims, including juror interviews).

**B. Claim 3: DNA testimony violated the Confrontation Clause.**

Under § 2254(d)(1), the Idaho Supreme Court unreasonably applied clear

federal constitutional law regarding the Confrontation Clause of the Sixth

Amendment by approving the testimony of an expert witness about important DNA

exclusions when it was undisputedly other individuals who conducted the relevant

testing.

At trial, Dr. Carla Finis testified for the State about a large number of

potential suspects who were supposedly excluded by DNA testing as sources of the

sperm fraction found in the victim's body.  *See* A-11 at 4395–4400.  The problem for

present purposes is that Dr. Finis did not perform the testing leading to those

results.  Instead, the testing was done by Ann Bradley and Cynthia Hall.  *See* A-11

at 4395, 4399.  Nonetheless, Dr. Finis testified to the results, namely, that 129 men

had been ruled out as possible perpetrators of the rape (ninety-four by Ms. Bradley's

testing and thirty-five for Ms. Hall's).  *See id*.  Neither Ms. Bradley nor Ms. Hall

testified at trial.

On appeal, the Idaho Supreme Court rebuffed a Confrontation Clause

challenge to Dr. Finis's testimony.  It reasoned that "Dr. Finis independently

interpreted the data and arrived at her own conclusions based upon the raw evidence." *Hall*, 419 P.3d at 1076.  Plus, Dr. Finis "supervised Ms. Bradley." *Id.* Based on those circumstances, the Idaho Supreme Court felt that Dr. Finis's "opinions and data analyses were thus her original product, which were available to be tested on cross-examination." *Id.*

The Idaho Supreme Court's approach is incompatible with the controlling federal precedent, which is *Bullcoming v. New Mexico*, 564 U.S. 647, 651 (2011).[7] Review of *Bullcoming* was accepted by the U.S. Supreme Court to consider the question of whether the Confrontation Clause sanctions the admission of testimony by a crime lab analyst who did not "personally perform or observe the performance

---

[7] Mr. Hall acknowledges that some similar issues are addressed in *Williams v. Illinois*, 567 U.S. 50 (2012) (plurality op.).  However, there is no majority opinion in *Williams*.  In such situations, "the holding of the Court may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977).  Here, the "[n]arrowest ground for the decision in *Williams* was the conclusion that the DNA profile report from the independent lab was not testimonial." *Commonwealth v. Brown*, 185 A.3d 316, 328 (Pa. 2018).  The Idaho Supreme Court did not determine that the germane information related by Dr. Finis was non-testimonial.  Rather, it concentrated on whether Dr. Finis could present the information under the Confrontation Clause or whether someone else had to.  *See Hall*, 419 P.3d at 1076.  Consequently, Mr. Hall will not address *Williams* in discussing § 2254(d)(1).

of the test" and the results are introduced at trial.  *Id.* at 657.[8]  *Bullcoming*

answered the question in the negative.  "As a rule," the Court reminded, "if an out-

of-court statement is testimonial in nature, it may not be introduced against the

accused at trial unless the witness who made the statement is unavailable and the

accused has had a prior opportunity to confront that witness."  *Id.*  The analyst who

performed the testing did not testify and no showing was made that he was

unavailable, or that there had been a chance to cross-examine him previously—

thus, the "surrogate testimony" did "not meet the constitutional requirement."  *Id.*

at 652.

The Idaho Supreme Court's contrary approach was not faithful to

*Bullcoming*.  As noted, the Idaho Supreme Court rested its conclusion entirely on

the facts that Dr. Finis supervised Ms. Bradley and Ms. Hall, and that she

conducted her own independent analysis of the results they announced.  *See Hall*,

419 P.3d at 1076.  But *Bullcoming* draws no such exceptions to its bright-line rule

that an expert may not convey from the stand results from forensic investigation

when the witness was not the one who "personally perform[ed] or observe[d] the

---

[8] In *Bullcoming*, the U.S. Supreme Court characterized the question presented with
reference to whether such testimony is permissible when the witness "*did not sign
the certification* or personally perform or observe the performance of the test."  564
U.S. at 657.  The reason *Bullcoming* referenced the signature on the certification is
that the issue turned on the admissibility of a document reflecting the test results.
*See id.* at 655.  By contrast, in the present case, the question does not revolve
around a physical report, since none was admitted by the State through Dr. Finis.
Rather, the question here is whether it was constitutional for Dr. Finis to verbally
relay from the stands conclusions about testing that was performed by others.
Therefore, the signature aspect of *Bullcoming* is not relevant, and Mr. Hall will
focus on the other elements of the decision: performing and observing the testing.

performance of the test." 564 U.S. at 657. Dr. Finis testified unequivocally that she did not perform the testing; Ms. Bradley and Ms. Hall did. *See* A-11 at 4395, 4399. And Dr. Finis did not suggest that she personally observed the testing. Finally, no showing was made that either Ms. Bradley or Ms. Hall was unavailable to testify, or that they had been made available previously for cross-examination. Under *Bullcoming*, those facts establish all of the ingredients of a Confrontation Clause violation.

A closer comparison of the clashing reasoning between *Bullcoming* and the Idaho Supreme Court confirms the same result. The *Bullcoming* Court emphasized that even though the surrogate witness there worked at the same lab as the analyst who performed the testing, there were important areas of cross-examination that the defense could not pursue because of the latter's absence from trial. *See* 564 U.S. at 655, 660, 661 & n.7. In particular, the surrogate testimony "could not convey what" the testing analyst "knew or observed about the events his certification concerned, *i.e.*, the particular testing and testing process he employed." *Id.* at 661. Likewise, defense counsel was obstructed from questioning the analyst about his "proficiency" in the testing he employed, as well as "the care he took in performing his work, and his veracity." *Id.* at 661 n.7. Those deficiencies underscored the Confrontation Clause problem in *Bullcoming*.

The same deficiencies are present here. Mr. Hall's counsel were unable to inquire of Dr. Finis about the testing performed in the comparison work, because she did not perform it. Counsel were thereby prevented from ferreting out for the

jury potential problems with the testing, which would have cast doubt on the results.  The fact that Dr. Finis supervised the two analysts, and that she analyzed the results as well, does not change that calculus.  If she did not participate or observe the testing, as she nowhere said she had, then there could still have been errors committed by Ms. Bradley or others that cross-examination of Dr. Finis would never expose.  And if there were such problems, Dr. Finis's independent analysis would have been based on faulty data, which again would not have been revealed by her own cross-examination.  Essentially, the Idaho Supreme Court's approach was to do precisely what *Bullcoming* forbids: to "dispense[] with confrontation simply because the court believe[d] that questioning one witness about another's testimonial statements provide[d] a fair enough opportunity for cross-examination." *Id.* at 662.

Mr. Hall realizes that Justice Sotomayor's concurring opinion in *Bullcoming* did express her own personal belief that it was significant that it was "not a case in which the person testifying is a supervisor," as Dr. Finis was.  564 U.S. at 672 (Sotomayor, J., concurring).  However, Justice Sotomayor was speaking only for herself.  For purposes of § 2254(d)(1), "[t]he *only* definitive source of clearly established federal law under AEDPA is the holdings (as opposed to the dicta) of the Supreme Court." *Hedlund v. Ryan*, 854 F.3d 557, 565 (9th Cir. 2017).  Needless to say, Justice Sotomayor's concurrence is not a majority holding.  And the portions of *Bullcoming* relied upon above all commanded a majority of Justices.  Moreover, even Justice Sotomayor stressed that "[i]t would be a different case if . . . a

Petitioner's Opening Brief on the Merits – 26

supervisor *who observed* an analyst conducting a test testified about the result or a report about such results." 564 U.S. at 673. To reiterate, there is no evidence that Dr. Finis observed the testing, and thus her testimony would seem to flunk the Confrontation Clause test under Justice Sotomayor's interpretation as well.

Because the Idaho Supreme Court unreasonably applied the rule from *Bullcoming*, § 2254(d)(1) is satisfied. Thus, the remainder of the issues are reviewed de novo. *See Frantz*, 533 F.3d at 736. The first such issue is whether the information provided by Dr. Finis about the testing was testimonial within the meaning of the Confrontation Clause. As mentioned, the Idaho Supreme Court did not reach that question. There is no doubt the answer is yes. Material is testimonial as a matter of Confrontation Clause law when it was generated "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford v. Washington*, 541 U.S. 36, 52 (2004). The Supreme Court has easily found that forensic analysis of crime-scene material fits the bill. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009). And lower courts have without difficulty done the same for DNA testing in particular. *See, e.g.*, *People v. John*, 52 N.E.3d 1114, 1123 (N.Y. 2016) (declaring that "the laboratory reports as to the DNA profile generated from the evidence submitted to the laboratory by the police in a pending criminal case were testimonial").

Having explained why the information was testimonial, and why its admission was not compliant with the Confrontation Clause, the only remaining

question is whether the error was prejudicial.  Five factors guide the inquiry: "(1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the" State's case. *Merolillio v. Yates*, 663 F.3d 444, 455 (9th Cir. 2011).

All five factors are satisfied.  First, Dr. Finis's testimony about the exclusions was exceedingly important.  DNA testing played a central role for the prosecution in linking Mr. Hall to the crimes.  In their opening statement at the guilt phase, the prosecution underscored that "[n]obody else on this planet has" Mr. Hall's DNA, including "[n]obody who lives now, nobody whoever will live," providing conclusive proof "beyond a reasonable doubt." A-11 at 3412–13.  What is more, DNA is a forensic discipline that jurors instinctively value. *See State v. Johnson*, 862 N.W.2d 757, 774 (Neb. 2015).  It is also critical to remember that this was a case in which plausible alternative-perpetrator defenses were available. *See supra* at Part I.A.III. In a case where alternative suspects were a meaningful possibility, testimony from an expert that they were excluded by virtue of a science considered highly reliable is unquestionably important.

Second, Dr. Finis's testimony was only marginally cumulative.  No other witness spoke to the exclusion of the 129 men as a whole.  Granted, Detective Dave Smith testified that a DNA sample was taken from Mr. Johnson and that he was then eliminated as a suspect. *See* A-11 at 4138–39.  However, Detective Smith was

not—unlike Dr. Finis—a DNA expert, and his passing comment would not have been viewed with any special deference.  Moreover, Detective Smith did not speak to the many people other than Mr. Johnson who Dr. Finis also characterized as excluded, including Mr. Hoffert.  Her testimony was therefore not cumulative in any way that would preclude relief on the claim.

Third, there was no evidence corroborating Dr. Finis's testimony as it related to the exclusion of the 129 men, except for the aforementioned statement from Detective Smith.  Fourth, the extent of cross-examination otherwise permitted is irrelevant because, again, there were no other witnesses who could have meaningfully addressed the matter.  It would not have been possible to probe Detective Smith in any illuminating fashion about DNA exclusions, as he had no scientific background.  The only two individuals who could have been sensibly cross-examined on the subject—Ms. Bradley and Ms. Hall—did not testify.

Fifth and finally, the overall strength of the State's case was far from unassailable.  As outlined earlier, there were serious alternative perpetrators in play.  And although it is true that inculpatory DNA evidence was presented, it did not make the case open and shut.  The DNA evidence did not rule out the prospect of a co-perpetrator.  In fact, the DNA evidence made the existence of such an individual more likely.  *See* B-27 at 4893 (report by DNA expert Dr. Greg Hampikian opining that he could conclude "to a reasonable degree of medical probability" that "the semen sample recovered from the victim includes DNA from more than one male").  While the DNA evidence tied Mr. Hall to the rape, it does

not represent proof that he committed the murder.  If there were an alternative perpetrator, that person might well have been the murderer.  That is sufficient to open the window to prejudice with respect to Mr. Hall's conviction for murder.

In the event the Court disagrees, there is still prejudice in connection with the death sentence.  The possibility that another man committed the murder would raise lingering doubt about Mr. Hall's guilt at sentencing, and a single juror would likely have voted against the ultimate punishment as a result.  Additionally, the presence of a co-perpetrator opens up a theory at sentencing as to respective culpability between the two men—which would be yet another fruitful avenue for the defense, and yet another reason why prejudice exists.  *See Mak v. Blodgett*, 970 F.2d 614, 623–24 (9th Cir. 1992) (per curiam) (finding a due process violation where a state trial court precluded the defendant from presenting evidence at a capital sentencing proceeding that a co-defendant planned the crime).

If relief is not granted, a hearing should be.  Such a hearing might profitably address, for example, the question of whether Dr. Finis did in fact personally observe the testing done by Ms. Bradley and Ms. Hall.

## C. Claim 14: The trial court violated Mr. Hall's due-process rights by denying him a complete appellate record.

The trial court's pervasive off-record conversations violated Mr. Hall's constitutional due-process rights under the Fourteenth Amendment.

There are three reasons, explained below, why Mr. Hall's claim should be reviewed de novo.  First, the Idaho Supreme Court's conclusion that "every relevant…proceeding" was recorded, *Hall,* 419 P.3d at 1064, is based on an

unreasonable application of clearly established federal law pursuant to § 2254(d)(1) and is an unreasonable determination of the facts under § 2254(d)(2).  Second, the state supreme court's determination that Mr. Hall must show specific prejudice, *see id.* at 1064–65, is based on an unreasonable application of clearly established federal law.  Third, the supreme court's finding that there were adequate substitutions for the missing records, *see id.*, is an unreasonable determination of fact.

By way of background, the Fourteenth Amendment ensures that defendants who are statutorily entitled to appellate review have certain due-process rights as a result. U.S. Const. amend. XIV; *Evitts v. Lucey*, 469 U.S. 387, 393 (1985).  Adequate appellate litigation relies on the defendant's ability to review "the entire transcript." *Hardy v. United States*, 375 U.S. 277, 279–80 (1964).  Yet, throughout Mr. Hall's proceedings, the trial court held frequent off-the-record side conversations, including in the judge's chambers, to determine matters such as juror selection, voir dire, juror dismissal, defense consulting, case consolidation, suppression motions, and psychological evaluations.  A-9 at 431, 531, 820, 956; A-10 at 1643, 2727; A-12 at 4751.  This lack of "a full record . . . and arguments" strips defendants like Mr. Hall of "'all hope of any (adequate and effective) appeal at all.'"  *Entsminger v. Iowa*, 386 U.S. 748, 752 (1967).

1. **The Idaho Supreme Court's determination about the completeness of Mr. Hall's record is an unreasonable application of federal law and an unreasonable determination of facts under § 2254(d).**

In concluding that Mr. Hall's transcript was sufficiently comprehensive, the state supreme court misapplied federal law and unreasonably determined facts. The state court's finding that "every relevant hearing [and] proceeding" was recorded, *Hall,* 419 P.3d at 1064, misconstrues Mr. Hall's constitutional right to a "record of sufficient completeness," as set forth in *Draper v. Washington*, 372 U.S. 487, 497 (1963). To reach the state court's conclusion, that an adequate record was compiled, one would have to discount the significance of every hole in the record, including during juror selection, suppression hearings, and psychological evaluations, and the role these proceedings played in Mr. Halls appeals. *See* D-24 at 6–9, 10–19, 92. These gaps at critical points undercut Mr. Hall's right to an effective appeal, as outlined in *Entsminger*, 386 U.S. at 752. As a consequence, it was legally incorrect for the Idaho Supreme Court to state that all relevant hearings were recorded. That is, several of the unrecorded hearings were in fact relevant under principles enunciated in U.S. Supreme Court cases.

Jurors selected to serve on capital cases are tasked with making life or death decisions. As a result, the U.S. Supreme Court has laid out special guidelines to determine when to exclude jurors who will unconditionally vote for life and those who will automatically vote for death. *Morgan v. Illinois*, 504 U.S. 719, 728 (1992); *Wainwright v. Witt*, 469 U.S. 412 (1985); *Witherspoon v. Illinois*, 391 U.S. 510, 518 (1968). Counsel must determine if a juror with strong predilections "will fail in

good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Morgan*, 504 U.S. at 729.  To ensure jurors can study and weigh evidence, "[*v*]*oir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981).  Given how consequential they can be, voir dire procedures are often contested in appeals.  *See Oswald v. Bertrand*, 249 F. Supp. 2d 1078 (E.D. Wis. 2003), *aff'd*, 374 F.3d 475 (7th Cir. 2004) (trial court's failure to question qualified jurors violated defendant's right to a fair jury); *Wright v. State*, 983 A.2d 519 (Md. 2009) (trial court's voir dire practice of asking questions in fast succession without allowing answers until the end deprived defendant of fair and impartial jury); *State v. Ritter*, 719 N.W.2d 216 (Minn. Ct. App. 2006) (depriving defendant of the ability to ask about law enforcement deference was an impermissible restriction on voir dire); *State v. Evans*, 352 N.W.2d 824 (Minn. Ct. App. 1984) (defendant's rights violated by time limit on voir dire).

Despite these constitutionally afforded rights, Mr. Hall's jury-selection record has serious lacunae.  A-9 at 820, 956; A-10 at 1643, 2067, 2727.  For instance, as the judge was formulating questions to determine whether veniremembers could weigh evidence in compliance with *Witherspoon*, he went off-record and made no effort to reproduce the substance of his unreported comments.  A-9 at 820–21.  Since the conversation before and after the off-record discussion was regarding how to phrase voir dire questions, presumably the unrecorded remarks were as well.  Similarly,

after explaining to veniremembers that they could still serve despite their potential

life- or death-leaning views, if they were able to faithfully weigh the evidence, the

judge asked one potential juror to stay behind, dismissed the rest, and then held an

unreported discussion with counsel.  A-10 at 1642–43.  After the off-record

conversation, the court questioned the potential juror about her vacation plans and

excused her.  It is not clear whether the unrecorded conversation that preceded was

regarding how jurors should weigh evidence or if it was about this veniremember,

as the court made no on-record statements to clarify.  *Id*.  Both unrecorded moments

followed discussions of how to effectively ensure impartial jurors.  Given the

context, the lack of record is worrisome, especially because issues of jurors with

concerning predispositions were raised in Mr. Hall's appeals.  *See* D-24 at 10–15.

For example, the State Appellate Public Defender (SAPD) argued, *see id.* at 13, that

Jurors 1 and 60 continuously emphasized their favorable views of the death

penalty, *see* A-9 at 895; A-10 at 2006.  In light of these views, voir dire was the

essential means by which trial counsel could determine whether jurors could

overcome their predilections.  *Morgan*, 504 U.S. at 720; *Witt*, 469 U.S. at 412.

Understanding how voir dire was formulated and conducted was accordingly

essential to ensuring Mr. Hall's appellate record was complete.

When potential jurors were dismissed, minimal information or mixed signals,

at best, were provided, which again undercut Mr. Hall's ability to litigate these

issues on appeal.  Throughout jury selection, there were questions about whether

potential Juror 91 would be excused based on possible travel conflicts and her

"specific problem about the death penalty in this case." A-10 at 1759. Later in the
proceedings, the judge dismissed her from service allegedly based on her travels.
*Id.* at 1981. But puzzlingly, when the court announced juror numbers, defense
counsel asked where Juror 91 was. The court replied, "Something happened to her."
*Id.* at 2727. After a "[b]rief discussion off the record" the court provided no further
information about her and proceeded to discuss the next juror. *Id.* at 2727. It is not
clear whether defense counsel simply forgot about Juror 91's prior dismissal or if
there was a discussion about her death penalty issues that was handled off-record.
In any event, Juror 91 was never discussed again on record. The lack of clarity
surrounding the dismissal again raises questions about how the trial court handled
jurors who initially had issues with the death penalty, even though *Witherspoon*
may have forbidden their dismissal. Mr. Hall's ability to appeal based on
*Witherspoon*, a case where the dismissal of all death-opposed jurors was ruled
unconstitutional, was undercut because of the lack of transparency surrounding
juror removal. 391 U.S. at 518.

Similarly, when discussing a note from Juror 27's mental health provider, the
judge again held an off-record conversation. A-9 at 956. Once back on the record,
the judge clarified that he received a letter from the Boise State University
Counseling Services, which claimed Juror 27 was unfit to serve. Then, the judge
noted on-record that the State asked for her removal. Immediately after, the judge
offered clarification of a prior off-record conversation saying, "Let me go back and
make a record of something that was stated earlier," namely, that defense counsel

had inquired whether "we could excuse prospective jurors at a time when whomever wanted to make a motion for cause. And I denied that motion." *Id.* at 958. While it is useful that the judge clarified an earlier off-record decision, it is not clear when this was decided, or how it impacted Juror 27, or if it was simply a non-sequitur. Regardless, the transcript later confirms that Juror 27 was removed. *Id.* at 1232–33. Although medical files are often handled confidentially for obvious reasons, it would have been important for Mr. Hall's appellate counsel to know whether any other factors played a role in the discharge of Juror 27. Nor is it difficult to construct a complete record in the face of confidentiality concerns, which courts around the country do every day by sealing sensitive material—something the trial judge in Mr. Hall's case seems never to have considered as an alternative to his pervasive off-record dialogues.

Since defense counsel were unfamiliar with laws concerning *voir dire* procedures, they attempted to hire a consultant, but the court thwarted that effort and provided no record of its decision. Troublingly, defense counsel was unaware of landmark cases, including *Witt*, which explain when jurors can serve despite their partialities. 469 U.S. at 412. Because of counsel's shortcomings, they brought in Rolf Kehne to serve as a voir dire "expert." However, the court ultimately barred Mr. Kehne from assisting. Deliberations about Mr. Kehne's role were held in the judge's chambers, entirely off-record. A-10 at 2061–62, 2067. Thus, not only does the record omit key moments in voir dire, it also lacks an explanation of why Mr. Kehne, who may have aided in voir dire, was dismissed. This record, in particular,

could have been useful for Mr. Hall's claims of ineffective assistance of counsel during jury selection, which he did raise on appeal. *See* D-24 at 140–46. Again, unreported conversations at moments that played a role in Mr. Hall's appeal underscore how he was deprived of his right to an adequate appellate record. Other issues raised on appeal demonstrate that the SAPD was interested in jury-instruction matters, D-24 at 143–46, and there were several issues at trial concerning jurors that also call attention to how potentially significant an appellate subject it could have been, A-10 at 2123 (Juror 63 had a hearing disability that impaired his ability to listen to key evidence); *id.* at 2251–52 (Juror 68 previously worked in the Idaho Department of Correction); *id.* at 2547–48 (Juror 85 was married to an investigator); *id.* at 3020 (Juror 110 worked with a deputy attorney general).

Gaps in the record occurred during other critical proceedings, including suppression decisions and psychiatric evaluation deliberations. For instance, decisions about which evidence, interrogation videos, and transcripts to show at the suppression hearing were made in the judge's chambers. A-9 at 431. The court failed to include any information about how it decided which parts of the videos to display, what the defense's apprehensions were, or how they agreed to overcome them. *Id.* The lack of record is particularly problematic because when the interrogation video, discussed off-record, was later shown to the jury, it was accompanied by a transcript that lacked the same redactions. A-11 at 4185–86. The redactions were specifically intended to remove references to Mr. Hall's past

crimes, including the Hanlon case in which he had already been charged. *See* Dkt. 65 at 2. That the jury may have been exposed to prejudicial information again demonstrates the need for an adequate record on appeal. Judge Neville put it best when expounding upon the importance of preventing the jury from being "swept away" by evidence from the Hanlon matter because it was "overwhelming." A-12 at 4695; A-9 at 755–56; A-10 at 3385 (similar statements). The potential widespread effects of suppression decisions are why counsel is required to be present, and for the same reason, is why they should be recorded. *United States v. Hamilton*, 391 F.3d 1066, 1071 (9th Cir. 2004) (suppression hearings are critical proceedings that require counsel). It follows that unrecorded exchanges on this subject, which was on its face potentially susceptible to an appeal, were constitutionally unacceptable.

There were other notable unpreserved proceedings as well. Decisions about who of the State's mental health experts would evaluate Mr. Hall were made in chambers. The judge summarized by saying, "My understanding was there were some names given for mental health professionals. I don't know if we need to make a record of that or not." A-9 at 531. In addition to discussing possible evaluators, it seems the parties discussed amending the judge's proposed order regarding access to the defendant. *Id.* at 535. They left the appellate record silent on how the court agreed have provided to the State the "testing materials by the Defense's mental health experts," including, "all of the raw data and testing forms, school records and that sort of thing." *Id.* at 530. The blank spot in the record matters since there were disputes over the State's mental health experts' access to Mr. Hall, and the

issue was raised on appeal.  D-24 at 92.  While the judge said, on the record, that names of mental health professionals were given and selected, no information is provided in the transcript about how each side decided which experts to use, whether any of them were contested, or how disputes were resolved.  A-9 at 531. Considering the sensitive role that psychiatric evaluation decisions play, and for the same reasons that counsel is required to be present, the discussion should have been recorded to protect Mr. Hall's rights to an adequate appeal.  *Estelle v. Smith*, 451 U.S. 454, 470 (1981) (court-ordered psychiatric interview is a "critical stage" of the proceedings).

Missing records during juror selection, suppression decisions, and psychological evaluation deliberations demonstrate how the state court's finding that the record included "every relevant hearing [and] proceeding" is an unreasonable application of law under § 2254(d)(1).  The Idaho Supreme Court concluded that the transcript was consistent with caselaw that requires it be a "record of sufficient completeness."  *Hall*, 419 P.3d at 1064 (quoting *Draper*, 372 U.S. at 497).  However, this conclusion is inconsistent with cases that characterize juror procedures, suppression hearings, and psychological evaluations as critically significant proceedings.  *Morgan*, 504 U.S. at 730 (the Court has "not hesitated, particularly in capital cases, to find that certain inquiries must be made to effectuate constitutional protections" in voir dire); *Estelle*, 451 U.S. at 454; *Hamilton*, 391 F.3d at 1071.  The right to adequate records extends to procedural issues before the trial as well: "anything that transpires in open court, with the

possible exception of the reading of a deposition, should be recorded by the reporter." *United States v. Piascik*, 559 F.2d 545, 550–51 (9th Cir. 1977). Thus, the gaps in these crucial moments demonstrate how the record was insufficient under clearly established law. *Draper*, 372 U.S. at 497.

Apart from being an unreasonable application of law under § 2254(d)(1), the state court's finding about the completeness of the record is also an unreasonable determination of facts under § 2254(d)(2). Section 2254(d)(2) is met when one "could not reasonably conclude that the finding is supported by the record before the state court." *Hurles*, 752 F.3d 768 at 778. For the aforementioned reasons, the facts simply do not support the state court's finding that all relevant proceedings were included in the transcript.

### 2. The Idaho Supreme Court's determination that Mr. Hall must show prejudice is based on an unreasonable application of clearly established federal law under § 2254(d)(1).

The Idaho Supreme Court required a showing of prejudice that the U.S. Supreme Court does not require in this area of law. *Hall,* 419 P.3d at 1065. The state court's opinion quoted *State v. Perry*, 245 P.3d 961, 978–79 (Idaho 2008), when explicating Mr. Hall's burden of showing a "reasonable possibility that the error affected the outcome of the trial." *Hall,* 419 P.3d at 1065. This standard is inapplicable as a matter of federal constitutional law. In *Draper* and *Entsminger*, only summaries of the trials, and in *Hardy*, no transcript at all, were made available to the defendants. *Draper*, 372 U.S. at 497; *Entsminger*, 386 U.S. at 752; *Hardy*, 375 U.S. at 279–80. Due to the lack of transcripts, the defendants could not

highlight the specific harm they suffered by virtue of a missing segment in the record.  Yet, in all three cases, the Supreme Court reversed lower court decisions which had previously upheld convictions despite the absence of records.  *Draper*, 372 U.S. at 497; *Entsminger*, 386 U.S. at 752; *Hardy*, 375 U.S. at 279–80.  Had the test been whether the lack of transcript created a reasonable probability of prejudice, as the Idaho Supreme Court supposed, the U.S. Supreme Court presumably would have affirmed in those cases.

While the Idaho Supreme Court held that the lack of an entire transcript is more prejudicial than missing gaps, the court should have considered that the gaps in Mr. Hall's records occurred at critical stages.  *Hall,* 419 P.3d at 1064.  As stated above, decisions about Mr. Hall's jury selection, suppression, and psychiatric evaluations were made without an adequate record despite involving highly consequential issues, some of which then played a role in Mr. Hall's appeal—and all of which *could* have played such a role had there been a complete transcript.

Thus, federal law does not require the reasonable possibility of prejudice that the Idaho Supreme Court held Mr. Hall must show.  As a result, the state court's requirement is based on an unreasonable application of clearly established federal law under § 2254(d)(1).  And "when the state court applies an incorrect standard, [the] prejudice analysis is 'unconstrained' by AEDPA deference."  *Weeden v. Johnson*, 854 F.3d 1063, 1072 (9th Cir. 2017).

**3. The Idaho Supreme Court's finding that there were adequate substitutions for the missing records is an unreasonable determination of facts under § 2254(d)(2).**

The Idaho Supreme Court's finding of adequate substitutions for the omitted records is an unreasonable determination of fact under § 2254(d)(2). Contrary to the state court's factual findings, there were minimal supplements for gaps in the record. Courts need not provide verbatim transcripts of every word; however, they do, at a minimum, need to provide suitable alternatives for off-record conversations. *Griffin v. Illinois*, 351 U.S. 12, 20 (1956). The Idaho Supreme Court acknowledged this rule, *Hall,* 419 P.3d at 1065, but did not faithfully apply it.

The trial court's substitutions were wholly inadequate. As explained above, the court discussed potential Juror 91's "specific problem about the death penalty in this case," but later claimed to dismiss her because of travel conflicts. A-10 at 1759, 1981. But concerningly, when the court announced juror numbers and defense counsel asked about Juror 91, the court replied, "Something happened to her." *Id*. at 2727. Subsequently, the judge held an off-record conversation. *Id*. Immediately after the unrecorded aside, the court proceeded to announce jurors. Taking into account the ambiguity surrounding her departure, and whether it was because of her scheduling conflicts or views of the death penalty, it raises red flags that the court made no effort to explain what was discussed off-record.

A comparable incident occurred in the middle of voir dire, right after the judge addressed the question of whether jurors were still eligible to serve despite strongly held views on the death penalty, if they could honestly weigh the evidence.

Before questioning one juror in particular, the judge held an "[u]nreported conversation." *Id.* at 1643. The judge made no effort to reproduce the substance. Given the sensitive nature of the voir dire instructions directly prior to the unrecorded aside, and the role that juror questioning played in Mr. Hall's appeals, it is a problem under *Griffin* that the court made no effort to recount what occurred. *See* D-24 at 140–46. Because the trial court failed to reproduce the substance of the exchange on the record, there is no mechanism for subsequent courts to evaluate whether the juror dismissals or voir dire were appropriate.

Additionally, in the middle of the penalty phase, the court went off-record and made no effort to reproduce the conversation. Right after defense counsel laid the groundwork for upcoming testimony from a forensic psychologist detailing Mr. Hall's upbringing, the court said, "Counsel approach, please." A-12 at 4751. The court proceeded to have an "[u]nreported conversation." *Id.* The judge then dismissed the jurors for lunch. There was no indication about what was discussed off-record. Because it followed the defense counsel's explanation of future testimony detailing Mr. Hall's childhood abuse, and occurred in the penalty phase, it is noteworthy that the court made zero effort to reproduce the substance of the unreported remarks. Had the judge, for instance, instructed counsel on what he was or was not authorized to say after the break, this would have been quite salient in Mr. Hall's appeals.

Thus, the Idaho Supreme Court's finding that there were adequate substitutions to the missing record was an unreasonable determination of facts

under § 2254(d)(2).  If this Court cannot "reasonably conclude that the finding is supported by the record" then Mr. Hall is entitled to de novo review under § 2254(d)(2).  *Hurles*, 752 F.3d at 778.  The substitutions that the Idaho Supreme Court referenced, as an alternative to a complete transcript, were not present in this case.  *Hall,* 419 P.3d at 1064–65.  The state court did not highlight even one example of steps the trial court took to provide an alternate record.  Hence, the state court's finding is an unreasonable determination of facts.

### 4.  Mr. Hall is entitled to relief or at least a hearing under a de novo standard.

If the Court agrees with any of the arguments above, Mr. Hall is entitled to de novo review.  *Frantz*, 533 F.3d at 735.  In such a review, the Court would examine whether Mr. Hall's constitutional rights were violated.  28 U.S.C. § 2254(a).  To satisfy the de novo standard, Mr. Hall relies on his § 2254(d)(1) arguments above.  That is, the fact that the Idaho Supreme Court misapplied clearly established federal caselaw shows how the rights established in the cases were violated in connection with Mr. Hall's proceedings.  As explained above, Mr. Hall's rights to a sufficiently complete transcript and an adequate appeal, as guaranteed by *Draper*, 372 U.S. at 497 and *Entsminger*, 386 U.S. at 752, were violated given the gaps in his record.  These holes occurred during deliberations about significant issues including juror selection, suppression, and mental health examinations.  A-9 at 431, 531, 820, 956; A-10 at 1643, 2727.  Mr. Hall additionally stresses that once de novo review is conducted, published Ninth Circuit law also becomes binding in addition to Supreme Court authority.  *Burton*, 816 F.3d 1132 at

1142 (explaining that once AEDPA is off the table, as is the case here for de novo review, circuit law, in addition to Supreme Court holdings, governs).  That matters here because *Hamilton*, for example, is strongly supportive of Mr. Hall's claim, as addressed earlier.

And as also discussed above, the Idaho Supreme Court erred in its analysis of prejudice—which likewise illustrates how Mr. Hall satisfied the appropriate prejudice test.

If the Court decides that more fact-finding is necessary to make its determinations, Mr. Hall respectfully requests an evidentiary hearing, as is permitted under the circumstances.  *See Cruz*, No., 2018 WL 1524026 at *21–30 (granting an evidentiary hearing because the petitioner met the terms of § 2254(d)). A hearing is called for if it "could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro*, 550 U.S. 465 at 474.  In this case, a hearing would be useful, among other things, to learn more about how the unreported conversations affected Mr. Hall's appeal.  Testimony could be taken from appellate counsel to gather additional information concerning the impact that unreported conversations had on litigation at the Idaho Supreme Court.  Similarly, it could be valuable to learn from people who were present at the trial about why the gaps occurred.  These are simply two examples, but in all events the claim cannot be denied on the papers without an evidentiary hearing.

### D. Claim 20: Unanimity was improperly required on mitigation and weighing.

Under § 2254(d)(1), the Idaho Supreme Court unreasonably applied federal constitutional law in deciding it was not error for the trial court to instruct the jurors that "[a]ny finding by you that the mitigating circumstances do or do not make the imposition of the death penalty unjust must be unanimous." *Hall,* 419 P.3d at 1101 (quoting Jury Instruction 48). In rejecting Mr. Hall's claim, the state court unreasonably posited that, even though Instruction 48 literally announced a unanimity requirement, the instructions as a whole "clearly" informed jurors there was no unanimity requirement. *See id.* at 1102. To the contrary, the instructions placed an unconstitutional unanimity requirement on the jurors' mitigation determinations in violation of federal constitutional law as determined by the U.S. Supreme Court.

In *Mills v. Maryland,* 486 U.S. 367, 384 (1988), the Supreme Court held it unconstitutional when "there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular circumstance." Instead, "[u]nder [the Court's] cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk." *Id.* The result in *Mills* was a reversal of a

death sentence because of a jury instruction that potentially required juror unanimity in order to find a given mitigating circumstance.  *Id.*

Similarly, the U.S. Supreme Court invalidated a state's requirement that jurors unanimously find specific mitigating circumstances in *McKoy v. North Carolina,* 494 U.S. 433, 444 (1990).  The *McKoy* decision elaborated on the *Mills* bar against unanimity requirements: "*Mills* was not limited to cases in which the jury is *required* to impose the death penalty if it finds that aggravating circumstances outweigh mitigating circumstances or that no mitigating circumstances exist."  *Id.* at 440 (emphasis in original).  Instead, *Mills* "held that it would be the height of arbitrariness to allow *or* require the imposition of the death penalty where 1 juror was able to prevent the other 11 from giving effect to mitigating evidence."  *Id.* (emphasis in original).  The unanimity requirement in Instruction 48 did precisely that in violation of federal constitutional law.

Here, the jury instructions were contradictory.  Instruction 48 both required unanimity and at the same time included some phrases indicating the decision must be individual:

> You must each decide for yourself whether all mitigating circumstances presented, when weighed against each statutory aggravating circumstance proven by the State, are sufficiently compelling to make the imposition of the death penalty unjust. Any finding by you that the mitigating circumstances do or do not make the imposition of the death penalty unjust must be unanimous, but you do not have to unanimously agree upon what mitigating circumstances exist.  The existence of mitigating circumstances need not be proven beyond a reasonable doubt. You must each decide for yourself whether mitigating circumstances exist and, if so, then consider them in your individual weighing process.

Petitioner's Opening Brief on the Merits – 47

> Once you have reached a unanimous decision on whether or not all mitigating circumstances, when weighed against each aggravating circumstance, make the imposition of the death penalty unjust, or have concluded that you are unable to reach a unanimous decision on that issue, so indicate on the verdict form and notify the bailiff that you are done.

A-158 at 14.

Despite any language aimed at the contrary, the central mitigation requirement in Instruction 48 is that any finding of how the mitigating circumstances affect the jury's sentencing decision must be unanimous. This requirement easily allowed for the situation *McKoy* sought to avoid—a single juror, acting on this requirement, could block the rest of the jurors from giving any effect to mitigating evidence. *See McKoy,* 494 U.S. at 440.

However, the Idaho Supreme Court decided that the instructions, as a whole, "clearly inform the jurors that they do not have to unanimously agree on the mitigating evidence and their decision does not have to be unanimous." *Hall,* 419 P.3d at 1102. This despite the fact that the instruction plainly stated the jury's findings on mitigation "must be unanimous." *Id.* at 1101 (quoting Jury Instruction 48). Jury instructions that state the precise opposite of the required law by no reasonable measure "clearly inform the jurors" that their decision on mitigation need not be unanimous. Like the unanimity requirements in *Mills* and *McKoy*, such contradictory instructions create a "substantial probability that reasonable jurors" could understand the instructions to mean what they say: mitigation decisions must be unanimous. *Mills,* 486 U.S. at 384.

Petitioner's Opening Brief on the Merits – 48

The Idaho Supreme Court decided that because there was language contradicting or qualifying the unanimity requirement and that the instructions accounted for the possibility of disagreement, there was no error.  See *Hall,* 419 P.3d at 1102.  But there is no authority from the U.S. Supreme Court to support the proposition that a clearly unconstitutional unanimity requirement is cured by confusing and ambiguous language to the contrary.  The arguably contrary language here would not have saved the instructions from allowing one holdout juror to dictate whether the rest of the jurors could "giv[e] effect to mitigating evidence," *McKoy,* 494 U.S. at 440, and that is all the claim must show.

Prejudice on a *Mills* claim is present where it is "reasonably likely that the jury could have believed that it was required to find the existence of mitigating circumstances unanimously."  *Frey v. Fulcomer*, 132 F.3d 916, 924 (3d Cir. 1997).  For the reasons already stated, there was such a reasonable likelihood here.  As a result, there is prejudice and the claim renders Mr. Hall's death sentence unconstitutional.

**E.  Claim 37: The HAC aggravator is unconstitutionally vague.**

In the next section of the brief, Mr. Hall explains why the utter-disregard aggravator is unconstitutionally vague.  There is a fuller description there of the legal principles at play and the flaws in the Idaho Supreme Court's analysis.  Because there is so much overlap between the two sections, and to avoid unnecessary repetition, Mr. Hall incorporates into this part his discussion regarding Claim 38.  Here, Mr. Hall will only add the few additional points that are necessary.

First, the argument for why HAC is vague is even stronger than the challenge to utter disregard.  That is primarily because the U.S. Supreme Court has declared another state's nearly identical HAC aggravator to be unconstitutionally broad.  *See Maynard v. Cartwright*, 486 U.S. 356, 364 (1988) ("[A]n ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous'").  Mr. Hall relies below on *Maynard* for his attack on utter disregard, but the decision even more directly supports his claim regarding HAC.  And although Idaho's HAC provision further specifies that the murder "manifest[] exceptional depravity," Idaho Code § 19-2515(9)(e), which was not the case in *Maynard*, the Eighth Circuit has correctly determined that such purportedly limiting language "is too broad to be useful," "has no objective meaning," and "the unconstitutional vagueness of the criminal language in [the] statute" therefore "remains."  *Moore v. Clarke*, 904 F.2d 1226, 1232 (8th Cir. 1990).  While Mr. Hall recognizes that Supreme Court authority is the lodestar for AEDPA purposes, *Moore* is a highly persuasive explanation of what *Maynard* requires, and it consequently bolsters the assault on HAC here.  *See Robinson*, 360 F.3d at 1057.  Relatedly, Justice Kidwell's dissent in Mr. Hall's consolidated appeal convincingly outlined why both *Maynard* and *Moore* demonstrate the unconstitutionality of HAC, *see Hall*, 419 P.3d at 1138 (Kidwell, J. Pro Tem, dissenting), further strengthening the claim now.

Second, there are flaws in the Idaho Supreme Court's analysis of HAC that are either not present or less visible in its approach to utter disregard.  The state

supreme court rejected the notion that the switch from judge to jury sentencing

rendered HAC unconstitutional in part based on its view that "the identity of the

sentencing authority was not an issue" in previous cases upholding the aggravator.

*Id.* at 1084.  In particular, the previous cases the court had in mind were *State v.*

*Osborn*, 631 P.2d 187 (Idaho 1981), and *Leavitt v. Arave*, 383 F.3d 809 (9th Cir.

2004) (per curiam).  *See Hall*, 419 P.3d at 1084.  As an initial matter, the Idaho

Supreme Court asked the wrong question for AEDPA purposes.  *Osborn* and *Leavitt*

are decisions by the Idaho Supreme Court and the Ninth Circuit respectively.  What

matters under § 2254(d)(1) is not whether the Idaho Supreme Court or the Ninth

Circuit focused on judge sentencing while affirming HAC as lawful.  Rather, the key

question is whether the *U.S. Supreme Court* relied on judge sentencing in its own

decisions regarding the vagueness of capital aggravators.  *See* § 2254(d)(1)

(requiring a showing that the decision at issue represented an unreasonable

application of clearly established constitutional law "as determined by the *Supreme*

*Court of the United States*").  As Mr. Hall explains below in his section on utter

disregard, and as he will elaborate upon here momentarily, the U.S. Supreme

Court's death-penalty caselaw does make the identity of the sentencer relevant to

the validity of aggravators.  That is all that is necessary to overcome § 2254(d)(1).

     What is more, the Idaho Supreme Court's characterization of *Osborn* and

*Leavitt* does not withstand scrutiny even when taken on its own terms.  Both

decisions are in actuality inextricably tied to judge-sentencing regimes.  In *Osborn*,

the Idaho Supreme Court explicitly stated that the limiting construction of HAC

made it "sufficiently definite and limited to guide the sentencing *court's* discretion in imposing the death penalty." 631 P.2d at 200. And contrary to the Idaho Supreme Court's assertion that "the identity of the sentencing was not . . . mentioned when the Ninth Circuit approved this Court's construction in [*Leavitt*]," *Hall*, 419 P.3d at 1084, *Leavitt* likewise acknowledged that it was dealing with judge sentencing, *see Leavitt,* 383 F.3d at 835 (specifying that a death sentence may be imposed in Idaho "if the *court* finds at least one aggravating circumstance beyond a reasonable doubt").

Perhaps more significantly, *Leavitt* relied on *Proffitt v. Florida*, 428 U.S. 242 (1976), which the Ninth Circuit understood as essentially dictating the resolution to the HAC question. *See Leavitt*, 383 F.3d at 836 (declaring that HAC was constitutional because "[t]he Supreme Court has already as much said that it is" in *Proffitt*). And *Proffitt* expressly and repeatedly promoted judge sentencing in capital cases as superior to jury sentencing. *See* 428 U.S. at 252 (reasoning that "judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases"). Again, Justice Kidwell properly picked up on this aspect of *Proffitt* in deeming HAC constitutionally suspect when assessed by a jury. *See Hall*, 419 P.3d at 1139 (Kidwell, J. Pro Tem, dissenting) (quoting the line above from *Proffitt* in defense of the conclusion that Idaho's "prior case law upholding Idaho's aggravating circumstances primarily

relied on judge sentencing" and with the segue to "jury sentencing, those prior cases no longer support upholding Idaho's aggravating circumstances").

It stands to reason that HAC's constitutionality is tethered to judge sentencing. The Idaho Supreme Court has defended HAC specifically by reasoning that "the key word" in the statute is "exceptional." *State v. Charboneau*, 774 P.2d 299, 322 (Idaho 1989), *overruled on other grounds by State v. Card*, 825 P.2d 1081, 1088 (Idaho 1991). "It might be argued," the court has conceded, "that every murder involves depravity." *Id.* The word "exceptional," though—to the Idaho Supreme Court's mind—"confines" the aggravator "only to those situations where depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence." *Id.* Put differently, HAC is constitutional because of its comparative qualities: it is only the "exceptional" murder that qualifies and not the normal one. The problem is that juries have no idea what a normal murder is, because the vast majority of them have never been involved before in a murder case. As explained in the following section, it is *judges* who can compare one murder to others, as they are the ones who see multiple murder cases. And judges can no longer salvage Idaho's overbroad aggravators from unconstitutionality as they are no longer the decision makers.

In summary, it is simply not true—as the Idaho Supreme Court maintained—that the older caselaw in this area shows HAC to be constitutional even in a jury-sentencing era. To the contrary, that caselaw is pervaded by judicial

sentencing, and reliance upon it now, after juries have entered the picture, is unreasonable under § 2254(d)(1).

Third and finally, to the extent this Court conducts a prejudice analysis limited to HAC, it would of course have to consider the aggravator's role in the case in particular, apart from utter disregard. In its closing argument after the penalty phase, the prosecution began its discussion of the aggravators with HAC. *See* A-12 at 5449. The prosecution then stressed that the jury instruction on HAC appeared as though it were "written just for this case." *Id.* According to the prosecution, HAC was at the core of the sentencing because "[w]e have to know the savagery and the violence of [the] attack." *Id.* at 5450. It is also of note that the prosecution referred, in exploring HAC, to the testimony of Dr. Glen Groben, the State's forensic pathologist. *See id.* at 5449. Dr. Groben created a series of exhibits that "show a reenactment"—which he himself staged—"of the body as it is postulated to have been hogtied either before or soon after Ms. Henneman's death." *Hall*, 419 P.3d at 1076. These were extremely graphic and gruesome photographs, A-121, A-122, A-123, which the Idaho Supreme Court itself described as having a prejudicial effect that was "not insubstantial," *Hall*, 419 P.3d at 1080. The prosecution deliberately enhanced the prejudicial impact even further by displaying for the jury a PowerPoint slide in which one of the disturbing, staged photographs of the victim's body was accompanied by a checkbox next to the HAC aggravator. B-22 at 3460, Slides 23–25. In short, HAC was a means for the prosecution to dwell on extraordinarily damaging material before the jury. As a consequence, the

unconstitutionality of the aggravator "had [a] substantial and injurious effect or influence in determining the jury's" sentence, *Brecht*, 507 U.S. 619 at 637–38 and it was prejudicial.

## F. Claim 38: The utter disregard aggravator is unconstitutionally vague.

Idaho's utter disregard aggravator sweeps broadly, encompassing all capital defendants and enabling inconsistent, random death-penalty application. When applied by a jury, the aggravator is void for vagueness in violation of the Eighth and Fourteenth Amendments, and its lack of clarity generates arbitrary and capricious application of the death-penalty. U.S. Const. amend. VIII; U.S. Const. amend. XIV § 1. Specifically, utter disregard is vague because it fails to narrow the class of first-degree murder offenders who are death-penalty eligible. Idaho Code § 19-2515(9)(f).

In overview, the Idaho Supreme Court unreasonably applied to this issue *Arave v. Creech*, 507 U.S. 463 (1993), and failed to apply clearly established federal law in *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980), and *Maynard v. Cartwright*, 486 U.S. 356, 356 (1988). The U.S. Supreme Court decided *Creech* many years prior to holding that a jury, not a judge, was to be the exclusive sentencer in capital cases. *Ring v. Arizona*, 536 U.S. 584, 609 (2002). The change in sentencer renders the utter disregard aggravator vague. That is, the *Creech* Court upheld the utter disregard aggravator on the premise that *sentencing judges,* rather than *jurors,* applied it. 507 U.S. at 471, 477. In contrast, the Idaho Supreme Court upheld the aggravator when applied by *jurors*, an entirely different, less experienced body of individuals. *Hall*, 419 P.3d 1085. Justice Kidwell dissented from the Idaho

Petitioner's Opening Brief on the Merits – 55

Supreme Court's decision in this case, expressing insightful concerns about how the transition from judge to jury sentencing breathed new life into vagueness challenges to Idaho's aggravators. *Id*. at 1138–39. He remarked, "The majority's approach understates the magnitude of the transition from the judge as a sentencer, to the jury as a sentencer, and provides no legal basis for declining to reconsider case law that relied on judge sentencing as opposed to jury sentencing." *Id*. at 1138 (Kidwell, J. Pro Tem, dissenting). Thus, as will be elaborated upon here, because the Idaho Supreme Court failed to apply clearly established federal law, Mr. Hall's constitutional claims satisfy the § 2254(d)(1) requirement and warrant de novo review. *Frantz*, 533 F.3d 724 at 739. For the same reasons, such review leads to relief.

Turning to the detailed analysis, to pass constitutional muster, capital punishment statutory schemes must comply with multiple conditions. States are obligated to craft their laws to avoid "arbitrary and capricious infliction of the death-penalty." *Godfrey*, 446 U.S. at 428. In accomplishing this, state legislatures have two options: (1) define capital first-degree murder narrowly or (2) specify aggravating circumstances that a jury is required to find at sentencing for a capital defendant to be death-penalty eligible. *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988). Idaho relies on aggravating circumstances, rather than a narrow definition of capital first-degree murder, to meet the constitutional narrowing requirement. *See* Idaho Code § 19-2515(5)(a). Regardless of the option it chooses, a state's capital sentencing scheme must "genuinely narrow the class of persons eligible for the

death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). A sentencing scheme which grants the jury "unchanneled discretion to make an arbitrary and capricious decision" is vague and does not "genuinely narrow" to provide a jury guidance as it considers whether to end a human life. *Maynard*, 486 U.S. at 356.

Here, the Idaho Supreme Court opined that the utter disregard aggravator was not vague because the *Creech* decision said so. *See Hall*, 419 P.3d at 1084. But pivotal to this case is the fact that the Court in *Creech* only upheld the utter disregard aggravator in the context of *judge* sentencing. 507 U.S. at 471. The shift from judge to jury decision-making in Idaho's capital sentencing scheme, *see* Idaho Code § 19-2515(3)(b), encourages arbitrary and capricious action when juries take up the utter disregard aggravator. In *Creech*, the Court observed that "the question is close" when it held the aggravator constitutional because of a sentencing *judge's* unique ability to interpret the aggravator's narrowing construction. *Creech,* 507 U.S. at 471, 475. The relevant portion of the limiting construction clarified that the aggravator refers to "acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer." *Id*. at 468. Referencing the limiting construction, Justice O'Connor, speaking for the majority, wrote that "a sentencing *judge* reasonably could find that not all Idaho capital defendants are cold-blooded." *Id*. at 475–76. The Court made its decision based on the sentencing scheme presented to it, which, in the case of

Idaho's capital punishment program, exclusively utilized judge sentencers. *Id*. at
471. The Court's use of "judge" language when discussing Idaho's utter disregard
aggravator supports this. *See id*. at 471 ("[T]he federal court must presume that the
*judge* knew and applied any existing narrowing construction."); *id*. at 472 ("We
assume that legislators use words in their ordinary, everyday senses, and there is
no reason to suppose that *judges* do otherwise."); *id*. at 473 ("But that does not
mean that a State cannot, consistent with the Federal Constitution, authorize
*sentencing judges* to make the inquiry…."); *d*. at 475 ("A *sentencing judge* might
conclude that every first-degree murderer is 'pitiless'….").

Three aspects of the judge-to-jury sentencing change corroborate the
unreasonableness of the Idaho Supreme Court's decision in this case. First, the
U.S. Supreme Court characterized its *Creech* decision as being a "close" one for
multiple reasons. *Id*. It acknowledged the challenging nature of "[d]etermining
whether a capital defendant killed without feeling or sympathy," as compared to
determining another statutory aggravator, like whether someone "was previously
convicted of another murder." *Id*. at 473 (quoting Idaho Code § 19-2515(g)(1)).
Despite the challenge, the Court concluded, "that does not mean that a State
cannot, consistent with the Federal Constitution, authorize *sentencing judges* to
make the inquiry and to take their findings into account when deciding whether
capital punishment is warranted." *Id*. The Court also expressed hesitancy
regarding the helpfulness of the limiting construction surrounding the utter
disregard aggravator. *Id*. at 475. The *Creech* Court reasoned that "the word

pitiless, standing alone, does not narrow the class of defendants eligible for the death-penalty.  A sentencing judge might conclude that every first-degree murderer is pitiless, because it is difficult to imagine how a person with any mercy or compassion could kill another human being without justification."  507 U.S. at 475. The Court ultimately upheld the limiting construction, appeased by its view that "a sentencing judge reasonably could find that not all Idaho capital defendants are cold-blooded."  *Id.* at 475–76.  However, its reservations regarding the clarity of some of the words used demonstrate the decision truly was a "close" one.  *Id*. at 478. Taking into account the close call in *Creech* and the Court's heavy reliance on judges' role in sentencing, the transition to a non-judge decisionmaker had the potential to affect the operation and constitutionality of the aggravator.

Next, judges have access to and know how to understand appellate decisional law, which inevitably guides their decision-making in capital sentencing. "[T]rial judges are given specific and detailed guidance to assist them in deciding whether to impose a death-penalty or imprisonment for life."  *Lambrix v. Singletary,* 520 U.S. 518, 532 (1997).  Judges have at their disposal other decisions, from both their own and foreign jurisdictions, which shed light on "whether or not the punishment is too great" in complex capital sentencing cases.  *Proffitt,* 428 U.S. at 251.  In the same vein, "[a] judge as a sentencer will have more consistent results, as they are more familiar with the law and sentencing procedures."  *Hall*, 419 P.3d at 1139 (Kidwell, J. Pro Tem, dissenting).  For example, in *Proffitt*, the U.S. Supreme Court discussed the Supreme Court of Florida's practice of comparing "the circumstances

of a case under review with those previous cases in which it ha[d] assessed the imposition of death sentences." 428 U.S. at 259. The appellate review process enabled judges, a body of individuals who understand how to read and apply caselaw from prior opinions, to impose the death-penalty in a proportional and consistent manner. *Id*. In contrast, jurors lack such access and training.

Finally, by virtue of their experience, sentencing judges are expected to understand how to apply both aggravators and their narrowing constructions. An average person might qualify every capital crime as "heinous," "but a trial judge with experience in the facts of criminality possesses the requisite knowledge to balance the facts of the case against the standard criminal activity which can only be developed by involvement with the trials of numerous defendants." *State v. Dixon*, 283 So. 2d 1, 8 (Fla. 1973). In a pre-*Ring* era where, in Florida, jury sentencing was replaced by judge sentencing in capital cases, the Supreme Court of Florida was reassured that "the inflamed emotions of jurors can no longer sentence a man to die; the sentence is viewed in light of the judicial experience." *Id*.

The advantages which accompany judicial experience in capital sentencing were also appreciated in *Creech*. Concerning narrowing constructions, the *Creech* Court concluded, "Where, as in Idaho, the sentencer is a *judge* rather than a jury, the federal court must presume that the *judge* knew and applied any existing narrowing construction." 507 U.S. at 471. Implicit is the proposition that a jury should not be presumed to understand and apply a narrowing construction; therefore, juries require additional guidance. Unlike judges, "the members of a jury

will have had little, if any, previous experience in sentencing, [and] they are unlikely to be skilled in dealing with the information they are given." *Gregg v. Georgia*, 428 U.S. 153, 192 (1976) (plurality op.).  Experienced trial judges impose sentences daily, whereas jurors "may never…have made a sentencing decision," and as a result, may weigh aggravating and mitigating circumstances in a manner that leads to "unpredictable and inconsistent results."  *Id.* at 190; *accord Hall*, 419 P.3d at 1139 (Kidwell, J. Pro Tem, dissenting).

The national shift from judge to jury capital sentencing undermined the utter disregard aggravator's constitutionality.  In the words of Justice Kidwell, "[w]hen Idaho transitioned from having a judge do capital sentencing, to having a jury do capital sentencing, new policy implications arose that require us to revisit, and possibly overrule, prior decisions upholding the constitutionality of the aggravators with the limiting construction."  *Hall*, 419 P.3d at 1138 (Kidwell, J. Pro Tem, dissenting).

Considering the impacts of the shift to jury sentencing in capital cases, clearly established federal law in *Godfrey* and *Maynard*, rather than *Creech*, controls.  Unlike *Creech*, yet similar to this case, both *Godfrey* and *Maynard* involved jury sentencing.  *See Godfrey*, 446 U.S. at 426; *see also Maynard*, 486 U.S. at 359.  In each case, the Court struck down an aggravator which bears resemblance to utter disregard, finding the aggravators vague when in the hands of jurors.  *See Godfrey*, 446 U.S. at 433; *see also Maynard*, 486 U.S. 356 at 363–64.  In *Godfrey*, the U.S. Supreme Court invalidated an aggravating circumstance that

created death-penalty eligibility for any capital defendant whose offense was

"outrageously or wantonly vile, horrible, and inhuman."  446 U.S. at 428.  The

Court determined those words, on their own, did nothing to inherently restrain "the

arbitrary and capricious infliction of the death sentence."  *Godfrey,* 446 U.S. at 428.

In a later decision, the Court expounded upon the same aggravator, finding it vague

and imprecise, and reiterating its susceptibility to "arbitrary and capricious

application of the death-penalty in violation of the Eighth Amendment."  *Stringer v.*

*Black*, 503 U.S. 222, 228 (1992).[9]  Similarly, in analyzing Oklahoma's "especially

heinous, atrocious, or cruel" (HAC) aggravator, the Supreme Court held in

*Maynard*, "[t]o say that something is especially heinous merely suggests that the

individual jurors should determine that the murder is more than just heinous,

whatever that means, and an ordinary person could honestly believe that every

unjustified, intentional taking of human life is especially heinous."  486 U.S. at 364.

The Court held the HAC aggravating circumstance unconstitutionally vague,

because it led jurors to nothing other than arbitrary conclusions.  *Id.*

Given the resemblance between the "cold-blooded, pitiless slayer" limiting

construction here and the aggravators in *Godfrey* and *Maynard*, the Idaho Supreme

Court decided this case unreasonably, because it failed to apply the clearly

---

[9] Chief Justice Rehnquist, along with Justices Kennedy, O'Connor, and White, joined the majority in *Maynard*, *Stringer*, and *Creech*. Justice Scalia joined the majority in both *Maynard* and *Creech*.  Such continuity in Justices across the cases suggests that the *Creech* decision did not *change* capital sentencing law, but merely clarified it by upholding otherwise vague aggravators solely in a judge-sentencing context.

established federal law created in those cases.  The court acted unreasonably when it invoked "a Supreme court case [*Creech*] and unreasonably extend[ed] its legal principle to a new context [jury sentencing] where it should not apply.*"  McClelland v. Kirkpatrick*, 778 F. Supp. 2d 316, 330 (W.D.N.Y. 2011).  All the constructions and aggravators in *Godfrey*, *Maynard*, and the present case utilize subjective labels that ordinary people would interpret as applying universally to first-degree murder offenders.  The Court in *Godfrey* stated the "outrageously or wantonly vile, horrible, and inhuman" aggravator "gave the jury no guidance concerning the meaning of any of [the statute's] terms.  In fact, the jury's interpretation of [the statute] can only be the subject of sheer speculation."  446 U.S. at 429.  Similarly, utter disregard fails to provide guidance—it can hardly be argued that any murder is committed *with* regard for human life.  Consequently, any finding of utter disregard is arbitrary.  Likewise, the "especially heinous" component of the *Maynard* aggravator invites arbitrary application, given that ordinary people perceive all murders as "especially heinous."  486 U.S. 364.  Just as all murders may be categorized as "especially heinous," there is no workable method for narrowing murders to distinguish those committed without regard for human life.

Upon closer review, the reasoning offered by the Idaho Supreme Court confirms this.  The Idaho Supreme Court denied Mr. Hall's request to revisit the utter disregard aggravator's constitutionality solely by referencing its decisions in *State v. Dunlap*, 313 P.3d 1 (Idaho 2013) and *State v. Abdullah*, 348 P.3d 1 (Idaho 2015).  *See Hall*, 419 P.3d at 1085.  In both cases the Idaho Supreme Court upheld

utter disregard, finding that it provided the jury accurate guidance and that the aggravator was not unconstitutionally vague. *Dunlap*, 313 P.3d at 34; *Abdullah*, 348 P.3d at 78. But *Dunlap* and *Abdullah* are not constitutionally sound in the wake of *Ring*. Given the *Creech* Court's focus on a sentencing *judge's* ability to understand the ordinary meaning of the utter disregard aggravator's limiting construction, 507 U.S. at 471–73, 475, the *Dunlap* court drew the unfounded conclusion that a *jury* possesses an equivalent ability to understand, *Dunlap*, 313 P.3d at 33–34. In particular, the conclusion was unwarranted considering realities such as the close nature of the *Creech* decision, judges' ability to review and make decisions consistent with appellate jurisprudence, and the impact of judges' sentencing experience. Because *Godfrey* and *Maynard* demonstrated that the constitutional threshold for aggravators is much higher for jury-sentencing schemes than judge-sentencing schemes, the Idaho Supreme Court did not apply clearly established federal law when it relied on *Dunlap* and *Abdullah* in this case. Notably, Justice Kidwell relied on *Godfrey* and *Maynard* in his dissent, implying these were the relevant law when considering jury-imposed aggravators. *Hall*, 419 P.3d at 1137 (Kidwell, J. Pro Tem, dissenting).

The overlap in the mens rea required to establish first-degree murder and the state of mind described by utter disregard (and its limiting construction) corroborate the aggravator's vagueness. The Idaho legislature articulates the mens rea needed for first-degree murder as "perpetrated by any kind of willful, deliberate and premeditated killing." Idaho Code § 18-4003(a). Aside from encouraging

arbitrary conclusions about a defendant's lack of conscience, the utter disregard

aggravator does nothing to assist jurors in distilling a death eligible subset of people

from the "willful, deliberate, and premeditated killing" class.  In his dissent to the

Idaho Supreme Court's decision here, Justice Kidwell cautioned, "It is difficult to

see how the [utter disregard] language could guide any sentencer, or limit the class

eligible to receive the death-penalty, as most consider any murder an utter

disregard for human life."  419 P.3d at 1138 (Kidwell, J. Pro Tem, dissenting).  In

the same vein, utter disregard is incapable of limiting the death penalty "to those

offenders who commit a narrow category of the most serious crimes and whose

extreme culpability makes them the most deserving of execution."  *Roper v.

Simmons*, 543 U.S. 551, 568 (2005).

If anything, utter disregard evokes a mental state akin to extreme

negligence, a significantly lower bar than that required to prove first-degree

murder.  It is noteworthy that Idaho is the only state[10] that uses utter disregard to

identify death-penalty eligible individuals from a pool of first-degree murder

offenders.[11]  *Cf.* Jeffrey L. Kirchmeier, *Aggravating and Mitigating Factors: The

Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 Wm. &

Mary Bill Rts. J. 345, 400 (1998).  Other states that use this language typically

---

[10] Mr. Hall made this assertion on direct appeal and the State did not contest it.  D-24 at 56.

[11] The article cited above conducted a nationwide survey of the most prevalent aggravators pertaining to facts surrounding a murder.  Kirchmeier, *supra*, at 400-01, 05.  Notably absent from the list was utter disregard.  *Id.*

employ it to categorize homicide offenses, such as recklessness or negligence, with lower mens rea requirements than those necessary for premeditated murder. *See Powell v. Fuchs*, 4 F.4th 541, 547 (7th Cir. 2021); *Vazquez v. Metro. Dade Cnty.*, 968 F.2d 1101, 1104 (11th Cir. 1992); *People v. Allen*, 151 N.E. 676, 679 (Ill. 1926); *State v. Richardson*, 249 N.W. 211, 212–13 (Iowa 1933); *State v. Budge*, 137 A. 244, 247 (Me. 1927). Therefore, disturbingly, Idaho currently uses utter disregard to identify a *more* grievous level of first-degree murder while other states (consistent with the plain language) use the same terminology to identify *less* grievous levels of homicides. Such disparity in understandings poses a legitimate risk, as jurors may conflate utter disregard with recklessness or negligence based on colloquial understandings of the phrase and find virtually *every* capital defendant death-penalty eligible.

In sum, the utter disregard aggravator fails to meet the constitutional narrowing requirements, encouraging arbitrary and capricious application of the death-penalty by juries. Consequently, the Idaho Supreme Court unreasonably upheld the aggravator and Mr. Hall's demonstration of the same satisfies § 2254(d)(1). Therefore, this case warrants de novo review and opens the possibility of relief being granted Mr. Hall. *Frantz*, 533 F.3d at 739. De novo review leads to a conclusion that Mr. Hall's constitutional rights were violated by virtue of the utter disregard aggravator. Mr. Hall's discussion above about how the Idaho Supreme Court unreasonably applied the federal law suffices to show, at the same time, how the aggravator's invocation in his case ran afoul of the Eighth Amendment.

Petitioner's Opening Brief on the Merits – 66

Prejudice then turns on the *Brecht* test.  *See Rogers v. McDaniel*, 793 F.3d 1036, 1042 (9th Cir. 2015) ("Having concluded that the depravity of mind aggravator was unconstitutionally vague, contrary to *Godfrey*, and that the Nevada Supreme Court did not cure that error, we next address whether the error was harmless [under *Brecht*].").  The *Brecht* test considers whether an error "had [a] substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. at 637–38.  If the aggravator is found unconstitutional, the State then bears the burden of demonstrating the error was harmless.  *Rogers*, 793 F.3d at 1042–43.[12]

Here, the *Brecht* test is satisfied.  First, Mr. Hall incorporates here the argument above regarding the prosecution's misstatement of the sentencing calculus, which deepens the prejudice on the present claim.  *See supra* at Part II.A.  Furthermore, "the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy," *Kansas v. Carr*, 577 U.S. 108, 119 (2016), and one which "is not a finding of fact, but a moral judgment," *United States v. Gabrion*, 719 F.3d 511, 533 (6th Cir. 2013).  As a somewhat amorphous, subjective determination, the weighing calculus is susceptible to influence by all of the information received by the jury.  It follows that a single

---

[12] Because the Idaho Supreme Court deemed the utter disregard aggravator constitutional, it did not address the prejudice question.  *See Hall*, 419 P.3d at 1084–85.  Accordingly, the issue is one for this Court's de novo consideration.  *See Wiggins*, 539 U.S. 510 at 534 (announcing that federal habeas "review is not circumscribed by a state court conclusion with respect to prejudice" when the state courts dispose of the claim before reaching prejudice).

Petitioner's Opening Brief on the Merits – 67

illegitimate aggravator can, if sufficiently prominent, infect the weighing process as a whole.  In other words, it is surely conceivable that a juror might have deemed a death sentence "unjust," Idaho Code § 19-2515(8)(b)(iii), in the absence of a particular aggravator that was wrongly found.  The question is whether that took place here.

Mr. Hall submits that it did.  In the state's closing argument at trial, the prosecutor devoted previous time to the utter disregard aggravator, contending that "it was written for Erick Hall."  A-12 at 5452.  The prosecution also used an egg timer in support of his presentation on the aggravator, so as to help jurors appreciate the duration of three minutes, the minimum amount of time required for someone to die while being suffocated.  *Id.* at 4657–62.  And the prosecution described in detail the way the victim's arms were bound and the manner in which Mr. Hall allegedly dragged her body, likewise with the objective of proving the utter disregard aggravator.  *Id*. at 5454.  In short, the aggravator served as a vehicle for highly damaging facts and argument.  As such, it is likely that the aggravator "would have overwhelmed at least one juror's judgment in a way that affected their weighing" calculation, *Rogers v. May*, 43 F.4th 530, 549 (6th Cir. 2022), leaving "grave doubt" about the integrity of the sentence, *Gill v. Ayers*, 342 F.3d 911, 921 (9th Cir. 2003), and meriting habeas relief.

### G. Claim 39: The propensity aggravator is unconstitutional.

Just like in Claim 37 above, Mr. Hall incorporates here the analysis in the discussion of Claim 38.  For the same reason, the advent of jury sentencing in Idaho

alters the landscape on the propensity aggravator as it does for the HAC and utter-disregard factors. The limiting instruction that was required to rehabilitate the propensity aggravator when there was judge-sentencing can no longer rehabilitate the aggravator when a jury is the decision maker. Under jury sentencing the aggravator, both as articulated in the statute and with the aid of a limiting construction, results even more so in the arbitrary and capricious imposition of death sentences in Idaho.

The propensity aggravator applies when "[t]he defendant, by his conduct, whether such conduct was before, during or after the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society." Idaho Code § 19-2525(9)(i). In Mr. Hall's case, the Idaho Supreme Court pointed to its own prior decisions in which it "upheld the propensity aggravator, when combined with [the *Creech*] limiting construction, against challenges that it is vague or that it unconstitutionally lowers the burden of proof." *Hall*, 419 P.3d 1085. The *Creech* limiting construction stated that a person with the propensity to kill is one "who is a willing, predisposed killer, a killer who tends toward destroying the life of another, one who kills with less than the normal amount of provocation." *Id.* (citing *Creech*, 670 P.2d at 471–72). With this limiting construction, the state court held the propensity aggravator "is sufficiently narrow to channel the sentencer's discretion and avoid arbitrary application of the death sentence." *Id.* For the following reasons, the propensity aggravator, even when

combined with the limiting construction, fails to narrow capital murder from other murders in violation of the Eighth Amendment.  *See Zant*, 462 U.S. at 877.

First, the propensity statute remains unconstitutionally vague and the state court's attempts to save it are unavailing.  To put it plainly, under the state court's interpretations of the propensity aggravator, all persons who commit murder, by definition, display a propensity to commit murder.  There is no reason to believe any of the state court's decisions have caused this aggravator to be applied otherwise. Murder in Idaho "is the unlawful killing of human being . . . with malice aforethought."  Idaho Code § 18-4001.  Malice is express when there is a "deliberate intention" to take a life and implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."  Idaho Code § 18-4002.  In an apparent attempt to explain the difference between a run-of-the-mill murder and a murder enhanced by the propensity aggravator, the state court points to the distinction between "a person predisposed to killing from a person who happens to kill in a fit of passion."  *Hall*, 419 P.3d at 1085.  But this is not a distinction to channel the worst-of-the-worst murderers from other murderers.  Instead, it is a distinction between murder and voluntary manslaughter.  *See* Idaho Code § 18-4006 (defining voluntary manslaughter as occurring  "upon a sudden quarrel or heat of passion").  The state court's attempts to provide content to the propensity aggravator reveals that it has failed to grasp and reasonably apply federal law that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must

reasonably justify the imposition of a more severe sentence on the defendant compared to others *found guilty of murder*." *Zant*, 462 U.S. at 877.  In Idaho, all murderers have by definition evinced a propensity to commit murder—because they have committed murder.  Since it is so broad, the aggravator increases opportunities for arbitrary imposition of the death penalty in addition to failing to narrow death eligibility.

Second, issues with the aggravator are only compounded with the move from judge to jury sentencing.  Setting aside the aggravator's general failure to distinguish between murderers, the Idaho Supreme Court decided "[t]he advent of jury sentencing does not alter the constitutional vagueness analysis because of the clarity of the limiting construction in *Creech* and the strength of the subsequent pronouncements by this Court and the federal district court that the propensity aggravator is not unconstitutionally vague." *Hall*, 419 P.3d at 1085.  The "clarity" of the limiting construction resorts to the same problematic distinction between deliberated murder and a rage-killing while failing to distinguish between first-degree murders.  *Id.* (quoting *Creech*, 670 P.2d at 471).  Equally problematic, the limiting instruction—originally meant for a sentencing judge—defines a "predisposed killer" as "one who kills with less than the normal amount of provocation."  *Id.*  While arguable the "normal amount of provocation" may have meant something to an experienced judge, to a jury this language has no context.  For a reasonable juror, a normal amount of provocation would just as likely be a non-murder—a justified killing in self-defense or, of course, in the heat of passion.

None of this genuinely narrows the class of person eligible for the death penalty as required. *See Zant*, 462 U.S. at 877; *see also Godfrey*, 446 U.S. at 433 (requiring a "principled way to distinguish" between death- and non-death-eligible murder defendants).

On the issue of jury sentencing rather than judge sentencing, the Idaho Supreme Court also relies on the decisions of this Court for support, namely *Beam v. Paskett*, 744 F. Supp. 958 (D. Idaho 1990), *rev'd in part*, 966 F.2d 1563 (9th Cir. 1992), *vacated*, 507 U.S. 1027 (1993). In an aside, the *Beam* court noted that the propensity aggravator "is admittedly less susceptible to an arbitrary and capricious application than the [HAC and utter-disregard] factors [ ]." *Id.* at 964. First off, the *Beam* decision—like every other existing ruling from this Court about capital aggravators—dealt with judge sentencing. Plus, "[i]t is black-letter law that the decision of one federal district court is not binding on another federal district court, or even on the same judge in another case." *Pears v. Mobile Cnty.*, 645 F. Supp. 2d 1062, 1076 n.18 (S.D. Ala. 2009).

There are two final reasons the propensity aggravator fails the narrowing test. First, requiring the jury to find a defendant "probably" constitutes a continuing threat to society unconstitutionally lowers the prosecution's burden to prove the aggravator beyond a reasonable doubt. Second, the trial court's instruction failed to provide any meaningful distinction between the propensity and the HAC aggravators. Mr. Hall will conclude the instant section by addressing each of these points.

Petitioner's Opening Brief on the Merits – 72

The jury was instructed to determine if the State proved beyond a reasonable doubt that Mr. Hall had "exhibited a propensity to commit murder which will *probably* constitute a continuing threat to society." A-12 at 4725-29. The trial court explained this language by rephrasing: the language above "means conduct showing that the defendant is more likely than not to be a continuing threat to society." *Id.* at 4729. Mr. Hall argued before the state high court that this "probably" language unconstitutionally lowered the state's burden of proof under *Ring*, 536 U.S. at 586–87 and *In re Winship*, 397 U.S. 358, 364 (1970). *See* D-24 at 57. On this aspect of the claim, the state court dismissed the argument with reference to its prior caselaw. *See Hall*, 419 P.3d at 1084–85.

But throughout its decisions, the Idaho Supreme Court has failed to grapple with how at odds it is to impose the beyond-a-reasonable-doubt standard on the state to prove each aggravator, while the language within the aggravator itself contains its own revision of the burden to a determination of "probably" or "more likely than not." *See, e.g.*, *State v. Sivak*, 674 P.2d 396, 400–01 (Idaho 1983). The result is an unreasonable decision in violation of the Sixth Amendment and the due process clause, which require the prosecution prove every element of an offense to a jury beyond a reasonable doubt, *see Winship*, 397 U.S. 361–68, including capital aggravators, *see Hurst v. Florida*, 577 U.S. 92, 98 (2016), as well as the "heightened reliability demanded by the Eighth Amendment in the determination whether the death penalty is appropriate in a particular case," *Sumner v. Shuman*, 483 U.S. 66, 72 (1987).

Here, as the jury was instructed both that it had to find each aggravator beyond a reasonable doubt but also instructed that the propensity aggravator could be found through a more-likely-than-not standard, the State was relieved of its burden of proof.  *See* A-12 at 4725–29.  This is so because the propensity instructions, both the statutory language "probably" and the judge's rephrasing this as "more likely than not," assign the aggravator a far lower standard than reasonable doubt—that of mere probability.  The State did not have to prove Mr. Hall was a continuing threat to society beyond a reasonable doubt.  Rather, it only had to prove he was "more likely than not" such a threat.  That cannot be squared with the Supreme Court authorities listed above.  *See also Sandstrom v. Montana*, 442 U.S. 510, 514–27 (1979).

Lastly, the Idaho Supreme Court failed to address Mr. Hall's argument that the propensity aggravator unconstitutionally duplicates the HAC aggravator.  The argument was raised by Mr. Hall before the Idaho Supreme Court, but the court overlooked the theory in its decision.  *Compare* D-24 at 58, *with Hall*, 419 P.3d at 1085.  As such, review is de novo here.  *See Johnson*, 568 U.S. 289 at 303.

A jury could find the prosecution has established both the HAC and the propensity aggravators if it decides the defendant derived some pleasure from killing.  In Mr. Hall's trial, the judge defined "cruel" in the HAC aggravator as a murder conducted "with utter indifference to, or even enjoyment of, the suffering of others."  A-12 at 4727.  Too similarly, the propensity aggravator defined "propensity" as "a proclivity, susceptibility and even an affinity toward committing

murder." *Id.* at 4729.  Such overlapping instructions rendered the propensity aggravator superfluous and, therefore, unconstitutionally incapable of narrowing the pool of murderers subject to the death penalty.  *See Allen v. Woodford*, 395 F.3d 979, 1012 (9th Cir. 2005) (explaining that the "double counting of aggravating factors" in a capital case "has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally" because "the defendant is essentially condemned twice for the same culpable act, which is inherently unfair").

In sum, the state court's decision that the propensity aggravator can survive the Supreme Court's narrowing requirement under the Eighth Amendment is an unreasonable decision subject to this Court's de novo review.  Because the aggravator duplicates the HAC aggravator, lowers the prosecution's burden from a beyond-a-reasonable-doubt to a more-likely-than-not standard, and is excessively vague, particularly in the context of jury sentencing, the aggravator is unconstitutional.  Prejudice is also patent.  The propensity aggravator was the sole focus of the prosecution's presentation of evidence at sentencing.  *See* A-12 at 4733. Given the cornerstone role the aggravator played in the State's case, and the inherent importance to jurors of future dangerousness, *see* Blume, *supra*, at 398, the error "had [a] substantial and injurious effect or influence in determining the jury's" sentence, *Brecht*, 507 U.S. at 637–38.  Mr. Hall has accordingly established prejudice.

**H. Claim 40: The felony-murder aggravator fails to serve the constitutionally required narrowing function where the murder conviction is also premised upon felony-murder.**

The felony-murder aggravator, Idaho Code § 19-2515(9)(g), like the aggravators treated above in Claims 37–39, fails to "genuinely narrow the class of persons eligible for the death penalty." *Zant*, 462 U.S. at 877. However, this aggravator fails not only because it renders all felony-murderers death eligible, thereby providing no narrowing function for this group, but it also has the perverse effect of making offenders with markedly lower degrees of mens rea more susceptible to death sentences. Because the felony-murder aggravator does not quantitatively narrow the class of felony murderers who may be sentenced to death, nor does it qualitatively narrow the class of defendants to those most deserving of death, the statutory provision is unconstitutional, and the state court's decision otherwise is unreasonable.

As Chief Justice Rehnquist explained for the U.S. Supreme Court in *Lowenfield*, 484 U.S. at 246:

> [T]he narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses . . . so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.

The U.S. Supreme Court has determined Idaho fits into the latter category of broad statutory definition with the narrowing accomplished during the sentencing proceeding. *See Creech*, 507 U.S. at 475.

In Idaho, all first-degree murderers, including felony murderers, are eligible for a death sentence. *See* Idaho Code § 18-4004. As the U.S. Supreme Court put it, after surveying the many killings that qualify as first-degree murder in Idaho, "a sizable class of even those murderers who kill with some provocation or without specific intent may receive the death penalty under Idaho law." *Creech*, 507 U.S. at 475. The breadth of capital-eligible murders in Idaho is reinforced by the state's definition of premeditation. As noted, all first-degree murder is death-eligible here, and all premeditated murder is considered first-degree. *See* Idaho Code § 18-4003(a). Premeditation in Idaho "does not require any appreciable space of time between the intention to kill and the killing; rather, it may be as instantaneous as successive thoughts of the mind." *State v. Sheahan*, 77 P.3d 956, 975 (Idaho 2003). That distinguishes Idaho from other states where the capital murder offense itself "requires that one or more specific elements beyond intentional premeditated murder be found." *Kansas v. Marsh*, 548 U.S. 163, 175 (2006); *see Jurek v. Texas*, 428 U.S. 262, 269 (1976) (plurality op.) (upholding Texas's regime on narrowing grounds because it defined capital murder as "intentional and knowing murders *committed in five situations*"). In Idaho, with such a substantial number of death-eligible murderers, the need "for narrowing by jury findings of aggravating circumstances at the penalty phase," as *Lowenfield* phrased it, 484 U.S. at 245, is a constitutional necessity. However, the felony-murder aggravator does none of the narrowing work through jury findings at the penalty phase.

Felony murder as an offense in Idaho at the time of the crime in Mr. Hall's case was defined as "[a]ny murder committed in the perpetration of, or attempt to perpetrate, aggravated battery on a child under twelve (12) years of age, arson, rape, robbery, burglary, kidnapping or mayhem."  Idaho Code § 18-4003(d) (2000). The felony-murder aggravator uses nearly the same language: "The murder was committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, kidnapping or mayhem and the defendant killed, intended a killing, or acted with reckless indifference to human life."  Idaho Code § 19-2515(9)(g) (previously Idaho Code § 19-2515(h)(7)).  The aggravator thus duplicates the language in the statute defining the offense and does almost nothing to narrow the number of felony murders that qualify for a death sentence.  It serves no restrictive purpose after a conviction of felony murder.  Since the Idaho legislature has broadly included all defendants convicted of felony murder, which qualifies as first-degree murder, as death eligible and provides no narrowing mechanism, the aggravator is impermissible under Supreme Court jurisprudence.  *See McConnell v. State*, 102 P.3d 606, 623–24 (Nev. 2004) (determining that it was impermissible to double-count felony-murder as both an offense of conviction and as a determinant of death eligibility).

In Mr. Hall's appeal, the Idaho Supreme Court attempted to address the constitutional aspects of Mr. Hall's claim and missed the mark.  The court's decision not to invalidate the aggravator first relied on its previous decision in *State v. Wood*, 967 P.2d 702, 716–17 (Idaho 1998), and then reduced a long line of Supreme Court

jurisprudence to a single passage in the Supreme Court's decision in *Tuilaepa v. California*, 512 U.S. 967 (1994)—all to the exclusion of the ruling in *Lowenfield* and similar cases.  Mr. Hall will unpack how the state high court failed to account for Supreme Court law in the discussion below.

Before uncritically relying on its previous decision in *Wood*, the state high court did begin its analysis by identifying the correct U.S. Supreme Court principle when it quoted *Lowenfield*: "[t]o pass constitutional muster, a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."  *Hall*, 419 P.3d at 1085 (quoting *Lowenfield*, 484 U.S. at 244).  The court then noted that *Lowenfield* had determined narrowing could be accomplished by jury findings either at sentencing or at the guilt phase.  *Id.* (citing *Lowenfield*, 484 U.S. at 244–45).  True, *Lowenfield* states, "We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase."  484 U.S. at 244–45.  But what the Idaho Supreme Court's analysis omitted was Chief Justice Rehnquist's crucial point on the next page when he explains that for a constitutional narrowing function to occur during the guilt phase, the legislature must "itself narrow the definition of capital offenses."  *Id.* at 246.  Otherwise, when the legislature defines capital offenses broadly, as Idaho unquestionably does, narrowing must occur through "jury findings of aggravating circumstances at the penalty phase."  *Id.*  Here, the Idaho Supreme Court unreasonably failed to apply

the correct and full legal principle announced in *Lowenfield*.  Instead, the court

glossed over *Lowenfield* to privilege its own decision in *Wood* over the caselaw of the

U.S. Supreme Court.

From *Wood*, the Idaho Supreme Court quoted the following language: "[t]he

Idaho Legislature has narrowed the class of murders that may be punished by

death in I.C. §§ 18-4003 and 18-4004.  The fact that the . . . aggravator in I.C. § 19-

2515 duplicates an element of first-degree murder in I.C. § 18-4003 does not violate

any constitutional standard."  *Hall*, 419 P.3d at 1086 (quoting *Wood*, 967 P.2d at

716–17).  Again, the Idaho Supreme Court's logic rests on the premise that the

legislature "has narrowed the class of murders."  The murder statute does no such

thing.  Instead, as already described, Idaho's code defines first-degree murder as

broadly as possible, explicitly classifies every premeditated or felony-murder as

first-degree, and then explicitly makes every first-degree murder eligible for death.

The undeniable reality blinkered by *Wood*—and then blinkered again by the Idaho

Supreme Court here—is that the statute defining murder literally performs no

capital narrowing whatsoever.  Tellingly, despite resting its entire case for

narrowing on the supposed work done by the offense statutes, the Idaho Supreme

Court has never even attempted to say *what* it was about those statutes that did

any narrowing, either twenty-five years ago in *Wood* or twenty years later in *Hall*.

That is because there is nothing to say: the offense statutes plainly do no narrowing

whatsoever.  The absence of any reasoning exemplifies the state courts' failure to

faithfully apply Supreme Court precedent in contravention of § 2254(d)(1).

As it happens, it is this very breadth and inclusiveness of Idaho's scheme that led the U.S. Supreme Court to require a narrowing construction in *Creech*. *See* 507 U.S. 474–75. Idaho has indisputably adopted a capital punishment scheme that defines first-degree murder broadly and makes all first-degree murders death eligible. To claim the Idaho legislature's expansive definition of first-degree murder performs the narrowing function is to fundamentally misunderstand what "narrowing" means and to misapply Supreme Court law. Any objective and reasonable analysis of Idaho Code § 18-4003 reveals its broad sweep, and that is precisely why narrowing is required through aggravating circumstances at the penalty phase in Idaho.

The purpose of narrowing aggravators is to provide the jury with a "principled basis" for "distinguish[ing] those who deserve capital punishment from those who do not." *Creech*, 507 U.S. at 474. Put another way, when the legislature defines death-eligibility broadly, constitutional aggravators are necessary for any meaningful narrowing of the class of murderers who could be considered the worst of the worst. *See Roper*, 543 U.S. at 568.

The felony murder aggravator does the opposite: it subjects *less culpable* defendants to death sentences. Felony murder in Idaho "lacks a *mens rea* element" of any kind with respect to the death of the victim. *State v. Stevens*, 191 P.3d 217, 227 (Idaho 2008), *abrogated on other grounds by State v. Garcia*, 462 P.3d 1125, 1135 n.3 (Idaho 2020). The only intent the prosecution must prove in a felony-murder case is "the specific intent *to commit the predicate felony*" and "the state is

relieved of the burden of proving that a defendant had the specific intent *to kill*."
*State v. Scroggins*, 716 P.2d 1152, 1158 (Idaho 1985).  Indeed, the defendant need
not have even killed anyone to be guilty of felony murder.  It is enough that he
furthers "a common plan or scheme to commit the underlying felony and *one of*" the
criminal actors "causes the death during the perpetration of the felony, regardless of
who actually fired the fatal shot."  *State v. Pina*, 233 P.3d 71, 75 (2010), *abrogated
on other grounds by Verska v. St. Alphonsus Reg. Med'l Ctr.*, 265 P.3d 502, 508–09
(Idaho 2011).

   With these background principles of Idaho law in mind, it is not difficult to
see how the felony-murder aggravator turns on its head the project of narrowing the
death penalty to the worst of the worst murderers.  Imagine a defendant who
intends to commit a burglary and his partner kills the victim.  Such a defendant is
automatically subject to a capital charge, felony murder, and automatically guilty of
a capital aggravator, felony murder.  Compare that defendant to the so-called
"normal" murderer who himself kills a victim and does so with premeditation, but
without engaging in any of the conduct that would implicate the capital
aggravators.  He is spared the death penalty, despite far more culpable conduct and

a far more culpable mental state.  It strains credulity to consider such a system anything remotely like "narrowing."[13]

So, under Idaho's scheme, a defendant convicted of a "deliberate and premeditated killing," under Idaho Code § 18-4003(a), one who plans and intentionally carries out a murder, will still require a finding of a statutory aggravator under Idaho Code § 19-2515(9).  A defendant convicted of felony murder will not.  In the case of the felony-murderer, the aggravator has already been found by the jury, and no further aggravation is required under Idaho law because the aggravator and the crime are the same.

The point of narrowing is not to make less culpable defendants more likely to receive a death sentence.  As one commentator has put it, "A simple felony murder, unaccompanied by any other aggravating factor, is not worse than a simple premeditated and deliberated murder."  Richard A. Rosen, *Felony Murder and the Eighth Amendment Jurisprudence of Death*, 31 B.C. L. Rev. 1103, 1129 (1990).  And yet, the Idaho Supreme Court has maintained this form of "narrowing" complies with the Constitution.

It was to avoid arbitrary and absurd results like the above that the Supreme Court imposed the narrowing function in the first place.  A capital punishment

---

[13] Mr. Hall acknowledges that the hypothetical described above would potentially be impacted by the rules in *Tison v. Arizona*, 481 U.S. 137 (1987), and *Enmund v. Florida*, 458 U.S. 782 (1982), about what mental state a defendant must have with respect to the killing for him to be constitutionally eligible for a death sentence. But to the extent those cases would protect the hypothetical defendant, it is hardly a defense to a narrowing claim to say that Idaho's regime is so overbroad that it is unconstitutional in other respects as well.

scheme must channel the sentencer's discretion because "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.  A constitutional aggravating circumstance must "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877.  In Idaho, the legislature has chosen to define capital murder broadly and employ aggravators to narrow those eligible for death.  The Idaho Supreme Court unreasonably failed to apply the above constitutional principles in its analysis of the felony-murder aggravator in both *Hall* and *Wood*.

Instead, as a last resort, the Idaho Supreme Court attempted to use the U.S. Supreme Court's decision in *Tuilaepa* to save the aggravator.  The state court points to the fact that an aggravating circumstance may be found "in the definition of the crime or in a separate sentencing factor (or in both)." *Hall*, 419 P.3d at 1086 (quoting *Tuilaepa*, 512 U.S. at 971–72).  And then immediately the court dismisses the fuller context provided by *Lowenfield* and *Creech*: "Regardless of the United States Supreme Court's observation that first-degree murder in Idaho was broadly defined, the felony murder aggravating circumstance . . . fulfills the test pronounced in *Tuilaepa*." *Id.*  The pertinent part of the test for the state court's purposes is that an aggravator "must apply only to subclass of defendants convicted of murder." *Id.* (quoting *Tuilaepa*, 512 U.S. at 972).  The court interprets this to mean as long as an

aggravator applies to a smaller pool of the larger death-eligible whole, no matter the culpability of this smaller pool, the statute is constitutional. Along this line of thinking, the state court concludes that the language of the felony murder aggravator "may apply to many murders, but it certainly does not apply to every first-degree murder—which is all the narrowing required by *Tuilaepa*." *Id.* But the state court misses the point. The purpose of a constitutional aggravator is the principled narrowing of all death-eligible murderers to those most deserving of death—it makes no sense for the subclass to be those less culpable, those involved in a felony who act with reckless indifference to human life, as opposed to the larger class of first-degree murderers who act with deliberation and premeditation. Moreover, *Tuilaepa* was decided on the "assumption (unchallenged by these petitioners) that California has a statutory scheme that complies with the narrowing requirement defined in *Lowenfield*." *Tuilaepa*, 512 U.S. at 984 (Steven, J., concurring). Mr. Hall is certainly not conceding anything of the sort, and he argues strenuously to the contrary in the next section.

Accordingly, the Idaho Supreme Court's decision was an unreasonable application of federal constitutional law. Because, as discussed in the following section, the constitutional defect in the felony-murder aggravator leads to prejudice in conjunction with the problems attendant to the other aggravators, relief is necessary.

## I. Cumulative prejudice warrants relief.

Insofar as the Court is unwilling to grant relief on any individual claim, Mr. Hall asks for relief based on the cumulative prejudicial impact of the errors arrayed above. *See Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (recognizing the availability of cumulative-prejudice arguments in the Ninth Circuit). "[A]lthough individual errors might not rise to the level of a constitutional violation, a collection of errors might violate a defendant's constitutional rights." *Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2004). Cumulative prejudice is found when "the combined effect of the errors had a substantial and injurious effect or influence on the jury's verdict," even when none of them individually warrant relief. *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007). In that situation, "the errors have so infected the trial with unfairness as to make the resulting" verdict "a denial of due process." *Id.*

Cumulative prejudice is established with respect to the guilt phase. Mr. Hall's restraints would have implied to the jury that respected authority figures had already, before trial, found him a threat to society. *See supra* at Part II.A. That would have made the jurors more likely to convict him. And any remaining doubt would likely have been dissipated by the DNA testimony against him—which is substantially undermined by Mr. Hall's Confrontation Clause claim. *See supra* at Part II.B. Thus, the two claims working in tandem demonstrate cumulative prejudice as to the convictions.

Alternatively, there is at least cumulative prejudice in connection with Mr. Hall's sentencing.  In this brief, Mr. Hall is attacking each of the aggravators found by the jury.  If the Court sustains his challenges, as he believes it should, Mr. Hall would then have no lawful aggravators left.  His death sentence as a whole would have to fall as a result.  *See Howard v.* State, 495 P.3d 88, 93 (Nev. 2021) (finding that the final remaining aggravator had been invalidated and therefore concluding that the death sentence "constitute[d] cruel and unusual punishment in violation of the Eighth Amendment" because the narrowing requirement was no longer satisfied).

If the Court is not prepared to strike each of the aggravators, Mr. Hall respectfully asks it to address for now only which ones are unconstitutional, and to reserve judgment on the consequences until all of the habeas claims have been resolved.  That is the most economical path because Mr. Hall has alleged other claims in connection with aggravators that are not being briefed now, *see, e.g.*, Dkt. 39 at 83–84, and he may add still others in an amended petition.  It would be illogical and inefficient to adjudicate the prejudice question now, when additional aggravators may be deemed unconstitutional later on.  The prejudice question ought to wait until that later juncture.

Assuming the Court declines to do so, it should grant relief.  Mr. Hall recognizes that "[i]n Idaho, the [jury] must weigh each of the aggravating circumstances separately against all of the mitigating circumstances." *Abdullah*, 348 P.3d at 79 (quoting *State v. Hairston*, 988 P.2d 1170, 1183–84 (Idaho 1999)).

However, the significance of that principle in the prejudice analysis here is undercut by the fact that the prosecution at sentencing misinformed the jury by presenting a PowerPoint slide that "strongly suggested that all the aggravators should be considered collectively against all the mitigation evidence—in direct conflict with the weighing directed by section 19-2515." *Hall*, 419 P.3d at 1107. Although the Idaho Supreme Court deemed the error harmless, *see id.*, it still deepens the prejudice caused by each of the errors affecting the aggravators. That is, the prosecution encouraged the jury to lump all the aggravators together. If they are lumped together, then subtracting weight from any of them alters the overall calculus. And weight must be subtracted from each of them because of the errors spelled out above. Because the jury was prodded by the State to evaluate all of the aggravators and mitigators in aggregate, it would have been easier for the error involving a single aggravator to spill over and affect the ultimate outcome.[14] And the ultimate outcome was also impacted by the error regarding unanimity on mitigation, which would have made it more likely that a juror inclined to vote for life felt that she had to switch to comply with the instructions. *See supra* at Part

---

[14] To the extent the Court disagrees with the paragraph above, Mr. Hall respectfully asks that it reserve its ruling on the prejudicial impact of the present error (and the other challenges to aggravators) until it directly addresses the claim that the prosecution committed misconduct by misstating the weighing process to the jury, *See* Dkt. 39 at 76–77, which is not part of the instant merits briefing. Mr. Hall also clarifies that he is not presently briefing the merits of the cumulative-error claims that are pled in his habeas petition. *See* Dkt. 39 at 44, 120. Rather, he is simply arguing—as Ninth Circuit law entitles him to do—that the collective prejudice from the errors discussed in this brief warrant relief. The cumulative-error claims in his petition should be evaluated at a later date, when all of the relevant claims can be weighed together.

II.D.  Lingering doubt at sentencing created by the Confrontation Clause claim
would add even more weight to the scales.  *See supra* at Part II.A.3.

In assessing the cumulative prejudice caused by the defects in the
aggravators, it is also important to consider Idaho's capital regime in a more holistic
fashion.  After all, it is the "*scheme*" that "must genuinely narrow the class of
persons eligible for the death penalty and must reasonably justify the imposition of
a more severe sentence on the defendant compared to others found guilty of
murder."  *Lowenfield*, 484 U.S. at 244.  A recent law review article meticulously
evaluated the law and data surrounding Idaho's death-penalty system as a whole
and concluded that it "does not meaningfully narrow capital eligibility."  Aliza
Plener Cover, *Narrowing Death Eligibility in Idaho: An Empirical and
Constitutional Analysis*, 57 Idaho L. Rev. 559, 605 (2021).  The article reached that
determination after an exhaustive review of sentencing practices in Idaho, which
revealed that "[t]he death eligibility rate of factually first-degree cases was" in the
"strikingly high" range of 93% to 98%, and the rate for first-degree convictions was
even higher: 97% to 99%.  *Id.* at 588.

For present purposes, the most relevant aspect of the article is its discussion
of how four particular aggravators in Idaho are overbroad.  One of those is the
felony-murder aggravator, which the article identifies as being "a near replica of the
first-degree felony murder provision, rendering the vast majority of felony-murders
capital-eligible."  *Id.* at 571.  The other three are HAC, utter disregard, and
propensity, which the article characterizes as "fuzzy" in the sense that they "are

both broad and inherently ambiguous." *Id.* Needless to say, these are the four aggravators found in Mr. Hall's case and under attack here. Equally important, none of the more definite aggravators were charged against Mr. Hall. As the article notes, there are in Idaho aggravators that "are readily discernible and likely apply only to a narrow band of cases," such as a previous murder conviction (the author's example) or the murder of a judicial officer acting in her official capacity (Mr. Hall's example). *Id.* at 570; Idaho Code § 19-2515(9)(j).

But Mr. Hall was sentenced to death for not a single aggravator that is capable of such objective evaluation. He was sentenced to death entirely on the basis of aggravators that either have no real content and could apply in virtually every first-degree murder prosecution or—in the case of felony murder—an aggravator that was literally charged as and found as an offense of conviction. Mr. Hall's case is therefore the paradigmatic illustration of Idaho's overbroad death penalty. Because his aggravators collectively demonstrate as much, this feature of Idaho's system further points to the need for relief.

If no relief is forthcoming, an evidentiary hearing is in order. In *Hidalgo v. Arizona*, 138 S. Ct. 1054 (2018), Justice Breyer issued a statement regarding the denial of certiorari on behalf of himself and three of his colleagues. The petitioner there had presented a challenge to Arizona's death-penalty scheme on narrowing grounds similar to the criticism articulated in Professor Cover's article. *See id.* at 1056. In particular, the petitioner argued that Arizona's "statutory aggravating circumstances . . . apply to virtually every first-degree murder case in the State" in

light of the sort of data assembled in the law review article.  *Id.*  Justice Breyer noted that the evidence was "unrebutted," that it "point[ed] to a possible constitutional problem," and that it "warrants careful attention and evaluation."  *Id.* at 1057.  However, he still voted to deny the certiorari petition because "the opportunity to develop the record through an evidentiary hearing was denied," leading to facts that were "limited and largely unexamined by experts and the courts below in the first instance."  *Id.*  If other inmates were able to develop the record, it would lead to a petition "better suited for certiorari."  *Id.*

That record should be created here.  Professor Cover's article highlights serious concerns about the breadth of Idaho's capital scheme, which are directly relevant to the challenges Mr. Hall has asserted in the instant brief.  Those concerns should be fully vetted through an evidentiary hearing.  Such a hearing is permissible because, to the extent the Idaho Supreme Court addressed the more global narrowing challenge, its decision flunks the § 2254(d)(1) test.  The Idaho Supreme Court declared that "[t]he constitutionally required narrowing function is provided in the definition of first-degree murder in Idaho."  *Hall*, 419 P.3d at 1097.  For reasons presented earlier, that analysis is directly at odds with the controlling U.S. Supreme Court caselaw—not to mention the U.S. Supreme Court's own interpretation of Idaho's regime.  Moreover, Mr. Hall was diligent in pursuing the global challenge in state court.  It was presented to the Idaho Supreme Court, *see* D-24 at 139, which had a chance to provide the requested hearing.  Section 2254(e) is

consequently no impediment to a hearing, and one should be held under the logic persuasively articulated by Justice Breyer in his *Hidalgo* opinion.

## III.    If relief is denied a Certificate of Appealability is appropriate.

A petitioner cannot appeal the denial of habeas relief on any claim unless he has obtained a certificate of appealability ("COA") for that claim.  *See* 28 U.S.C. § 2253(c)(1)(A) (requiring a petitioner to secure a COA before appealing the denial of habeas relief); *see also* § 2253(c)(3) (providing that a COA must "indicate which specific issue or issues satisfy the showing required by" the COA standard). Pursuant to Rule 11(a) of the Rules Governing 2254 Cases in the United States District Courts, "[t]he district court must issue or deny a [COA] when it enters a final order adverse to the applicant."  A COA should be granted where the habeas petitioner "has made a substantial showing of the denial of a constitutional right." § 2253(c)(2).  When a district court denies a claim on the merits, the COA inquiry examines whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right."  *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  "Although not dispositive, in a capital case, the nature of the penalty is a proper consideration in determining whether to issue a [COA]." *Williams v. Woodford*, 384 F.3d 567, 583 (9th Cir. 2004) (alterations omitted). "Where the petitioner faces the death penalty, any doubts as to whether a COA should issue must be resolved in the petitioner's favor."  *Rhoades v. Davis*, 852 F.3d 422, 427 (5th Cir. 2017).

Although a formal ruling on a COA is not required until a final decision on the petition is forthcoming, Mr. Hall believes it would be appropriate for the Court to indicate whether any claims being denied on their merits now will be certified for appeal.  That would be especially salutary because the claims are being addressed in the present litigation and the Court will therefore have them fully in focus, whereas a final ruling on the remaining claims will not be rendered for some time. *See Duncan v. United States*, No. 2:17-cv-091, 2019 WL 1320039, at *28 (D. Idaho March 22, 2019) (ruling on a COA while deferring a final decision on other claims). Accordingly, and for the same reasons laid out in the argument section above, Mr. Hall respectfully asks the Court to state in its order that a COA will issue for any claim upon which it is denying relief.  If the Court is not prepared to grant a COA at that time, Mr. Hall requests in the alternative that the Court defer its decision on the COA until releasing a final judgment on the petition as a whole.

## IV.    Conclusion

In light of the above, Mr. Hall respectfully asks the Court for the following relief in descending order of preference: vacatur of his convictions; vacatur of his death sentences; an evidentiary hearing; more modest tools of factual development; or whatever other remedies are just and appropriate under the circumstances.

Respectfully submitted this 17th day of October 2022.

/s/ *Jonah J. Horwitz*
Jonah J. Horwitz
Christopher M. Sanchez

Attorneys for Petitioner

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of October 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which is designed to send a Notice of Electronic Filing to persons including the following:

L. Lamont Anderson
Lamont.anderson@ag.idaho.gov

/s/ *Julie Hill*
Julie Hill