Nicole Owens
Executive Director
Jonah J. Horwitz, Idaho Bar No. 10494
Christopher M. Sanchez, Idaho Bar No. 12070
Assistant Federal Defenders
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, Idaho 83702
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
ECF:   Jonah_Horwitz@fd.org
          Christopher_M_Sanchez@fd.org

Attorneys for Petitioner

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| ERICK VIRGIL HALL, | ) | CASE NO. 1:18-CV-218-BLW |
| | ) | |
| Petitioner, | ) | |
| | ) | **CAPITAL CASE** |
| v. | ) | |
| | ) | |
| TIM RICHARDSON,[1] Warden, Idaho | ) | PETITIONER'S REPLY BRIEF |
| Maximum Security Institution, | ) | ON THE MERITS OF CLAIMS 2, |
| Department of Correction, State of | ) | 3, 14, 20, 37, 38, 39, AND 40 |
| Idaho, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

---

[1] Tim Richardson should be substituted in as the respondent. *See* Dkt. 62 at 1 n.1.

## TABLE OF CONTENTS

I.     Introduction ........................................................................................ 1

II.    Mr. Hall's AEDPA argument is not estopped and is meritorious. .................. 1

III.   Claims ................................................................................................ 4

       A.    The shackling claim is meritorious or deserves a hearing ...................... 4

       B.    The Confrontation Clause claim is meritorious or deserves a hearing. 11

       C.    The appellate-record claim is meritorious or deserves a hearing .......... 15

       D.    The mitigation-unanimity claim is meritorious or deserves a hearing. 17

       E.    The HAC claim is meritorious or deserves a hearing. ........................... 21

       F.    The utter-disregard claim is meritorious or deserves a hearing. .......... 29

       G.    The propensity claim is meritorious or deserves a hearing. .................. 32

       H.    The felony-murder claim is meritorious or deserves a hearing. ........... 39

IV.    Cumulative error is properly addressed now and it is present. ...................... 46

V.     The Court should address—and grant—a COA. .............................................. 48

VI.    Conclusion .......................................................................................... 49

Pursuant to the Court's order, *see* Dkts. 63, 70, Petitioner Erick Virgil Hall hereby submits his reply brief on the merits of the eight exhausted claims currently before the Court.

## I.    Introduction

Mr. Hall will first address the State's estoppel argument and the constitutionality of the Antiterrorism and Effective Death Penalty Act (AEDPA). *See* Dkt. 83 at 7–11.  Next, Mr. Hall will discuss his individual claims.  Afterwards, Mr. Hall will respond to the State's points on cumulative error.  And finally, Mr. Hall will take up the certificate of appealability (COA) issue.  Every section of this brief is incorporated into every other section.

## II.   Mr. Hall's AEDPA argument is not estopped and is meritorious.

The State contends that Mr. Hall is estopped from challenging the constitutionality of AEDPA because he stipulated that the eight claims at issue "may be considered on the merits by this Court under 28 U.S.C. § 2254(d)."  Dkt. 83 at 7.[2]  For multiple reasons, this formalistic gambit of the State's fails.

First, in entering into the stipulation, Mr. Hall was simply following the guidance of the Court.  The Court "direct[ed] the parties to meet and confer to discuss which, if any, claims in the Amended Petition were decided on the merits in state court."  Dkt. 56 at 6.  It further "encourage[d] the parties to agree as to at least some claims that would be appropriate, at this juncture, for the Court to consider on

---

[2] In this brief, unless otherwise noted, all internal quotation marks and citations are omitted, and all emphasis is added.

the merits under 28 U.S.C. § 2254(d)." *Id.*  In the stipulation, Mr. Hall was answering the question posed by the Court to the parties: if any claims were to be resolved on the merits under § 2254(d), what would they be?  By answering the question asked of him by the Court, Mr. Hall was certainly not waiving the ability to raise other contentions in addition to providing his § 2254(d) analysis.  Indeed, Mr. Hall only agreed that the claims "*may* be considered on the merits by this Court under 28 U.S.C. § 2254(d)." Dkt. 83 at 2.  That is correct in light of the constitutional attack on AEDPA.  The Court *may* reject Mr. Hall's constitutional theory and instead apply § 2254(d).  Or it may embrace the theory and afford de novo review.  Either way, there was nothing misleading about the stipulation.

Second, the elements of judicial estoppel are not satisfied.  The test requires that the estopped party "succeed[] in persuading a court to accept that party's earlier position." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).  Mr. Hall did not convince the Court to order briefing on § 2254(d).  Neither party proposed the current merits briefing to the Court.  Rather, the parties both believed a stay was appropriate until the state post-conviction litigation concluded.  *See* Dkts. 14, 15.  It was the Court that sua sponte called for the § 2254(d) briefing.  *See* Dkt. 22 at 5.  The implicit assumption of the State's estoppel position is that Mr. Hall somehow led the Court into taking an approach that it actually adopted over both parties' objection.  Furthermore, it is likewise not the case that Mr. Hall's "interests have changed," causing him to "assume a contrary position." *New Hampshire*, 532 U.S. at 749.  Mr. Hall's interests have remained constant.  He wished for a stay and so

sought one.  When the Court declined to grant it and elicited a list of exhausted claims suitable for adjudication, Mr. Hall worked with the State to provide one.  And he is now offering his thoughts on the claims to the Court.  Nothing has changed in either Mr. Hall's position or in the posture of the case.

Third, even if Mr. Hall's position had changed, it is not "to the prejudice of the" State.  *Id.*  The State hyperbolically describes its participation in the construction of an eight-claim list as an "ordeal."  Dkt. 83 at 8.  It was nothing of the sort.  But more significantly, that is the wrong focus for estoppel purposes.  The State didn't have to cooperate in the preparation of the list because of anything Mr. Hall said in the stipulation.  It had to cooperate because the Court ordered the parties to do so.  *See* Dkt. 56 at 6.  To show prejudice, the State would have to demonstrate that it did something differently because of the stipulation itself.  The State doesn't even attempt to make that showing.  Nor is it easy to see how it could.  The only relevant real-life impact is that the State had to defend the constitutionality of AEDPA in a brief that revolves around AEDPA, which the Attorney General managed to do without difficulty in two pages of largely recycled text.  *Compare* Dkt. 83 at 9–10, *with Abdullah v. Ramirez*, D. Idaho, No. 1:17-cv-098, Dkt. 20 at 7–9.  That is hardly an injury sufficient to prevent the Court from reaching the constitutionality of the principal statute involved in the litigation.

Finally, the State's presentation on the merits of the constitutional question is largely unresponsive.  The thrust of Mr. Hall's argument was that the Supreme Court's recent decision in *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), transforms

AEDPA into an unconstitutional suspension of the writ.  *See* Dkt. 75 at 4–5.  The State does not engage with that explanation.  *See* Dkt. 83 at 9–10.  Instead, the State makes a largely pre-*Ramirez* case for AEDPA.  *See id.*  That insufficiently accounts for the "protean dynamism" of habeas corpus as a remedy.  Steven Vladeck, *The New Habeas Revisionism*, 124 Harv. L. Rev. 941, 991 (2011). Left unrebutted, Mr. Hall's argument should be endorsed by the Court and the claims should be considered de novo.  Nevertheless, Mr. Hall will—as he did in his opening brief—assume that the Court will utilize AEDPA and he will do the same below.

## III.    Claims

Mr. Hall will go through the claims one at a time.

### A. The shackling claim is meritorious or deserves a hearing.

The State's first salvo against Mr. Hall's shackling claim (Claim 2) is that clearly established Supreme Court law under AEDPA only forbids visible shackles and not audible ones.  *See* Dkt. 83 at 23–26.  In a brief footnote, the State brushes aside the fact that this Court has already found to the contrary.  *See id.* at 26 n.8.  Specifically, this Court has expressly held that the governing AEDPA case, *Deck v. Missouri*, 544 U.S. 622 (2005), "requires that the jury know about the restraint—either by seeing it *or hearing it*."  *Weaver v. Carlin*, No. 3:10-cv-295, 2013 WL 1797444, at *12 (D. Idaho Apr. 29, 2013).  Although the State is correct that *Weaver* is not formally binding here, it still represents the well-considered position of the Court on the precise question presented now.  It is worthy of more than a footnote.

Most importantly, *Weaver* was right.  To be sure, *Deck* involved visible rather than audible shackles.  *See* 544 U.S. at 624.  Still, AEDPA does not require habeas courts to await "some nearly identical factual pattern" before applying a clearly established rule, nor does it prohibit "finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced."  *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).  The very first reason *Deck* offered for its holding was that restraints "suggest[] to the jury that the justice system itself sees a need to separate a defendant from the community at large."  544 U.S. at 630.  That suggestion is conveyed as soon as a jury becomes cognizant of restraints, regardless of how it learns of them.  Thus, *Deck*'s limitations apply here.

The State misleadingly intimates that the Ninth Circuit has itself answered the question against Mr. Hall.  *See* Dkt. 83 at 32.  In the referenced case, though, the Ninth Circuit relied upon measures "taken to ensure that [the] defendant's shackling [was] not visible" because no issue other than visibility was presented.  *Rich v. Calderon*, 187 F.3d 1064, 1069 (9th Cir. 1999).  *Rich* did not deal with audible restraints one way or the other.  In sum, this Court's conclusion in *Weaver* that *Deck* encompasses audible restraints is well-grounded in the governing law, and it should be adhered to here.

Defending the state post-conviction court's post-hoc justification for the restraint, the Attorney General denies that they were post-hoc at all.  *See* Dkt. 83 at 26–27.  The State's premise is that the rationales were contrived by the same judge

who presided over the trial.  *See id.*  It is a creative but implausible angle.  Binding

Ninth Circuit law unequivocally forbids the use of "post-hoc rationales" for

restraints.  *Larson v. Palmateer*, 515 F.3d 1057, 1063 (9th Cir. 2008).  The State

insists that there is no authority for the rule that "contemporaneous explanations"

are mandated.  Dkt. 83 at 27.  To the contrary, that is exactly the rule articulated

by *Larson*.  The concept of "post-hoc" is defined with reference to its opposite, which

is "contemporaneous."  *See, e.g.*, *Boeing Corp. v. Cascade Corp.*, 207 F.3d 1177, 1186

(9th Cir. 2000) (contrasting "[p]ost hoc accounting" with "contemporaneous

accounting").  For something to be post hoc in the context of a trial means nothing

more than that it occur *after* the trial, which is what happened here.

The State's rationalization of the post-conviction court's approach also glosses

over the problems caused by a judge whose "findings" occur well after the trial has

ended.  By handling the issue in that manner, the post-conviction court prevented

an adequate record from being made, since its own statements after the trial would

not be subject to cross-examination.  *See Hill v. State*, 842 S.E.2d 853, 860–61 (Ga.

2020) (finding that a trial court abused its discretion because it ordered the

defendant to wear shackles and "failed to establish a record—for example, by calling

witnesses or holding an evidentiary hearing to support its determination that the

threat warranted extra security measures").

The State sees no problem with the Idaho Supreme Court's refusal to

acknowledge Mr. Hall's affidavit in its handling of the shackling issue.  *See* Dkt. 83

at 29–30.  According to the State, the omission is acceptable because Mr. Hall

"never stated the jury actually saw or was even aware of the brace." *Id.* at 29. Needless to say, Mr. Hall is incapable of speaking to what the jury saw or was aware of. It is the jurors alone who can illuminate their own perceptions. Like any testimony, affidavits are only admissible if the witness has "personal knowledge of the matter." *State v. Smith*, 516 P.3d 1071, 1086 (Idaho 2022). Mr. Hall's affidavit properly cabined itself to his personal knowledge. He averred that he had to press the button on the brace to unlock it every time he sat and that it made "clicking noises" every time he stood up. *See* B-7 at 1377.[3] Mr. Hall was able to establish that "the jurors would have been able to hear these noises," *id.*, but he of course could not say what exactly they did hear or how they interpreted the sounds. It is unpersuasive for the State to discount Mr. Hall's affidavit on the basis that it complied with Idaho state law and focused on personal knowledge. And it is even more unpersuasive for the State to criticize the affidavit for that limitation while at the same time dismissing the need to hear directly from the jurors—the only people who would be able to resolve the question definitively. *See* Dkt. 83 at 30–31.

The State's critique of the affidavit fails for the additional reason that it was not embraced by the Idaho Supreme Court itself. In rejecting the shackling claim, the Idaho Supreme Court did not question Mr. Hall's reliance on the affidavit on any of the grounds now invoked by the State. The court did not even mention the affidavit. *See State v. Hall*, 419 P.3d 1042, 1119–20 (Idaho 2018). To support its avoidance of the Idaho Supreme Court opinion, the State points to *Pye v. Warden,*

---

[3] Citations in the format above are to the current lodgings. *See* Dkt. 34.

Petitioner's Reply Brief on the Merits – 7

*Ga. Diagnostic Prison*, 50 F.4th 1025 (11th Cir. 2022) (en banc), and its attestation that "most of the courts of appeals have held that even where a state court rejects a petitioner's claim in a reasoned decision, the federal habeas court must defer to a state court's ultimate *ruling* rather than to its specific *reasoning*." Dkt. 83 at 30 (emphasis in original). What the State notably leaves out is that the associated string-cite does *not* include any decisions from the Ninth Circuit. Instead, *Pye* identifies the Ninth Circuit as following the opposite path and "limit[ing] federal habeas courts' review to the state courts' specific justifications." 50 F.4th at 1040 n.9. Of course, it is the Ninth Circuit's precedent that controls here. And in the Ninth Circuit, courts "may look only to the reasoning of the [state court]." *Kipp v. Davis*, 971 F.3d 939, 952 n.10 (9th Cir. 2020); *accord James v. Ryan*, 733 F.3d 911, 916 (9th Cir. 2013) (understanding precedent as "instruct[ing] us to give the state courts the benefit of the doubt when the basis for their holdings is unclear" and as not "requir[ing] us to ignore a state court's explicit explanation of its own decision").

The State is untroubled by the absence of juror interviews in part because the substantive due process claim was supposedly ill-suited to post-conviction proceedings. *See* Dkt. 83 at 30–31. Again, the State is putting words in the Idaho Supreme Court's mouth. The Idaho Supreme Court had no reservations about resolving the merits of the due process claim in a post-conviction posture. *See Hall*, 419 P.3d at 1119–20.

Finally, the State's presentation on harmless error is not compelling. The State places great weight on the DNA evidence, *see* Dkt. 83 at 33, but at most it tied

Mr. Hall to the rape and did not prove that he committed a murder by himself. That gap is significant, because there were other highly suspicious individuals on the table.  The State writes off the first of those individuals—Christian Johnson— by cherry-picking the most innocuous sounding descriptions of him from the transcript.  *See id*. at 33.  Those descriptions notwithstanding, the relevant eyewitness also called Mr. Johnson "really strange" and observed that she had turned back to see if he would follow the victim because she "was a little bit concerned for" Lynn Henneman's safety.  A-11 at 3577, 3580.  In addition, the State skips over the single most suspicious factor about Mr. Johnson—that he called the police after the murder to report that he overheard a 6'8" man dressed in all black with a stutter inculpating himself in the murder on a pay phone.  *See* Dkt. 75 at 19. The State does not even attempt to supply an explanation as to why a blameless party would do such a thing.  In short, while the State is correct that the evidence regarding Mr. Johnson was not one-sided, Mr. Hall is not required to prove his innocence, but only to demonstrate a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Mr. Johnson's behavior was dubious enough to favor Mr. Hall's claim on that scale.

So was Patrick Hoffert's behavior, who by one account confessed to a rape right around the time of the offense and then committed suicide.  *See* B-22 at 3380– 86.  The State's response to Mr. Hoffert is to echo trial counsel's excuse that the "evidence would have placed Hall with Lynn on the evening of her murder." Dkt. 83

at 34.  There is no validity to the excuse, given that the DNA evidence already cemented the same connection in a far more definitive fashion.

It is the State's view that Mr. Hall "confessed to murdering Lynn in a letter to her family."  *Id.* at 33.  That is an overstatement.  While the letter is certainly prejudicial, its vague apologetic statements do not constitute a confession.  *See* A-133.  What is more, the letter was obtained during a lengthy, suggestive interrogation during which Mr. Hall also consistently indicated that he had little memory of what transpired at the time of the offense.  *See, e.g.*, A-21 at 7, 8, 20, 32, 34, 37, 46–48, 53, 55–56, 64, 66, 74.  The letter was not nearly enough to foreclose the possibility of prejudice.

Next, the State downplays the damage the shackling would have done on the propensity aggravator because the jury found three others.  *See* Dkt. 83 at 34.  The State's rejoinder would hold water if the issue were one of actual innocence, where the question is whether the inmate is "eligible for the death penalty under the applicable state law."  *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992).  Here, by contrast, the inquiry is instead into whether propensity—and future dangerousness more broadly—was so central to the penalty phase that the shackling was prejudicial with regards to the jury's general weighing of death against life.  Since future dangerousness is always salient to jurors, and since the prosecution focused exclusively on propensity at sentencing, the answer is yes.  *See* Dkt. 75 at 20.

Lastly, the State urges the Court to disregard Mr. Hall's residual doubt theory because there is no constitutional right to such a defense at a capital

sentencing.  *See* Dkt. 83 at 34.  There is a disconnect in the State's reasoning.  Just because there is no *constitutional* right to present residual doubt as mitigation does not mean that it's impermissible as a matter of state law.  A lingering-doubt argument was raised in *State v. Hairston*, 988 P.2d 1170, 1191 (Idaho 1999).  If the Idaho Supreme Court shared the State's stance, it presumably would have said as much there.  Instead, the court rebuffed the claim on the merits, finding "nothing to indicate that the judge harbored any lingering doubt."  *Id.*  And if residual doubt can be asserted under state law, the absence of a constitutional right to present it is irrelevant.  In that event, the defense would be extremely pertinent for purposes of analyzing prejudice, since "recent studies have shown that in general residual doubt is one of the most compelling mitigating circumstances a capital defendant can establish to improve his chances of receiving a life sentence."  *State v. Hartman*, 42 S.W.3d 44, 59 (Tenn. 2001).  Because the State has failed to show the unavailability of residual-doubt theories in Idaho, its argument fails.

**B. The Confrontation Clause claim is meritorious or deserves a hearing.**

On the Confrontation Clause claim (Claim 3), the State begins by taking issue with Mr. Hall's reading of the Idaho Supreme Court opinion as taking no position on whether the information at issue was testimonial or not.  *See* Dkt. 75 at 23 n.7.  It is the State's opinion that "the Idaho Supreme Court necessarily found that Dr. [Carla] Finis' testimony was non-testimonial" because "[o]therwise, the court could not have affirmed" and would instead have found a constitutional violation.  Dkt. 83 at 40.  The State misunderstands Confrontation Clause law.  In

the context of this case, the testimonial requirement is necessary but not sufficient for the Confrontation Clause to be triggered.  A statement is barred by the Clause when it is *both* testimonial *and* when the witness is serving as merely a conduit for someone else's judgment.  *See United States v. Vera*, 770 F.3d 1232, 1237 (9th Cir. 2014) (explaining that there is no Confrontation Clause "problem when an expert . . . reach[es] an independent judgment" but that he violates the Clause when "he is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation").

The Idaho Supreme Court did not address whether the information relayed by Dr. Finis was testimonial.  In its opinion, the court recited the standard for what qualifies as testimonial: material that was "made with a primary objective of creating an evidentiary record to establish or prove a fact at trial."  *Hall*, 419 P.3d at 1075.  The court never asked whether that standard was satisfied.  Its reasoning, instead, was rooted entirely in the conclusion that "Dr. Finis independently interpreted the data and arrived at her own conclusions based upon the raw evidence."  *Id.* at 1076.  That has nothing to do with whether the information was prepared for trial or not.  Stated differently, the material could easily be testimonial under the Idaho Supreme Court's construction—it would just be testimonial information presented by the right witness.

Turning to the crux of the State's Confrontation Clause briefing, it maintains that "there is no clearly established Supreme Court holding that resolves Hall's

case." Dkt. 83 at 41.  The Ninth Circuit cases proffered by the State to bolster that conclusion are inapposite.  When the Ninth Circuit declared in *Flournoy v. Small*, 681 F.3d 1000, 1004 (9th Cir. 2012), that there was not "clearly established federal law" on the Confrontation Clause claim presented there, it was in the context of a case where the testifying supervisor "participated personally in the work that was done" by the lab.  Contrastingly, Dr. Finis testified that she did not perform the testing and never indicated that she had even observed it.  *See* A-11 at 4395, 4399. In the State's other Ninth Circuit case, the court expressly refused to apply *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), since it was decided too late under AEDPA.  *See Meras v. Sisto*, 676 F.3d 1184, 1187–88 (9th Cir. 2012).  *Bullcoming* is at the heart of Mr. Hall's Confrontation Clause claim, *see* Dkt. 75 at 23, and it was issued well in advance of the Idaho Supreme Court's opinion and is therefore fair game for AEDPA purposes in the present case.

The State discerns no bright-line rule in *Bullcoming* that would apply here because New Mexico in that case never claimed the witness "had any independent opinion" about the testing at issue, whereas Dr. Finis did.  Dkt. 83 at 41.  However, that brief passage in *Bullcoming* was not part of the constitutional account of why the Confrontation Clause was violated.  It was merely a response to the dissent's pragmatic point that it "is a hollow formality" to compel "the State to call the technician who filled out a form and recorded the results of a test."  *Bullcoming*, 564 U.S. at 677 (Kennedy, J., dissenting).  The core holding in *Bullcoming* did not hinge on the presence vel non of an independent opinion.  It answered the question

presented: whether a lab employee can testify to results when she did not

"personally perform or observe the performance of the test." *Id.* at 647.  The answer

was no, and it dictates the result here.  It is improper for the State to fixate

exclusively on a fact in *Bullcoming* that the majority itself did not make essential to

its holding.  *See Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (reiterating that

AEDPA does not "prohibit finding an application of a principle unreasonable when

it involves a set of facts different from those of the case in which the principal was

announced").  And it is unconvincing for the State to hang its hat on Justice

Sotomayor's concurrence in *Bullcoming*, *see* Dkt. 83 at 41, which does not reflect

clearly established federal law under AEDPA, *see Herrera v. Pfeiffer*, No. CV 20-

10583, 2021 WL 3127014, at *7 n.3 (C.D. Cal. May 17, 2021) (calling a concurrence

"not clearly established federal law under AEDPA" because it was not "embodied in

a holding of" the Court), *adopted by* 2021 WL 3406651 (C.D. Cal. Aug. 3, 2021).

    In regards to prejudice, the only contention of consequence in the State's brief

is that "Dr. Finis' testimony was not particularly important because it merely

eliminated 129 men as possible sperm donors from a world population of over 8

billion people."  Dkt. 83 at 43.  The State overlooks who these men were.  One was

Christian Johnson, *see* A-11 at 4354–55, the only credible alternative perpetrator

about whom the jury was told, *see supra* at Part III.A.  More generally, the 129 men

in the pool were "submitted to the lab by law enforcement agencies."  A-11 at 4396.

Put another way, they were *suspects*.  Jurors would naturally attribute special

significance to the elimination of suspects chosen by law enforcement investigating

the case, as opposed to the eight billion other random people on the planet.  It

follows that Dr. Finis's testimony was indeed impactful, and the error was harmful.

### C. The appellate-record claim is meritorious or deserves a hearing.

Ironically, the State dedicates most of its section on the appellate-record

claim (Claim 14) to its own speculations about what must have transpired during

*unreported* conversations while at the same time accusing Mr. Hall of engaging in

"rank speculation."  Dkt. 83 at 51.  The State characterizes four of its reconstructed

histories of these exchanges as "obvious."  *Id.* at 51, 53, 55, 57.  A fifth script is

"clearly establish[ed]" by the context.  *Id.* at 58.  No matter how strong the State's

adjectives and adverbs, both parties are at the end of the day left with some degree

of speculation.  That is what happens when trial courts leave substantial portions of

capital trials un-transcribed without explanation.  It would be perverse if the

inherent nature of the constitutional violation gave the State a ready-made excuse

for dismissing the claim.

The State returns time and time again to trial counsel's comfort with the

inadequate record.  *See, e.g.*, Dkt. 83 at 53, 54, 55.  This is not a case where it can

simply be assumed, with the State, that trial counsel were vigilantly safeguarding

their client's rights.  Trial counsel made no objection as the prosecutor

"mischaracterized the statutory scheme" at sentencing by "strongly suggest[ing]

that all the aggravators should be considered collectively against all the mitigation

evidence—in direct conflict with the weighing directed by" the statute, which

instead requires the jurors to "weigh[] all the mitigating evidence against each

Petitioner's Reply Brief on the Merits – 15

aggravating circumstance individually." *Hall*, 419 P.3d at 1106, 1107.  Lead counsel concurrently represented an important government sentencing witness in her own criminal case.  When the witness was called by the State, counsel remarked on the record that he did not wish to make things more difficult for *her*; expressed anxiety about cross-examining her too aggressively; indicated he was "very familiar" with her "background"; and, after all that, cavalierly declared that he was "just going to go ahead and question her," and if he was "creating ethical problems," so be it—"[l]et's just do it."  A-12 at 4871–75.  Trial counsel's confidence is no assurance.

The State detects no unreasonableness in the Idaho Supreme Court's attestation that there were "transcripts of every relevant hearing, proceeding, and the trial." *Hall*, 419 P.3d at 1064.  This is so, the State posits, because the Idaho Supreme Court was only "referring to a record of sufficient completeness."  Dkt. 83 at 56.  Stated differently, the Attorney General construes the opinion as finding a sufficient number of relevant transcripts.  As before, the State warps the opinion to make it more constitutionally palatable.  The Idaho Supreme Court did not opine that there were a sufficient number of relevant transcripts—it opined that there were transcripts of "*every* relevant hearing." *Hall*, 419 P.3d at 1064.  Considering how many un-transcribed proceedings are recited in Mr. Hall's opening brief, *see* Dkt. 75 at 33–40, that is so inaccurate as to be unreasonable.

The State's invocation of speculativeness does not match up with its own chosen caselaw.  In *Diaz v. Covello*, No. 4:21-cv-137, 2022 WL 3641128, *10 (N.D. Cal. Aug. 23, 2022), a case cited by the State, the petitioner failed to demonstrate

"how the absence of th[e] transcript prejudiced his appeal."  The missing portions of Mr. Hall's transcript related to significant legal issues, some of which were actually the subject of appellate litigation.  *See* Dkt. 75 at 41.  Insofar as Mr. Hall is being asked by the State to make a more particularized showing, it is impossible in light of the fundamental nature of the claim.

Apart from the legal nuances involved in this claim, it is worth returning to a common-sense lens.  The reality is that the trial court took numerous discussions with counsel in a capital case off the record without every explaining in a single instance why it was appropriate or necessary to do so.  Nor does the State offer any such explanation.  Although Mr. Hall recognizes the difficulty of prevailing on such a claim, he emphasizes that this is a highly irregular set of facts involving pervasive and seemingly unnecessary bench conferences, in camera proceedings, and the like—all of which have deprived this Court of the ability to conduct the kind of comprehensive review warranted in a death penalty case, and all of which thereby collectively violated due process.

**D. The mitigation-unanimity claim is meritorious or deserves a hearing.**

Turning to the mitigation-unanimity claim (Claim 20), the State parses Jury Instruction 48 such that it only applies to the weighing process and not the finding of a particular mitigating circumstance.  *See* Dkt. 83 at 61.  As the State sees things, it is correct that the weighing determination "must be unanimous" and there was consequently no error in the instruction.  *Id.*  The State's tack was not taken by the Idaho Supreme Court.  *See Hall*, 419 P.3d at 1102.  In deciding this issue, the

Petitioner's Reply Brief on the Merits – 17

Idaho Supreme Court did not draw a distinction between weighing and the finding of mitigators.  *See id.*  The Idaho Supreme Court upheld the instruction because it thought the jury was adequately told that *both* tasks could be accomplished without unanimity.  *See id.*  Because the State is again concocting a rationale unexpressed by the Idaho Supreme Court, the point should be disregarded for reasons sketched out above.  *See supra* at Part III.A.

To the extent the Court disagrees and considers the argument, it is meritless. The Idaho Supreme Court's bottom-line holding was that the "instructions, taken together, correctly instruct[ed] the jury on the status of the law as contained in Idaho Code section 19-2515(7)(b)."  *Id.*  While the State elides the contents of the provision, the statute explicitly extends the non-unanimity language not just to the finding of mitigating circumstances but to the weighing phase.  *See* Idaho Code § 19-2515(7)(b) ("If the jury finds the existence of a statutory aggravating circumstance but finds that the existence of mitigating circumstances makes the imposition of the death penalty unjust or *the jury cannot unanimously agree on whether the existence of mitigating circumstances makes the imposition of the death penalty unjust*, the defendant will be sentenced to a term of life imprisonment without the possibility of parole.").  The State's implication that non-unanimity is only the rule with respect to one aspect of the inquiry and not the other is inconsistent with the plain language of the statute.

Elsewhere, the State frames the issue differently, observing that the outcome of the weighing "must be unanimous before the death penalty can be *imposed*."

Dkt. 83 at 62.  That is true, but it is not what the jurors were advised by Instruction 48.  They were informed that "[a]ny finding by you that the mitigating circumstances do *or do not* make the imposition of the death penalty unjust must be unanimous."  *Hall*, 419 P.3d at 1101.  It was thus communicated to the jurors in no uncertain terms that they were required to be unanimous with respect to how they resolved the ultimate question posed by the weighing component of the deliberations (whether Mr. Hall was to be sentenced to death), *even if* they were voting for life.  That was not an accurate distillation of Idaho law.  The statute permits the jury to disagree about the result of the weighing, and it dictates a life sentence.  It was constitutionally unacceptable for the Court to admonish the jury that they were forbidden from doing what the statute allows—agreeing to disagree about weighing, and therefore returning a life sentence.

To put a finer point on it, imagine that there were eleven jurors whose answer to the weighing question was to vote for death, and one juror whose answer was life.  Fairly reading Instruction 48, the lone juror would have concluded that she was not entitled to dissent from her peers, since "[a]ny finding by [the jury] that the mitigating circumstances do *or do not* make the imposition of the death penalty unjust must be unanimous."  *Id*.  That is precisely the harm the Supreme Court sought to prevent in *Mills v. Maryland*, 486 U.S. 367 (1988).  The purpose of *Mills* is to ensure that each juror is able to "giv[e] effect to mitigating evidence."  *McKoy v. North Carolina*, 494 U.S. 433, 443 (1990).  A juror is not giving effect to mitigating

evidence when she is instructed that even if she believes the evidence calls for a life

sentence she cannot so vote because the verdict must be unanimous.

The State's harmless-error analysis is tenuous.  It maintains that a *Mills*

claim is made weaker both when there is a "dearth of mitigation," because then the

result was preordained anyway, and when there is a plethora of mitigation, because

then the jurors were able to examine it all.  *See* Dkt. 83 at 63–64.  The State does

not cite any cases that embrace its "heads I win, tails you lose" framework.  In any

event, neither one of the State's proposed approaches is the correct one.  The

quantum of mitigation presented at sentencing is irrelevant to the inquiry

altogether.  As the State agrees, the test is "whether there is a reasonable likelihood

that the jury has applied the challenged instruction in a way that prevent[ed] the

consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S.

370, 380 (1990).  *Boyde* did not say that there is a certain amount of such evidence

that must have been offered for the error to matter.  And the sounder *Mills* opinions

impose no requirement along those lines.  *See, e.g.*, *Frey v. Fulcomer*, 132 F.3d 916,

922–25 (3d Cir. 1997).  Insofar as the State has brought forth out-of-circuit

authority to the contrary, *see* Dkt. 83 at 63, it rests on shaky foundations and

should not be followed here.

### E. The HAC[4] claim is meritorious or deserves a hearing.

The State's first engagement with the HAC claim (Claim 38) is to pin its argument to the "exceptional depravity" language in Idaho's statute. *See* Dkt. 83 at 69. In the State's judgment, the phrase distinguishes Idaho's aggravator from the Nebraska provision struck down in *Maynard v. Cartwright*, 486 U.S. 356 (1988). For that distinction, the State's Supreme Court authority is *Walton v. Arizona*, 497 U.S. 639 (1990). *See* Dkt. 83 at 70. Critically, though, *Walton* involved judge sentencing. *See* 497 U.S. at 643. The major plank of Mr. Hall's theory in this area is all about the problems caused by the switch from judge to jury sentencing. *See, e.g.*, Dkt. 75 at 51. A judge-sentencing case approving of similar language would therefore hardly doom an argument based on jury sentencing.[5]

Notably, *Walton* itself drew that distinction and therefore strongly supports Mr. Hall's own position. As indicated by Mr. Hall's opening brief, the principal Supreme Court cases upon which he is relying for Claim 38 are *Maynard* and *Godfrey v. Georgia*, 446 U.S. 420 (1980). The *Walton* Court distinguished *Maynard* and *Godfrey* for the very reason that they dealt with jury and not judge sentences.

---

[4] Heinous, Atrocious, and Cruel.

[5] The Arizona cases alluded to by the State, *see* Dkt. 83 at 74, do involve jury sentencing, but they do not meaningfully engage with any of the *reasons* for why the transition from one model to the other is constitutionally problematic, so they are of limited value here, *see State v. Ellison*, 140 P.3d 899, 921–22 (Ariz. 2006) (en banc); *State v. Anderson*, 111 P.3d 369, 394–95 (Ariz. 2005) (en banc). And although *Bell v. Cone*, 543 U.S. 447 (2005), did arise from a jury sentence, the Supreme Court did not address any argument there relating to the decision-making entity, and the decision does not resolve the issue presented now.

"When a jury is the final sentencer," *Walton* explained, "it is essential that the jurors be properly instructed regarding all facets of the sentencing process." 497 U.S. at 653. "*That* [was] the import of [the] holdings in *Maynard* and *Godfrey*." *Id.* "But the logic of those cases has no place *in the context of sentencing by a trial judge*." *Id.* That is exactly Mr. Hall's point. Instructions that pass constitutional muster in judge-sentencing schemes do not necessarily do so in jury-sentencing schemes. As recognized by *Walton*, the controlling cases for jury sentencing are *Maynard* and *Godfrey*, and they struck down aggravators as vague. *Walton* expressly rejects the State's attempt to collapse judge-and jury-sentencing precedents into a single amorphous mass. The case does the State no favors.

Under the same straightforward logic, the State's appeal to AEDPA principles misses the mark. The State faults Mr. Hall for having "not cited any Supreme Court holding establishing that the constitutionality of a statutory aggravator is based upon whether the factfinder is a judge or jury." Dkt. 83 at 70–71. Preliminarily, the State's own preferred case, *Walton*, elucidates precisely that holding in the language quoted in the preceding paragraph. More importantly, the State turns the AEDPA test on its head. Under AEDPA, "a state-court decision" is unreasonable within the meaning of § 2254(d)(1), "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Supreme Court's. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Mr. Hall's clearly established law comes from *Maynard* and *Godfrey*. Those cases invalidated aggravators in jury-sentencing regimes. Since he

has on-point cases, Mr. Hall has no obligation to point to Supreme Court law distinguishing juries from judges.  If anyone has that obligation, it is the State, for it is the State that is attempting to escape the reach of *Maynard* and *Godfrey*.

It is also illogical for the State to claim that the distinction between judges and juries has no constitutional weight while at the same time itself relying on a case that draws exactly that distinction.  The State's most important case on HAC is *Proffitt v. Florida*, 428 U.S. 242 (1976), which the Attorney General regards as having greenlit the instruction here.  *See* Dkt. 83 at 69.  Yet *Proffitt* itself grounded its result in the assumption that "a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases."  428 U.S. at 252.  If the distinction matters in the State's own authority, it surely matters in Mr. Hall's.

It is a distinction that resonates not just with precedent, but with social science.  Empirical studies prove that juries in capital sentencings frequently lack full comprehension of their instructions and, in contrast to judges, "fall back on their own prior knowledge" to interpret the instructions.  James Luginbuhl & Julie Howe, *Discretion in Capital Sentencing Instructions: Guided or Misguided?*, 70 Ind. L.J. 1161, 1169 (1995); *accord* William J. Bowers et al., *The Decision Maker Matters: An Empirical Examination of the Way the Role of the Judge and the Jury Influence Death Penalty Decision-Making*, 63 Wash. & Lee L. Rev. 931, 963 (2006).

Linguistically, too, the State's wish to distance itself from *Maynard* is unavailing.  The State places great import on the fact that HAC in Idaho includes

the phrase "exceptional depravity" whereas the Oklahoma statute at issue in

*Maynard* did not. *See* Dkt. 83 at 69. It is a distinction without a difference. While

the Oklahoma statute may not have contained the word "exceptional," it did contain

the phrase "*especially* heinous." *Maynard*, 486 U.S. at 364. Of that phrase, the

Supreme Court observed that "an ordinary person could honestly believe that every

unjustified, intentional taking of human life is *especially* heinous." *Id.* There is

little daylight between "exceptional" and "especially." One of the words even

appears in the definition of the other. *See Webster's Third New International*

*Dictionary* 776 (1993) (defining "especially" as "particularly, notably, *exceptionally*").

The State misplaces reliance on *Leavitt v. Arave*, 383 F.3d 809 (9th Cir.

2004). *See* Dkt. 83 at 69–70. However, the limiting instruction approved in *Leavitt*

was not given to Mr. Hall's jury. In *Leavitt*, the jury was instructed to consider

whether the defendant's offense was a "conscienceless or pitiless crime which [wa]s

unnecessarily torturous to the victim." 383 F.3d at 835–36. That language does not

appear in Mr. Hall's HAC instruction. *See* A-158 at Instruction 44. The absence of

"torture" in particular is significant. "Torture" has a concrete meaning, whereas

Instruction 44 is simply a long string of equally capacious and hyperbolic

pejoratives like "wicked," "evil," and "vile." *Cf. Smith v. State*, 881 P.2d 649, 655–56

(Nev. 1994) (per curiam) (deeming a capital aggravator unconstitutionally vague

where it relied upon "torture, depravity of mind or the mutilation of the victim"

because of a failure to instruct the jury that "depravity of mind must include

torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself").

In his opening brief, Mr. Hall commented on how his attack on HAC is strengthened by the superior facility that judges—as opposed to juries—have with comparing potentially capital cases with other first-degree murders. *See* Dkt. 75 at 53. The State dismisses Mr. Hall's point as an attempt to make "proportionality review" constitutionally required. *See* Dkt. 83 at 72. That is not correct. Proportionality review refers to the practice of state appellate courts analyzing whether the death "penalty is . . . unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." *Pulley v. Harris*, 465 U.S. 37, 43 (1984). Mr. Hall is not asserting an error that is primarily rooted in appellate practices. He is relying on the well-settled Eighth Amendment duty that states have, *at the trial level*, to "genuinely narrow the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 877 (1983); *accord Maynard*, 486 U.S. at 356. As noted, the U.S. Supreme Court has specifically relied upon the distinction between judges and juries in upholding narrowing regimes. *See Proffitt*, 428 U.S. at 252 n.10 ("[A] trial judge with experience in the facts of criminality possesses the requisite knowledge to balance the facts of the case against the standard criminal activity which can only be developed by involvement with the trials of numerous defendants."). There is no reason to suppose that the distinction only matters in this area of law when the sentencer is a judge but not when it is a jury.

Dissatisfied with the distinction drawn by the Supreme Court, the State collapses it. Judges are not that much better than juries at the necessary comparative work, the State cautions, because few of them have more than one capital case. *See* Dkt. 83 at 73. The State confuses the comparative process at issue. Under the Supreme Court's narrowing jurisprudence, a capital sentencer needs to compare the case before him with other murders, regardless of whether they involve the death penalty. *See Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) ("To pass constitutional muster, a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant *compared to others found guilty of murder*."); *Arave v. Creech*, 507 U.S. 463, 476 (1993) (indicating that the relevant pool for constitutional narrowing purposes is "the broad class of first-degree murderers"). Consistent with that principle, Idaho's aggravators in particular have been upheld for the very reason that they supposedly separate the capital cases from the "normal" murders. *See Hall*, 419 P.3d at 1085; *see also State v. Osborn*, 631 P.2d 187, 200 (Idaho 1981) (rejecting a challenge to HAC and acknowledging the argument that "every murder involves depravity" but relying on the ability of sentencing judges to say when the depravity involved is "exceptional"). Juries are not equipped to say what a normal murder entails. Judges are.

Even if the State were right that capital comparators are necessary, it would not mean that judges are equivalent to juries. A judge who has never decided another capital case still has access to the many Idaho Supreme Court opinions in

which death sentences were imposed.  Such a judge presumably reviews many such opinions in the course of resolving the uniquely capital issues that arise in death-penalty matters.  In the process, a judge becomes familiar with the situations in which death penalties were levied in the past.  Juries have no such benefit.  They are essentially left to their own intuitions with minimal guidance in the form of instructions that are little more than "word salad."  *Hall*, 419 P.3d at 1136 (Kidwell, J, pro tem) ("Vague words remain vague when more vague words are added.").[6]

To minimize the narrowing problem in Idaho, the State falls back on Idaho Code § 19-2827(a).  *See* Dkt. 83 at 73.  The provision requires the Idaho Supreme Court to review in every capital case whether the death sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor" and whether the evidence supports the aggravators found by the jury.  § 19-2827(a).  That first clause has nothing to do with aggravators at all, so it is neither here nor there.  And the second clause is no cure for vagueness.  One of the symptoms of vagueness is that it makes a statute so broad that all kinds of evidence could be thought to support it.  The flaw with HAC is that "an ordinary person could honestly believe

---

[6] The State intimates that Justice Kidwell's dissent is deserving of less consideration because he was sitting in a pro tem capacity at the time.  *See* Dkt. 83 at 70 n.17.  Mr. Hall is unaware of any authority that Idaho Supreme Court opinions by pro tem justices enjoy a lesser status under Idaho law.  It is a rule that would make particularly little sense with respect to Justice Kidwell, who was a full member of the court for a number of years and authored several decisions in capital cases at the time.  *See Stuart v. State*, 36 P.3d 1278 (Idaho 2001); *Sivak v. State*, 8 P.3d 636 (Idaho 2000); *McKinney v. State*, 992 P.2d 144 (Idaho 1999).  And the State itself repeatedly relies on an Idaho Supreme Court opinion that was also written by a pro tem Justice.  *See* Dkt. 83 at 22, 34, 75, 78, 79 (citing *State v. Abdullah*, 348 P.3d 1 (Idaho 2015)).

Petitioner's Reply Brief on the Merits – 27

that every unjustified, intentional taking of human life is especially heinous."
*Maynard*, 486 U.S. at 364.  Given that flaw, any piece of evidence associated with
any murder could be regarded as supportive of HAC, and thus as satisfying the
§ 19-2827(a) test.  That hardly proves that any narrowing is taking place.

The State also overestimates the extent to which § 19-2827 is performing any
tempering function.  In the forty-six years in which the statute has been in force,
the Idaho Supreme Court has used it to vacate only three death sentences.  *See*
*State v. Pratt*, 873 P.2d 800, 824 (Idaho 1993); *State v. Scroggins*, 716 P.2d 1152,
1159 (Idaho 1985); *State v. Windsor*, 716 P.2d 1182, 1193 (Idaho 1985).  As evident
from the foregoing citation, the last of those cases was decided thirty years ago.
Over the same period of time, the Idaho Supreme Court has affirmed dozens of
death sentences.  A statute of such modest and declining salience is not the reliable
constitutional backstop the State makes it out to be.

The State denies that the constitutional violation prejudiced Mr. Hall
because "the entirety of the mitigation is weighed against each individual
aggravator" and there were three others found by the jury.  Dkt. 83 at 75.  That
perspective does not adequately account for how damaging the material was that
came in through the HAC aggravator alone, including the devastating testimony of
Dr. Glenn Groben.  *See* Dkt. 75 at 54.  Any prejudicial information would naturally
have been factored into the jury's calculations at the weighing stage—where it
actually imposed a death sentence—regardless of which aggravator served as the
vehicle.  The State responds that the prosecution could have made use of the same

material as non-statutory aggravation.  *See* Dkt. 83 at 75.  But the jury was given

no guidance from the trial court on how to consider non-statutory aggravation.  *See*

*generally* A-158.  The HAC material had the official imprimatur of the trial court

because it fell under a statutory aggravator.  That made it far more damaging, and

it means that prejudice is present.

**F. The utter-disregard claim is meritorious or deserves a hearing.**

On the utter-disregard claim (Claim 38), the State repeats the same

conceptual mistake that it makes in connection with the HAC claim.  The State

chides Mr. Hall for insufficiently molding his case to the facts of *Creech* under

AEDPA.  *See* Dkt. 83 at 78.  But as the State itself recognizes, the clearly

established law upon which Mr. Hall is relying is not *Creech*, but *Maynard* and

*Godfrey*.  *See id*.  It is not the State's prerogative to choose the clearly established

law that Mr. Hall is invoking to satisfy the AEDPA test.

The State underappreciates the extent to which *Creech* was inextricably tied

to the identity of the sentencing authority as a judge rather than a jury.  As the

State observes, the *Creech* Court employed "the phrases 'sentencer' and 'sentencing

judge' interchangeably."  *Id*.  To the State's eye, that toggling back and forth

suggests that it was of no moment that the sentencer in *Creech* was a judge.  In fact,

the opposite is true.  The Supreme Court in *Creech* moved seamlessly from

"sentencer" to "sentencing judge" because they were one and the same thing there.

That is precisely why the result was tied to the judge-sentencing scheme—because

the Court had no occasion to be thinking of any other kind of scheme.

A closer examination of the *Creech* opinion's analysis supports the same conclusion.  The Court reiterated the presumption that "the *judge* knew and applied any existing narrowing construction" and stated: "We assume that legislators use words in their ordinary, everyday senses, and there is no reason to suppose that *judges* do otherwise." *Creech,* 507 U.S at 471, 472.  These interpretive maneuvers would not be possible with sentencing juries as the subject.  It would be incoherent to presume that a jury applied a narrowing construction when the record was silent, and a jury wouldn't explain its decision in writing at all.  The *Creech* Court was not using "sentencing judge" merely because that was who meted out Mr. Creech's death sentence—it was including that phrase because the reasoning of its opinion flowed from the nature of the decision-making authority.

That feature of *Creech* places it in a distinct category from *Kansas v. Carr*, 577 U.S. 108 (2016).  The State pulls from *Carr* the rule that juries in capital cases—like judges—are presumed to follow their instructions.  *See* Dkt. 83 at 80.  But the instruction at issue in *Carr* was a specific admonishment from the trial court to the jury to "give separate consideration to each defendant" in a case where two brothers were tried jointly.  *See* 577 U.S. at 124.  There is nothing about that instruction that calls for legal expertise.  A lay person is just as capable of understanding what it means to ignore one defendant while making a decision as is a judge.  It is quite a different story for the kind of deliberative process at the heart of the claim here.  Utter disregard survived *Creech* because "a sentencing judge reasonably could find that not all Idaho capital defendants are cold-blooded."  507

U.S. at 475–76.  A juror cannot begin to rationally conduct that inquiry, since she will almost certainly only sit in judgment of one murder defendant once in her life.

In his opening brief, Mr. Hall noted that in every other state where it is used apart from Idaho, "utter disregard" connotes a state of mind associated with a *less* culpable type of offense, whereas in Idaho alone it can trigger a death sentence.  *See* Dkt. 75 at 66.  The State tries to defeat the point with a quote from *Creech*, where the Court reasoned that "[t]he law has long recognized that a defendant's state of mind is not a "subjective" matter, but a *fact* to be inferred from the surrounding circumstances."  507 U.S. at 473 (emphasis in original).  But the State loses sight of what that fact signified in *Creech* itself.  *Creech* regarded utter disregard as comprehensible to a judge because the limiting instruction involved—"cold-blooded, pitiless slayer"—had one dictionary definition of essentially "without mercy."  *Id.* at 471.  However, the Court mentioned that there was another dictionary definition that used "cold-blooded" to mean premeditated.  *Id.* at 472.  Obviously, it would be a serious constitutional infirmity for a capital aggravator to be identical with the mens rea defining first-degree murder.  There is certainly no narrowing going on when the aggravator means the exact same thing as the statute defining the very pool that must be narrowed.  The *Creech* Court was untroubled by the risk in Idaho, though, because the Idaho Supreme Court was evidently using cold-blooded "in its first sense."  *Id.*  No matter what one thinks about this logic as it pertains to judge sentencing, it doesn't fit at all with juries.  The idea that twelve citizens will intuitively grasp that one definition of a key term applies and not the other one is

simply fantastical.  To reach the contrary result, one would have to believe that a juror in a capital case in Idaho sees "utter disregard" as singling out the worst of the worst while a juror in a criminal trial in Illinois, Iowa, or Maine sees it as doing the opposite.  *See* Dkt. 75 at 66.  There is no basis for such a conclusion.

Moving on to prejudice, the only point of the State's worthy of mention is that the constitutional violation on utter disregard could not have been impactful because in Idaho each aggravator is weighed against all of the collective mitigation.  *See* Dkt. 83 at 81–82.  Although the State accurately summarizes how Idaho's scheme is *supposed* to work, it does not reflect what the prosecutor told the jurors.  He indicated to them "that all the aggravators should be considered collectively against all the mitigation evidence—in direct conflict with the weighing directed by" the statute.  *Hall*, 419 P.3d at 1106, 1107.  It is inappropriate for the State to now rely on the rigors of Idaho's scheme in defending the death sentence when the State improperly reduced its burden to obtain the death sentence in the first place.  The State should have to live with the formulation that it used to its great benefit at trial.  Under that formulation, the invalidity of a single aggravator quite easily destabilizes the death sentence, and that is what transpired here.

**G. The propensity claim is meritorious or deserves a hearing.**

In regard to the propensity claim (Claim 39), the State charges Mr. Hall with "attempting to dissect words and phrases from the limiting instruction, instead of examining it as a whole."  Dkt. 83 at 84.  Mr. Hall does not dispute the principle that the instruction must be considered in its entirety.  That does not mean,

however, that the State can simply white out the most problematic language in the instruction.  "In order for a person to have a propensity to commit murder," the jury was advised, "the person must be a willing, predisposed killer, a killer who tends toward destroying the life of another, one who kills with *less than the normal amount of provocation*."  A-158 at Instruction 46.  The Court thereby communicated to the jury that propensity was defined with reference to the average first-degree murder.  Yet a jury has no idea what amount of provocation is involved in the average first-degree murder.  Following the State's proper holistic analysis, no other aspect of Instruction 46 contradicted the unconstitutional language.

The authorities cited by the State for its holistic approach do not support the outcome it lobbies for.  In *Devier v. Zant*, 3 F.3d 1445, 1463–64 (11th Cir. 1993), the Eleventh Circuit rejected the petitioner's assertion that the instructions gave the jury "unbridled discretion" with respect to the death penalty, despite some language to that effect, because there was also specific language explaining how to weigh mitigation and aggravation.  That is dissimilar from Mr. Hall's case, where nothing in Instruction 46 was inconsistent with the "normal amount of provocation" language.  The State's other citation on this point actually helps Mr. Hall.  There, the Eleventh Circuit set aside a death sentence because "[t]he jury was [then] instructed if an aggravating circumstance was found the form of [its] verdict *would be* death."  *Moore v. Kemp*, 809 F.2d 702, 733 (11th Cir. 1987).  Even though the instructions included some other passages in tension with that one, they fell "far short of providing clear and explicit information to the jury that it had the option

not to recommend a sentence of death." *Id.* Just so in Mr. Hall's case—the jury was encouraged to conduct a comparative exercise without any reference points, and there was nothing "clear and explicit" to cure the error.

It is the State's impression that there is no "basis for concluding a judge can determine what constitutes a 'normal amount of provocation' any better than a juror." Dkt. 83 at 86. Common sense counsels otherwise. A judge presiding over a capital case is a judge whose job involves handling other murder prosecutions as well. That is plainly not the case for jurors. *See Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (plurality op.) (commenting that experienced trial judges impose sentences daily, whereas jurors "may never . . . have made a sentencing decision" and as a result may weigh aggravators in a fashion that generates "unpredictable and inconsistent results"); *accord Hall*, 419 P.3d at 1139 (Kidwell, J., pro tem) ("Because of the lack of experience, jurors need specific and detailed guidance on which murderers should receive the death penalty as opposed to only life in prison" and "[t]he aggravators in Idaho do not provide such guidance, and result in the arbitrary, capricious and unconstitutional imposition of the death penalty."). The State is comforted by the sentence in the instruction characterizing propensity with reference to "a proclivity, a susceptibility, and even an affinity toward committing the act of murder." Dkt. 83 at 87. However, reviewing the instruction as a whole, a reasonable juror would understand those terms as explaining how to *tell* that there is "less than the normal amount of provocation," A-158 at Instruction 46, and the comparison problem therefore persists.

The State is likewise unable to save the Idaho Supreme Court's approach from overbreadth.  In the consolidated appeal, the state high court labored to differentiate propensity on the ground of the distinction between "a person predisposed to killing from a person who happens to kill in a fit of passion." *Hall*, 419 P.3d at 1085.  As Mr. Hall has established, that latter category constitutes textbook manslaughter.  *See* Idaho Code § 18-4006 (defining voluntary manslaughter as occurring "upon a sudden quarrel or heat of passion").  The State's only response is a perfunctory assertion that "the limiting instruction is much more than a distinction between murder and voluntary manslaughter."  Dkt. 83 at 85.  Tellingly, the State does not engage with the fact that the Idaho Supreme Court has gone out of its way to define propensity in terms that are synonymous with first-degree murder.  The State's unexplained ipse dixit does not change that reality.

With no binding precedent to help its cause, the State presses upon this Court its own prior decisions in *Beam v. Paskett*, 744 F. Supp. 958 (D. Idaho 1990), and *Creech v. Hardison*, No. CV 99-224, 2010 WL 1338126 (D. Idaho Mar. 31, 2010).  The State is unsatisfied by Mr. Hall's level of engagement with the decisions.  *See* Dkt. 83 at 86.  It apparently escaped the State's notice that Mr. Hall distinguished the Court's previous orders on the issue on the basis that they "dealt with judge sentencing."  Dkt. 75 at 72.  That is the crucial distinction running throughout Mr. Hall's aggravator claims.

Mr. Hall explored in his opening brief the constitutional complications caused when a general standard of proof (reasonable doubt) is layered on top of an

aggravator that carries its own separate standard of proof ("probably" or "more likely than not").  *See* Dkt. 75 at 74.  The State is sanguine about the resulting difficulties, but it does not wrestle with the core problem.  *See* Dkt. 83 at 87. Mostly, the State just recites the places in which the reasonable-doubt test was reiterated to the jury in connection with aggravators.  *See id.*  If anything, those passages only exacerbated the violation.  Each time reasonable doubt appeared, it reminded the jury that they were applying *both* that standard *and* the more-likely-than-not standard, which is what creates the constitutional violation.  Additionally, the State's citations do not dispose of the claim.  Although the Supreme Court has rejected challenges to future dangerousness that were based on the difficulty of forming "a predictive judgment," *id.*, it has not done so with respect to Mr. Hall's theory, which relates instead to the reduction in the standard of proof caused when one test is projected on another.  *See Tuilaepa v. California*, 512 U.S. 967, 976–77 (1994) (finding that Texas's future-dangerousness requirement was "not vague"); *Jurek v. Texas*, 428 U.S. 262, 274 (1976) ("The fact that [the future dangerousness determination] is difficult . . . does not mean that it cannot be made.").

In terms of the double-counting aspect of the claim, the State takes aim at Mr. Hall's proposed standard of review.  Mr. Hall advocated for a de novo standard because the Idaho Supreme Court did not address the argument in its opinion.  *See* Dkt. 75 at 74.  The State disagrees, positing that Mr. Hall's "burden still must be met by showing there was no reasonable basis for the state court to deny relief." Dkt. 83 at 88.  It is the State's preference that the test from *Harrington v. Richter*,

562 U.S. 86, 105 (2011) be followed, under which a summary disposition receives AEDPA deference and "[t]he question is whether there is any reasonable argument" to support the disposition.  Both parties rely upon *Johnson v. Williams*, 568 U.S. 289 (2013).  *See* Dkt. 75 at 74; Dkt. 83 at 88.  Mr. Hall has the better reading.

In *Johnson*, the question was whether the *Richter* test applied to a Sixth Amendment claim that was intertwined with a juror challenge based on state law. *See* 568 U.S. at 293–98.  The Supreme Court applied the presumption that the California state judiciary addressed the Sixth Amendment issue on the merits and thus that AEDPA deference was due.  *See id.* at 298–303.  But the *Johnson* Court's reasoning for doing so was closely tied to the context, in which a state-law issue and a federal-constitutional issue were presented in a single package.  The Court's first reason for invoking *Richter* was that "there are circumstances in which a line of state precedent is viewed as fully incorporating a related federal constitutional right."  *Id.* at 298.  Its second reason was that "a state court may not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim."  *Id.* at 299.

Neither reason bears on Mr. Hall's situation.  Mr. Hall did not argue a state-law issue along with a closely related federal issue.  He asserted *first* that the propensity aggravator "unconstitutionally lower[ed] the State's burden of proving this aggravating circumstance beyond a reasonable doubt" under the Due Process Clause, *Ring v. Arizona*, 536 U.S. 584 (2002), and *In re Winship*, 397 U.S. 358 (1970).  *See* D-24 at 57.  And he argued *second* that "[t]his instruction does not

distinguish this aggravator from the HAC aggravator" and that it therefore flunked the U.S. Supreme Court's Eighth Amendment narrowing test. *Id*. at 58. The Idaho Supreme Court directly addressed the narrowing issue and said nothing about reasonable doubt. *See Hall*, 419 P.3d at 1085. This is therefore, as a categorical matter, not a situation in which it would ever be logical to assume that an entirely distinct claim, relying on an entirely distinct body of law, was addressed on the merits. The presumption of merits adjudication should not be applied. Alternatively, and for similar reasons, if the Court does apply the presumption, it should find it rebutted on the ground that the Idaho Supreme Court did under the circumstances presented here "overlook[] . . . [the] federal claim[s]," *Johnson*, 568 U.S. at 306, and de novo review is appropriate.

On the substance of the issue, the State construes *Jones v. United States*, 527 U.S. 373 (1999) as rejecting Mr. Hall's double-counting theory. *See* Dkt. 83 at 88. In a footnote, though, the State essentially concedes that its own take on *Jones* has been rebuffed by the Ninth Circuit in *Allen v. Woodford*, 395 F.3d 979 (9th Cir. 2005). *See* Dkt. 83 at 89 n.19. The State's desire to see *Allen* "reexamined," *id.*, must therefore wait until an en banc proceeding at the Ninth Circuit. *Allen*'s role here is made even more central by the governing de novo standard, since without AEDPA deference there is no requirement of clearly established *Supreme Court* law and the precedent can instead come from the Ninth Circuit. *See Burton v. Davis*, 816 F.3d 1132, 1142 (9th Cir. 2016).

Petitioner's Reply Brief on the Merits – 38

**H. The felony-murder claim is meritorious or deserves a hearing.**

Closing with the felony-murder claim (Claim 40), the State urges the Court to view the issue through the lens of "double deference."  Dkt. 83 at 93.  The State's citation is to *Cullen v. Pinholster*, 563 U.S. 170 (2011).  *See* Dkt. 83 at 93.  Double deference was afforded in *Pinholster* to an AEDPA claim alleging ineffective assistance of counsel.  *See* 563 U.S. at 190.  The reason was that deference applied both to counsel's decision-making process and to the state courts' judgments.  *See id*.  That logic is inapplicable to Claim 40.  The State feels deference is called for here both under *Tuilaepa* because of the type of claim at bar and separately under AEDPA.  *See* Dkt. 83 at 93.  In *Tuilaepa*, the Supreme Court stated that vagueness challenges to capital aggravators are subject to deferential review because the area of law was "not susceptible of mathematical precision."  512 U.S. at 974.  That is a kind of deference that is essentially directed at the state-court judgment under consideration, since it is ultimately the state courts who upheld the death sentence before federal habeas proceedings.  Such a species of deference has been supplanted by AEDPA, which did not exist at the time *Tuilaepa* was decided.  *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (explaining that AEDPA directs the federal judiciary to the state courts' dispositions "and [to] give[s] appropriate deference to [those] decision[s]").  There is only one sort of deference applicable here, unlike in *Pinholster*, and it is the standard AEDPA variety.

The Idaho Supreme Court's decision does not withstand even that deferential level of scrutiny, and the State's protestations to the contrary are insubstantial.

First, the State misidentifies the denominator in the narrowing calculus. The State is satisfied that "not every murderer is eligible for the death penalty because death cannot be imposed for anyone convicted of *second*-degree murder." Dkt. 83 at 93. Second-degree murder is a red herring. While weighing an overbreadth challenge against Idaho's capital scheme in particular, the U.S. Supreme Court made it clear that the pool from which narrowing must be accomplished is "the category of *first*-degree murderers." *Creech*, 507 U.S. at 475. In the most significant passage for present purposes, the Court paused at the possibility that "[a] sentencing judge might conclude that every first-degree murderer" could be found guilty of utter disregard. *Id.* "[H]owever," the Court was persuaded to uphold the aggravator "because some within the broad class of *first*-degree murderers do" reflect the requisite traits. *Id.* at 476. That is to say, the aggravator would have fallen if it had proven itself unable to differentiate *within* first-degree murder convicts. None of the Supreme Court's narrowing cases rely on the distinction between first- and second-degree murder, including the several such decisions cited here, such as *Maynard*, *Godfrey*, *Tuilaepa*, *Lowenfield*, and *Zant*.

The State provides no countervailing authority and its silence is unsurprising. If the distinction between first- and second-degree murder mattered for narrowing purposes, it would mean that a state could automatically impose the death penalty on every defendant convicted of first-degree murder. That arrangement has been unconstitutional for almost fifty years. *See generally Woodson v. North Carolina*, 428 U.S. 280 (1976). Narrowing must take place *within*

the class of defendants eligible for capital punishment.  *See Creech*, 507 U.S. at 474 ("If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm.").  It is jurisprudentially incoherent to claim a single population (first-degree murderers) as both the eligibility criterion and as the narrowing mechanism.

At a higher level of abstraction, the State is in error when it parrots the Idaho Supreme Court's view that the statutes defining murder perform any of the narrowing function required by the Eighth Amendment.  As noted above, the U.S. Supreme Court correctly perceived Idaho as attempting to accomplish that narrowing through its aggravators and not through its statutes laying out the elements of murder.  This Court has shared the same perception.  *See Hoffman v. Arave*, 73 F. Supp. 2d 1192, 1197 (D. Idaho 1998) (prefacing a discussion on this subject with the comment that the Idaho "legislature has attempted to satisfy the [narrowing] requirements of the Eighth and Fourteenth Amendment through the adoption of I.C. § 19-2515," which "attempts to channel the sentencer's discretion by requiring that the sentencing judge, after receiving evidence and argument in aggravation and mitigation, not impose a sentence of death unless at least one of the ten statutorily-identified aggravating circumstances is found to exist"), *rev'd in part on unrelated grounds*, 236 F.3d 523 (9th Cir. 2001).  So far as Mr. Hall is aware, there is also a consensus in the legal academy that Idaho is in the aggravator-narrowing camp rather than the murder-definition-narrowing camp. *See, e.g.*, Aliza Cover, *Narrowing Death Eligibility in Idaho: An Empirical and*

*Constitutional Analysis*, 57 Idaho L. Rev. 559, 567 (2021) ("Some states, like Louisiana, attempt to narrow death eligibility through the first-degree murder statute itself.  Idaho has not taken this approach."); William J. Bowers, *The Capital Jury Project: Rationale, Design, and Preview of Early Findings*, 70 Ind. L.J. 1043, 1049 (1995) (listing only California, Louisiana, Texas, and Virginia as adopting the definitional approach to narrowing); Gregory Michael Stein, *Distinguishing Among Murders When Assessing the Proportionality of the Death Penalty*, 85 Colum. L. Rev. 1786, 1790 & n.27 (1985) (similar).

Apart from the state supreme court and the Attorney General, it would seem that every observer has found that Idaho narrows through aggravators and not through its statutes delineating the offense of murder.  This is the paradigmatic situation in which "there is no possibility fairminded jurists could disagree," *Waidla v. Davis*, 68 F.4th 575, 585 (9th Cir. 2023), and § 2254(d) is therefore satisfied.

The State hangs its hat on the fact that "the felony-murder aggravator applies only to a subclass of defendants convicted of murder."  Dkt. 83 at 94.  Conveniently, the State avoids the question of what separates this subclass from the rest.  To be constitutional, the distinguishing factor would have to be something aggravating.  *See Zant*, 462 U.S. at 877 & n.15 (describing how an aggravator scheme is constitutional if it "justif[ies] the imposition of a *more severe sentence* on the defendant" such that "only the worst criminals or the criminals who commit the worst crimes are selected for this punishment"); *accord Roper v. Simmons*, 543 U.S. 551, 568 (2005) (limiting capital punishment "to those offenders who commit a

narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution").

A felony murderer is not categorically more culpable than a premeditated murderer.  The opposite is true.  A felony-murderer need not have a specific intent to kill, *see Scroggins*, 716 P.2d at 1158, as opposed to a premeditated murderer.  Mr. Hall grants the State's point that the pool of felony-murderers eligible for death in Idaho has been further limited by the Supreme Court in *Tison v. Arizona*, 481 U.S. 137, 158 (1987), to those who at least acted in reckless disregard to life.  *See* Dkt. 83 at 95.  Still, someone acting recklessly is plainly not as culpable as someone killing willfully.  Nor does the "intent necessary to prove the underlying felony" alter the bottom line.  *Id*.  An intent to commit an arson or a robbery, for example, is obviously not as egregious standing alone as the intent to end a fellow human being's life.  Simply put, felony-murder certainly constitutes a subclass, but it is not a more aggravated one, and it therefore does not satisfy the Supreme Court's narrowing requirement.  *See Loving v. United States*, 517 U.S. 748, 755 (1996) (announcing that additional aggravating factors were necessary to save a capital scheme where it permitted death sentences for premeditated and felony murder and excluded lesser types of murder); *McConnell v. State*, 102 P.3d 606, 623 (Nev. 2004) (per curiam) (en banc) (rejecting the State's argument here because it "does little more than state the minimum constitutional requirement to impose death for felony murder"); *State v. Middlebrooks*, 840 S.W.2d 317, 345 (Tenn. 1992) ("A simple felony murder unaccompanied by any other aggravating factor is not worse than a simple,

premeditated, and deliberate murder."), *superseded by statute on unrelated grounds as stated in State v. Miller*, 638 S.W.3d 136, 164 (Tenn. 2021).

Stepping back, the State also conducts the wrong comparative test.  It maintains that "there is a vast number of murders that would not constitute first-degree murder just because they were committed during the perpetration of a felony." Dkt. 83 at 94.  The State's framework would make sense if the question here had to do with whether felony-murder as an offense adequately narrowed the pool of other types of murders.  Of course, that is not the question here.  Rather, the issue at bar is whether the felony-murder aggravator "genuinely narrow[s] the death eligibility of *felony murderers*." *McConnell*, 102 P.3d at 624.  Thus, it is completely inconsequential that a death resulting from a theft, for example—*see* Dkt. 83 at 94—would not qualify as a felony-murder offense.  Such a death would not qualify for the felony-murder *aggravator* either.

To ascertain whether the requisite constitutional narrowing is taking place, the comparison to make is between felony-murder as an offense and felony-murder as an aggravator.  Such a comparison reveals that the two are nearly identical. *Compare* Idaho Code § 18-4003(d) (2000) (defining felony-murder as an offense with reference to the underlying crimes of "aggravated battery on a child . . . , arson, rape, robbery, burglary, kidnapping or mayhem"), *with* Idaho Code § 19-2515(9)(g) (2000) (enumerating the felony-murder aggravator, which included as the underlying offenses "arson, rape, robbery, burglary, kidnapping or mayhem").  The only difference is that felony murder as an offense included battery on a child and

felony murder as an aggravator did not.  That slight deviation hardly supplies a "principled basis" to "distinguish those who deserve capital punishment from those who do not."  *Creech*, 507 U.S. at 474.  With the proper pool in mind, it is plain that the aggravator is accomplishing no narrowing whatsoever.

The Idaho Supreme Court eviscerated the narrowing requirement in a similar fashion.  It held that the felony-murder aggravator "may apply to many murders, but it certainly does not apply to *every* first-degree murder."  *Hall*, 419 P.3d at 1086 (emphasis in original).  According to the opinion on consolidated appeal, that "is all the narrowing required by" the U.S. Supreme Court.  *Id.* However, the U.S. Supreme Court has not itself characterized narrowing as such an academic exercise.  To the contrary, it has explained that "[t]he use of aggravating circumstances is not an end in itself, but a means of *genuinely* narrowing the class of death-eligible persons and thereby channeling the jury's discretion."  *Lowenfield*, 484 U.S. at 244.  Standing alone, the fact that one can imagine a first-degree murder that does not satisfy the aggravator hardly shows that this genuine narrowing is taking place.  For it does not show that the aggravator "*reasonably* justif[ies] the imposition of a more severe sentence on the defendant compared to others found guilty of murder."  *Zant*, 462 U.S. at 874.  The U.S. Supreme Court's test is designed to accomplish the critical task of ensuring that only the worst of the worst are sentenced to death.  By contrast, the Idaho Supreme Court's test is designed to allow for a rubber-stamp of constitutional approval to be placed on a death-penalty system based on the flimsiest of distinctions and the most

hypothetical of scenarios.  The latter is not a reasonable application of the former, and § 2254(d)(1) is therefore satisfied.

## IV.   Cumulative error is properly addressed now and it is present.

Consistent with binding Ninth Circuit precedent, Mr. Hall examined in his opening brief how prejudice from the claims sub judice collectively mandate relief, even if they do not do so individually.  *See* Dkt. 75 at 86–92.  The State refuses to speak on the subject, on the ground that cumulative-error is absent from the stipulated list of claims set for merits briefing.  *See* Dkt. 83 at 4.  Contrary to the State's supposition, "the evaluation of cumulative error is *inherent* in the analysis, regardless of whether Petitioner has included a separate claim regarding cumulative error."  *Cox v. Woodford*, No. CV 92-3370, 2002 WL 35649460, at *7 (C.D. Cal. Aug. 26, 2002).  It would not have made sense for the parties to stipulate to briefing on the claims of cumulative error pled in the habeas petition.  *See* Dkt. 39 at 44, 120.  Obviously, those claims were not fully "decided on the merits in state court." Dkt. 56 at 6.  Rather, they encompass *all* of the claims in the petition as a whole, which includes a number of unexhausted issues.  *See* Dkt. 39 at 44, 120. Nevertheless, that doesn't change the fact that a legally correct analysis of the eight pending claims must take into account whether "the combined effect of these errors . . . had a substantial and injurious effect or influence on the jury's verdict." *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007).

The State characterizes as "nonsensical" the proposition that the Court must both weigh the cumulative error associated with the briefed claims now, as well as

the cumulative error associated with every claim considered on the merits before the case is fully resolved.  Dkt. 83 at 96.  Nonetheless, that redundancy is the inevitable consequence of the litigation track chosen by the Court.  That is, if certain claims receive merits rulings at the outset, then cumulative prejudice has to be analyzed in connection with them.  And if other claims are later also found subject to merits consideration down the road, as the Court's plan allows for, then a separate cumulative-error inquiry is necessary for all of the claims subject to merits review.  The State may not prefer the Court's method (and Mr. Hall doesn't either), but that ship has sailed.  Whenever merits review takes place, it carries with it cumulative error.  The State's view is essentially that the Court ought to weigh each briefed claim in isolation, despite the Ninth Circuit's clear declaration that "a collection of errors might violate a defendant's constitutional rights."  *Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2004).  That would be a recipe for reversal.

On the substance of cumulative error, the State's only contribution to the debate is to assert in a perfunctory aside that the Attorney General disputes the methodology and the conclusions of the law review article that Mr. Hall relied on for his discussion of Idaho's overbroad scheme of aggravating circumstances.  *See* Dkt. 83 at 97.  Because the State does not clarify *why* either the methodology or the conclusions are deficient, it has forfeited any such position—or at the very least conceded the propriety of an evidentiary hearing on the issue.  *See Hidalgo v. Arizona*, 138 S. Ct. 1054, 1056–57 (2018) (Breyer, J., regarding the denial of certiorari) (expressing interest in reviewing a challenge to Arizona's death-penalty

scheme on narrowing grounds similar to the criticism articulated in Professor Cover's article but stressing the importance of allowing the record to be developed through an evidentiary record).

Moreover, the State's perception that overbreadth is irrelevant here is mistaken. Two of the aggravator challenges at issue now are for vagueness, one is for arbitrariness, and the last is based on narrowing. *See* Dkt. 83 at 49–85. All of these claims turn in large measure on the core idea that the Constitution demands a "principled basis" for "distinguish[ing] those who deserve capital punishment from those who do not." *Creech*, 507 U.S. at 474 . The State has no authority or explanation as to why the Court should blind itself to the big-picture problems with Idaho's patently overbroad scheme while it takes up the closely related question of whether each aggravating circumstance in Mr. Hall's case adequately accomplishes its narrowing function.

## V.   The Court should address—and grant—a COA.

In his opening brief, Mr. Hall suggested that the Court consider now whether COAs were merited for any of the claims under review, while the pertinent issues are fresh in its mind. *See* Dkt. 75 at 92–93. The State disagrees in a conclusory footnote, where it writes that "this is not the proper juncture for discussion regarding a COA." Dkt. 83 at 96 n.20. It is unclear to Mr. Hall why the State believes that to be so. What could be a more "proper juncture" to consider whether "jurists of reason would find [an issue] debatable," *Slack v. McDaniel*, 529 U.S. 473, 478 (2000), than when the Court is reviewing the merits of the same claim? Why is

it a more "proper juncture" to answer that question ten or fifteen or twenty years in the future, as the State implies, long after the Court has moved on to other claims?

Mr. Hall also does not understand the State's feeling that a COA determination now "results in piece-meal litigation that unnecessarily delays final resolution of capital cases." Dkt. 83 at 96 n.20. It is no more "piece-meal" for a COA section to be tacked on to the end of an order issued in, say, 2040 on the final disposition of the habeas petition as it is for the same section to be tacked on to the end of an order now. As for delay, it would presumably be more time-consuming for the Court to try to look back at the claims in a number of years, after personnel changes and extensive litigation in the interim, than it would be for the Court to pose the straightforward inquiry of how strong the claims are now, when they are actually being reviewed.

Lastly, because the State has decided that it "will not address" the COA issue, Dkt. 83 at 96 n.20, it has effectively conceded the matter, and any denied claims should be certified.

## VI.   Conclusion

For the reasons stated here and in the opening brief, Mr. Hall respectfully asks for the forms of relief he spelled out earlier. *See* Dkt. 75 at 93.

Respectfully submitted this 26th day of July 2023.

/s/ Jonah J. Horwitz
Jonah J. Horwitz
Christopher M. Sanchez

Attorneys for Petitioner

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of July 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which is designed to send a Notice of Electronic Filing to persons including the following:

L. Lamont Anderson
Lamont.anderson@ag.idaho.gov

/s/ Julie Hill
Julie Hill